## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| Plaintiff | § | |
| v. | § | Civil Action No. 3:CV-11-0138-P |
| | § | |
| CACHE, INC. | § | |
| Defendant | § | |

## TABLE OF CONTENTS

**TITLE**                                                             **PAGE**

I. INTRODUCTION ...................................................................................1

II. GROUNDS FOR SUMMARY JUDGMENT...............................................2

III. STATEMENT OF UNCONTROVERTED FACTS ......................................3

IV. ARGUMENT AND AUTHORITIES.........................................................14

IV(a). TITLE VII DISTRICTION AND RETALIATION CLAIMS.....................14

   A. THE BURDEN SHIFTING ANALYSIS................................................14

   B. THE RACE DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW..........15

      1. Plaintiff fails to meet her *prima face* elements of a race discrimination claim.....15
      2. Plaintiff fails to show pretext for race discrimination ...........................................17

   C. THE RETALIATION CLAIM FAILS AS A MATTER OF LAW ..........................18

      1. Plaintiff cannot establish a caused connection ....................................................18
      2. Plaintiff fails to show pretext for retaliation for engaging in protected activity ...19

IV(b). FMLA CLAIMS .........................................................................................19

   A. NO INTERFERENCE WITH FMLA RIGHTS.......................................................19

      1. King not entitled to FMLA leave because she did not have a serious health
         condition ..........................................................................................................20

      2. King's position was not changed so her FMLA claim fails as a matter of law.....22

B. KING'S FMLA RETALLATION CLAIM ALSO FAILS
AS A MATTER OF LAW ...................................................................................23

1. King not protected under the FMLA ...................................................23
2. Defendant's reasons for termination were not pretextual .......................................24

V. CONCLUSION ...............................................................................................................24

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE</u>

*AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex.2008)......................................15

*Bauer v. Albemarle Corp.,* 169 F.3d 962, 967 (5th Cir. 1999) ...................................17

*Belgrave v. City of New York,* 1999 WL 692034, at *43 (E.D.N.Y. Aug.31, 1999) ...............20

*Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358, 360 (5th Cir.2004) ........................................15

*Burlington Northern & Santa Fe Railway Co. v. White,* (2006)..............................................15

*Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 353 (5th Cir.2001)...........................15

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).........................................................14

*EEOC v. SunDance Rehab. Corp.,* 466 F. 3d 490 ( 6th Cir. 2006) ........................................18

*Grant v. Specialty Hospital-South Dallas,* 2010 WL 3606029
     (N.D.Tex. Sept. 2010).........................................................................................23

*Harris-Childs v. Medco Health Solutions, Inc.,* No. 2005 WL 562720, at *6
     (N.D.Tex. Mar 10, 2005), *aff'd,* 169 Fed. Appx. 913 (5th Cir.2006)...............................15

*Hoppens v. Gen. Nutrition Ctr.,* 129 F.3d 608, 608 (5th Cir.1997).........................................23

*Lawrence v. Univ. of Tex. Med. Branch at Galveston,* 163 F.3d 309, 311 (5th Cir.1999)......15

*Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir. 1991)...........................................16

*Lockhart v. Home Interiors & Gifts, Inc.,* 2006 WL 887387, at *6
     (E.D. Tex. Mar. 29, 2006)...................................................................................21

*Lynch v. Baylor University Medical Center,* 2006 WL 2456494 (N/D. Tex) ........................18

*McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir.2007).............................................18

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, (1973) .....................................................14

*Oyoke v. The University of Tex. Houston Health Sci Ctr,* 245 F.3d 507, 513
     (5th Cir. 2001) .................................................................................................15

*Patrick v. Ridge,* 394 F.3d 311, 317 (5th Cir.2004)..............................................................15

**CASES**                                                                                          **PAGE**

*Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001) ....................................15

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)........................................17

*Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002)........................................................17

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) ...................................15

*Richardson v. Monitronics Int'l, Inc.,* 434 F.3d 327, 332 (5th Cir.2005) ...............................23

*Rutherford v. Harris County,* 197 F.3d 173, 184 (5th Cir. 1999)............................................16

*Schimek v. MCI, Inc.,* 2006 WL 2252034, at *11 (N.D.Tex. Aug.7, 2006) ............................20

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ..............................................................................14

*Smith v. Xerox Corp.,* 602 F.3d 320 (5th Cir.2010)................................................................18

*Stewart v. Miss. Transp. Comm'n,* 586 F.3d 321, 331 (5th Cir.2009) ....................................18

*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 257 (1981) .........................................15

*Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir.2000) .........................................................15


**STATUTES**                                                                                       **PAGE**

29 U.S.C. § 2611(11) ................................................................................................................20

29 U.S.C. § 2612(a)(1)(D) ........................................................................................................20

29 U.S.C. § 2612(6) ..................................................................................................................20

29 U.S.C. § 2614(a)(1) ..............................................................................................................21

29 U.S.C. § 2614(a)(2) ..............................................................................................................22

29. U.S.C. § 2614(a)(3)(B) ........................................................................................................21

**REGULATIONS**                                                                                    **PAGE**

29 CFR §§ 825.115 ....................................................................................................................20

29 C.F.R. §§ 825.302-.303..........................................................................................................20

RULES                                                                            PAGE

FED. R. CIV. P. 56(c) ...............................................................................................14

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| LACHICA KING | § | |
| Plaintiff | § | |
| v. | § | Civil Action No. 3:CV-11-0138-P |
| | § | |
| CACHE, INC. | § | |
| Defendant | § | |

## DEFENDANT CACHE, INC.'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant, CACHE, INC. ("Defendant" or "Cache"), and moves the Court for entry of Summary Judgment in the above-styled matter pursuant to Rule 56 of Federal Rules of Civil Procedure. In support of Defendant's Motion for Summary Judgment, Defendant contemporaneously files its Brief in Support of Defendant's Motion for Summary Judgment and Appendix incorporating evidence that supports Defendant's Motion for Summary Judgment.[1] Defendant shows the Court as follows:

## I. INTRODUCTION

1.    Plaintiff is LaChica King ("Plaintiff" or "King"); Defendant is Cache, Inc. ("Cache").

2.    On December 10, 2010, Plaintiff sued Defendant in state district court for race discrimination and retaliation for allegedly engaging in protected activity, and Defendant removed the case to this court.

---

[1] Citations to summary judgment evidence in the Appendix are referenced as "App" followed by the relevant page numbers. For the court's convenience, evidence is further identified with references as follows: (1) excerpts from Plaintiff's deposition is referenced as "King" followed by the page and line numbers, and, if applicable, deposition exhibit numbers (denoted in the Appendix as Exhibit I); (2) evidence produced in discovery is referenced by Bates' Number (denoted in the Appendix as Exhibit II); (3) evidence contained in declarations are referenced by initials of the declarant followed by the relevant paragraph number, and, if applicable, attached exhibit numbers (denoted in the Appendix as Exhibits III, IV, V and VI). Referenced audio recordings are contained on a CD attached to counsel's declaration, and each recording is referenced by the Appendix page number of the envelope containing the CD followed by the VN number of the recordings and its date. The EFC filing contains a copy of the envelope in which the CD is contained, and the CD is included in the Court's copy sent by U.S. mail.

3.     On May 8, 2011, Defendant filed its First Amended Answer and pled the affirmative defenses of after-acquired evidence and failure to mitigate damages.

4.     On July 12, 2011, Plaintiff added claims under the Family & Medical Leave Act, and on July 18, 2011, Defendant filed its Second Amended Answer in response to Plaintiff's new claims.

5.     Defendant files its Motion for Summary Judgment, and this supporting Brief, on all of Plaintiff's claims. Summary judgment should be granted because there is no genuine issue of material fact on at least one element of each of Plaintiff's claims.

## II. GROUNDS FOR SUMMARY JUDGMENT

6.     Defendant seeks summary judgment on Plaintiff's discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, ("Title VII"), 42 U.S.C. Section 1981 ("Section 1981"), and the Texas Commission on Human Rights Act, Tex. Lab. Code §21.051 ("TCHRA") by showing there is no genuine issue of material fact as to each of the following elements of Plaintiff's claims:[2]

> (1) No employee outside Plaintiff's protected class was retained or was treated differently under circumstances nearly identical to hers.

> (2) Defendant's reasons for terminating Plaintiff were not pretext for race discrimination.

> (3) No causal connection exists between Plaintiff's alleged protected activity and her termination.

> (4) Defendant's reasons for Plaintiff's termination were not a pretext for retaliation for allegedly engaging in protected activity.

---

[2] King did not plead hostile environment/harassment claims based on her race, African American, but to the extent her pleadings may be construed as raising such claims, King cannot meet the elements required to prove such claims. There is no genuine issue of material fact as to each of the following elements of a racially hostile environment claim, if such claim is raised: (1) Plaintiff was not subjected to unwelcome harassment; (2) any harassment Plaintiff may allege was not based on her race; and (3) any harassment Plaintiff may allege did not affect a term, condition, or privilege of her employment.

7.      Defendant seeks summary judgment on Plaintiff's claims under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§2601-2654, by showing there is no genuine issue of material fact as to each of the following elements of Plaintiff's claims:

(1) Plaintiff was not entitled to FMLA leave since she did not have a serious health condition as defined under the FMLA and/or she did not request FMLA leave.

(2) Plaintiff was never denied benefits under the FMLA, even had she been entitled to FMLA leave, since she was restored to the same position she held before her absence.

(3) Defendant's reasons for terminating Plaintiff were not a pretext for retaliation, motivated by Plaintiff's request for leave under the FMLA, or by Plaintiff's absence due to injury.

## III. <u>STATEMENT OF UNCONTROVERTED FACTS</u>

8.      Cache is a retail clothing chain selling women's clothing nationwide with its corporate headquarters located in New York. Defendant King, who is African American, was recruited by Carol Keeler, ("Keeler"), the Store Manager of Cache Store No. 246, in Arlington, Texas, and hired as the full time Assistant Manager, at the end of June 2008. App1-3(King12:11-14:23); App192(MH1-2); App202(CK2). Mareatha Hornsby, ("Hornsby") was the District Manager for the district that included Store No. 246 from July 2008, through the end of King's employment, and is the person who made the decision to terminate King. App192, 196(MH1-2, 34).

9.      Store No. 246 was a low volume store, therefore, one of the managers generally opened and worked alone until around 1:00 pm, and, from then until closing, the store was generally staffed by only two employees, at least one being a manager. App192(MH3). The store was generally open seven days a week, but King asked for Sundays off and Tuesday evenings off, for church attendance, and was granted her request. App192(MH3). As a full time Assistant Manager, King was nonetheless expected to work 30 hours a week to maintain full time status.[3]

---

[3] King received an Employee Handbook which explains that full time classification is working an average of no less than 30 hours a week. King signed an acknowledgement stating that she agreed to read the Handbook and abide by

App168, 171-91(MC2(EXA)); App192(MH4). No full time employee was entitled to work more than 30 hours a week. App168(MC2).

10.     All employees are expected to comply with the policies and procedures in Cache's Employee Handbook. App168(MC3).  Managers and assistant managers, including King, were also expected to read, comply with and enforce Cache's operational policies and procedures contained in an in-store binder and on Cache's intranet and to foster a cohesive, team-oriented environment.[4] App168(MC3); App192,197(MH5(EXA)). As an Assistant Manager, King had shifts where she was responsible for opening and closing the store and, therefore, held a set of Cache's store keys to use for Cache's benefit. App193(MH6).

11.     During the entire period of King's employment from June 2008 through March 26, 2010, Defendant's security policy prohibited its employees from having their personal cell phones on the sales floor and also required that the cell phones be turned off during working hours, even though the cell phones were stored off the sales floor. App193(MH7).  The "no cell phone rule" was contained in the operational in-store binder and on Defendant's intranet website. All managers, including King, were required to read, comply with and enforce the operational policies and procedures, which included the rule against cell phone use. App193(MH8(EXB)).

12.     About a year after King began employment with Cache, in May 2009, Keeler reinforced the importance of managers following and enforcing certain policies by drafting a list that included the "no cell phone rule." April Baker (sometimes hereinafter referenced as "Baker") was the Co-Manager, and she and King both signed the list. App202, 205(CK3-4(EXA)).

---

its policies and procedures. App3-4(King14:24-15:15); App141(Cache000032). Although King testified that she did not read the entire Employee Handbook, she does not dispute the fact that she signed it and read the page she signed, which contains her agreement to read the entire Handbook. App3-4, 51-53, (King14:24–15:15; 122:2–124:6); App141(Cache000032).

[4] The managers of Store No. 246, including King, were expected to meet sales goals as well as perform their managerial responsibilities, and King routinely met or exceeded her sales goals. App202(CK3).

13.     On June 2, 2009, King received a written warning for violation of the "no cell phone rule," which she signed, but disputed. App41-42(King91:8-92:13); App202-03, 206(CK5(EXB)). Subsequently, King repeatedly and surreptitiously violated the "no cell phone rule" by recording Keeler and other employees without their knowledge with her cell phone on the sales floor.[5] App203(CK8, 13).

14.     In May or June 2009, Defendant's corporate offices reduced the number of payroll hours available to Store No. 246. As a result of the corporate decision, the store did not have enough hours to support the three full time manager positions that were in the store. App193(MH9).

15.     On July 21, 2009, King reported to work and opened the store with what appeared to be an ankle injury that was unrelated to King's employment.  App7(King36:2-10). Hornsby visited the store that morning and saw that King appeared to be unable to perform her job and got Keeler to come in for King's shift, and King left work. App7-10(King 36:2-39:16); App193(MH10).

16.     King did not seek treatment from any health care provider for the apparent ankle injury (App8-9, 12-13(King37:15-38:2; 41:11-42:23)), but took a paid leave of absence, including sick and vacation leave (App10-11(King39:15-40:2)) until, according to King, Keeler permitted King to return to work on Thursday, July 30, 2009, for a trial run. App13-14(King42:25-43:8).

17.     When King worked on July 30, 2009, she told Keeler she had not fully recovered, and King testified that Keeler suggested that she take the upcoming weekend off and that she [Keeler] would reduce King's hours for the next week, and King agreed. App10, 13-14,113-14(King40:8-21; 42:25-43:16; 247:23–248:2); App203(CK7).

---

[5] Keeler found out that King had been surreptitiously using her cell phone, which was also a recorder and camera, to record employees around March 17, 2010, when an acquaintance of King's, Dehran Watson, delivered copies of King's recordings to Keeler. App203(CK8, 13). The information gathered from these recordings showed King engaging in conduct that formed the basis of Hornsby's decision to terminate King's employment. App195-96(MH30-34).

18.     Three days later, on Sunday, August 2, 2009, King testified that she called Keeler, who told her that Hornsby was going to find out if King was eligible for short term disability leave. App14-15,115(King43:17-44:3; 250:2-25); App193(MH11); App203(CK7).

19.     The next day, Monday, August 3, 2009, King allegedly tried, unsuccessfully, to contact Keeler about a schedule of reduced hours. App14-15(King43:17-44:14). When King was unable to reach Keeler, she called Margarita Croasdaile ("Croasdaile") at Cache's Human Resources (HR) department about returning to work, and Croasdaile told her that she needed a doctor's note releasing her to return to work.[6] App15-16(King44:22-45:11); App168(MC4). Croasdaile understood from her conversation with King that King intended to get a doctor's note and return to work soon.[7] App168(MC4).

20.     King, however, did not submit a doctor's note to return to work the week of August 3, 2009, nor did she contact Croasdaile, Keeler, or Hornsby to let them know when she expected to return to work.[8] App12-13(King41:11-42:23); App169(MC9); App193(MH12); App203(CK8).

21.     Without knowledge of King's expected return to work date, on or about mid-August 2009, Defendant promoted Bobbye Villanueva ("Villanueva"), a former Cache employee who had been rehired in March 2009, as a part time sales associate, to part time Assistant Manager so that the store would have another manager and key holder to open and close the store. App193(MH12).

---

[6] Defendant requires employees to submit a medical release to return to work after an absence for illness or injury for a serious health condition, under its FMLA policy. App168-69,179(MC5(EXA)). Since a serious health condition under the FMLA is one that lasts more that than three consecutive days, it is Croasdaile's practice, when she is notified that an employee has been out sick or injured for at least four days, to require the employee to submit a doctor's note, regardless of whether the absence is covered by the FMLA. App169(MC6).

[7] Croasdaile is the Cache employee who designates absences as FMLA leave, and she did not designate King's absence as FMLA leave because, to Croasdaile's knowledge, King did not request FMLA leave and intended to return to work in early August. App169(MC7). Since Croasdaile did not designate King's absence as FMLA leave, the days King was out did not count against the 12 weeks of FMLA leave available to her for the year. App169(MC8).

[8] One of King's complaints is that Keeler did not give her a reduced schedule for the week of August 3, 2009. King, however, made it impossible for Keeler to schedule King to work that week, whether full or reduced hours, since King failed to submit a return to work medical release that week. App12-13, 15-16(King41:11-42:23; 44:15-45:11).

22.     On or about August 20, 2009, upon Hornsby's instruction, Keeler called King and left a message for King to bring in her store keys for someone to use until King returned to work. App22-24(King57:25-59:1); App193(MH13). King did not respond to Keeler's message, so Keeler left another message the following day, August 21, 2009, asking King again to bring in the store keys and specifically asking King to return the call. App24(King59:2-23). King did not respond to Keeler's two calls and messages.  App19-22(King54:8-57:6).

23.     Instead of responding to Keeler's messages, King made audio recordings of the messages to bring in the keys, establishing conclusively that King got the messages. King did not return the store keys or the calls. App19-24(King54:8-59:23).

24.     Given King's failure to contact Defendant after she was told to get a doctor's note,[9] and her failure to respond to Keeler's calls regarding the store keys, Defendant did not know whether King intended to return to work at all. App193(MH13). The absence of communication from King about her status or the store keys presented a security risk, so Defendant incurred the expense of changing the locks at the store.  App193(MH13-14).

25.     On Monday, August 31, 2009, twenty-eight days after Croasdaile specifically told King she needed to submit a doctor's note to return to work, King finally submitted a doctor's note releasing her to return to work.[10] App17-18(King50:11-51:7); App140(King, LaChica177).

26.     The two week work schedule had already been posted when King submitted the doctor's note, so King was placed on the next two week cycle on Monday, September 14, 2009. App169(MC10); App194(MH15-16).

---

[9] Defendant did not contact Kng about a return to work date because it is not Cache's practice to contact employees on leave. However, in the unusual circumstances of King's absence – no communication from a manager who had not accounted for the store keys or provided an expected return date - Hornsby instructed Keeler to contact King to bring in the store keys. App193(MH13).

[10] King began surreptitiously recording Cache employees the day she submitted her doctor's note, August 31, 2009. App25-26(King69:11-70:4).

27.    Upon her return to work on Monday September 14th, King was restored to her position as the full time Assistant Manager and scheduled for at least 30 hours a week to maintain her full time status. App111(King244:3-21; App169(MC10); App194(MH16-17).

28.    On October 26, 2009, King filed an EEOC charge[11] complaining, essentially, that Hornsby would not allow her to work while injured[12] and that when she returned to work after an injury she was scheduled to work 35 or fewer hours a week. App54-56,135-36(King134:1-135:9(EX10)). The EEOC subsequently dismissed the King's Charge on January 13, 2010. App142(Cache000051).

29.    On or about November 24, 2009, the Co-Manager, April Baker, who had authority over King, was scheduled to close and forgot her store keys. Baker told King she needed her [King's] store keys to close the store, and King refused to give Cache's store keys to Baker.[13] App63-64(King146:7-147:3).

30.    Keeler spoke to King by phone reiterating Baker's need to use King's store keys to close the store, but King still refused to give the keys to Baker. Keeler explained that Baker, who was opening the next morning, would give the store keys back to King the next day when she [King] came in for her shift. Keeler said that it would be ridiculous for Baker to have to drive 45

---

[11] While at the EEOC office, King called Keeler and misrepresented her circumstances in asking for the day off, stating that she was at the doctor's office. App54-60(King134:1-140:25); App212(VN00012(10/26/09)). King reported the time she was given off that day as sick time for which she was paid. App61-62(King141:1-142:16); App203(CK12).
[12] King's EEOC complaint about Hornsby sending her home because she was injured (App147-48(Cache 000260-61)) contradicts her FMLA claim that Keeler refused to come in so that King could leave. App7-10, 111-12(King36:2-39:19, 244:25-245:8). Indeed, King wrote in answer to No. 5 on the EEOC intake form that Hornsby sent her home after Keeler had said she could remain at work and that she was "forced" to take leave of absence. App143-46(Cache000160-63). Regardless of which story King chooses, neither contains facts that are material to any genuine issue raised in this Motion for Summary Judgment.
[13] King had previously forgotten her keys when she was the opening manager and called Keeler, who drove to the store and took her keys to King to open the store. App212(VN00017(11/25/09)). On the day that Baker forgot her keys, Baker called Keeler en route to work to ask if she should return home to get her keys, and Keeler told her it was not necessary because she could use King's keys to close. Keeler obviously had no idea that King would refuse to give her keys to Baker. App212(VN00017(11/25/09)).

minutes home and 45 minutes back to get her store keys. King, nonetheless, refused to do as Keeler asked. App64-65(King147:4-148:11); App212(VN00015(11/24/09)).

31.     This incident occurred only three days before "Black Friday," typically the busiest day of the year for Defendant, and in light of King's refusal to give the store keys to Baker, Keeler called Hornsby and informed her of the situation.    App194(MH19-20). Hornsby was in conference with a Store Manager and called Croasdaile and asked her to call and tell King to hand over Cache's keys to Baker.[14]  App194(MH19-20). After being asked by Croasdaile to turn the keys over, King finally agreed to do so. App70-71(King153:1-154:14); App194(MH20).

32.     The next day, November 25, 2009, Hornsby wrote King up for refusing to give Cache's keys to Baker when asked to do so by her superiors, the Co-Manager, and Store Manager. App194(MH21).  Keeler presented the disciplinary write-up to King, who refused to sign it.[15] App66-69,137(King149:11-152:25(EX12));    App212(VN00017(11/25/09));    App196(MH31). King's store keys were returned to her. App159( King153:12-20); App212(VN00017(11/25/09)).

33.     Just over a month later, King lost her set of store keys and called Keeler on New Year's Day and said she could not find her keys and could not open the store.  App73-79(King157:13-163:8); App211(VN00030(1/1/10)). Despite King's recent refusal to give Cache's keys to Baker upon Keeler's and Baker's request, Keeler, without complaint, drove to the store and gave her keys to King.  App72(King155:2-13); App212(VN00030(1/1/10); App202(CK9).

---

[14] Hornsby was aware that King had filed an EEOC Charge when she made the decision to give King another chance to give Cache's keys to Baker. App194(MH18-20). Keeler did not know that King had filed complaints with the EEOC or otherwise complained about race discrimination or retaliation for engaging in protected activity until after King was terminated. App203(CK13).

[15] There is no dispute that King understood that she was being insubordinate in refusing to do as Keeler asked because she told Keeler that she was not going to give her keys to Baker even if she had to get written up. App212(VN00015(11/24/09)). Clearly, King did not accept her managerial responsibility to use Cache's keys for Cache's benefit and testified that she did not have to obey or cooperate with the Store Manager about the store keys. App68(King151:2-25). King's explanation as to why she refused to sign the write up about the key incident – it was Baker's responsibility as a manager to have her keys - directly contradicts King's standard for herself, also a manager, that she had no duty to give her set of store keys to Baker to use for Cache's benefit. App69(King152:1-25).

34.     King did not find the store keys, so Defendant incurred the expense of re-keying the locks, for the second time, due to King's irresponsible conduct.  MH22. Hornsby prepared a disciplinary write-up for King's failure to protect Cache's property based on losing the store keys. App194(MH22). Keeler presented the disciplinary write-up to King, who refused to sign it although she admittedly lost and never found Cache's keys. App80-85,138(King169:9–174:3(EX14)); App203(CK10).

35.     On or about January 13, 2010, Hornsby interviewed the employees of Store No. 246 as part of an investigation of complaints King made against employees in mid December.[16] App45-46(King96:3-97:4); App194(MH23). At the beginning of King's interview, she asked if she could record it, and Hornsby permitted her to do so.[17] App195(MH24).

36.     During King's interview, she gave Hornsby a written list of complaints that included the following statement: "I conclude with valid proven evidence that I have been discriminated against due to race, religion and my abilities to perform at high levels irregardless of having to work in a hostile environment." App47-48,128-34(King107:17–108:24(EX8)); App195(MH25).

37.     Hornsby asked King to explain how she had been discriminated against due to her race, but King provided no explanation and instead said, "Why don't I just read this whole thing, OK, cause it's all in writing." App195(MH25).  King read the complaint, but it identified no facts related to race, and King failed throughout the interview of approximately 45 minutes to identify anything related to her race.[18] App47-48,128-34(King107:17–108:24(EX8)); App195(MH25).

---

[16] Although King did not testify in deposition that she complained to Hornsby about race discrimination in December 2009, should King now state that she did so, Hornsby has no memory of such complaint and did not investigate race discrimination in the interviews that preceded her interview of King. App195(MH25).

[17] Hornsby knew the prohibition against cell phones, but allowed King to use her cell phone to record the interview because she was not on the sales floor. App195(MH24). Hornsby found out afterwards that recording is not permitted without corporate authorization. App169(MC12); App195(MH26).

[18] No employee interviewed by Hornsby, including King, identified any circumstances between and/or among employees that were related to race. However, most of the employees said that they believed King was the cause of

Afterwards, Hornsby faxed the list of King's complaints to Croasdaile and told her that most employees thought King created tension in the store and did not want to work with her. MC11; App196(MH26).

38.     Shortly thereafter, on or about January 16, 2010, part-time Assistant Manager Villanueva called Keeler to let her know that King had engaged in conduct in front of customers that caused her [Villanueva] to decide to leave the store to avoid conflict with King. App203(CK11). Villanueva subsequently drafted an email to Hornsby describing the incident. App195,199-201(MH27(EXC)).

39.     On or about January 20, 2010, Croasdaile, who had received King's complaint list, which also demanded compensation, called King and denied the demands but offered King a severance amount of four weeks' pay if she resigned and signed a release of claims. App169-70(MC11,15).

40.     The next day, on or about January 21, 2010, when Villanueva reported to work, King spoke to Villanueva in a manner that Villanueva considered another attempt to provoke her. Villanueva emailed Keeler describing the incident. App203, 207-08(CK11(EXC)).

41.     The next day, January 22, 2010, King rejected the severance offer. App170(MC15).

42.     King continued to engage in insubordinate conduct toward Keeler, to the point of refusing to follow a simple instruction from Keeler to attach coupons to receipts (App86-92(King178:7–184:15); App212(VN00051(1/30/10)), a task King testified would have taken two seconds. App91-92(King183:22-184:15). King further told Keeler that she refused to do anything that was not "mandatory" and "in writing."[19] App212(VN00051(1/30/10)).

---

tension in the store. App195(MH23). The audio recordings made by King and subsequently provided to Defendant by Dehran Watson indicated to Hornsby that King was a source of tension in the store. App195(MH23).

[19] When asked in deposition about her refusal to do anything that was not in writing, King said that she would not have followed instructions from Keeler even if the instructions were in writing and did not know what it would have taken for her to have followed Keeler's instructions. App93-97(King185:16-189:8). King also testified that she did not have to obey Hornsby's instruction not to record the meeting of February 5, 2010, because it was not in writing. App119-20(King331:18-332:6).

43.     On or about February 1, 2010, just two days after refusing to follow the instruction to clip coupons to receipts, and ten days after rejecting the severance offer, King filed an EEOC complaint alleging retaliation. App42,121-27(King92:20-25(EX7)). The allegations in her EEOC Charge established conclusively that King knew that she was prohibited from having her cell phone on the sales floor. The Charge stated as personal harm: "On January 15, 2010, I was told by Carol Keeler, Store Manager that I could not use my cell phone on the floor." King gave the following statement as the reason: "I was told by Carol Keeler that she had to enforce the no cell phone rule on the floor." App38-44(King88:7-94:3(EX7)).[20]

44.     The EEOC dismissed the retaliation Charge the day it was filed. App149(Cache000272).

45.     Hornsby, who did not know that King had filed a second EEOC Charge, met with King on or about February 5, 2010, to advise her of the results of her investigation of King's complaints. App170(MC16); App195(MH28).

46.     At the beginning of the meeting King asked Hornsby if she could record it. Hornsby told her that she could not and explained that she had mistakenly allowed recording of the previous meeting because she did not know that Cache does not allow recording without corporate authorization.[21]App98-99,115-16(King201:11-21;204:19-206:16;265:22-266:1);App195(MH29). King responded by saying, "OK," but unbeknownst to Hornsby, however, King had already begun covertly recording the meeting and continued to record the entire meeting.[22] App212(VN00056(2/5/10)); App195(MH29).

---

[20] Just three weeks later, on February 23, 2010, King flagrantly violated the "no cell phone" rule again by photographing, with her cell phone, a list of rules containing the very rule she was violating: "No cell phones on the sales floor ever." App166(Cache000382).  The date of the photograph is shown on the image of the photograph on the email to which the photograph was attached. App150-67(Cache000366-383).

[21] Cache's policy prohibiting cell phones, most of which are recorders, on the sales floor and requiring cell phones be turned off during working hours, even if off the sales floor, effectively, prohibited employees from recording their conversations.  App169(MC13).

[22] King admitted in deposition that she was insubordinate to record the meeting of February 5, 2010, after being told she was not allowed to do so. App111-13(King265:21–267:12).

47.   Following the meeting of February 5, 2010, in which Hornsby specifically told King that recording was against company policy, King continued to covertly record her conversations with Keeler with her cell phone on the sales floor. App212(VN00057(2/6/10), VN00060(2/8/10), VN00063(2/16/10), VN00064, 65, 67(2/23/10), VN00068(2/24/10), VN00069(3/1/10), VN00070(3/3/10).

48.   Just over a month later, on or about March 17, 2010, an acquaintance of King's, Dehran Watson, contacted Keeler and told her that King had been secretly recording her and gave Keeler copies of the recordings. App203(CK13). There were approximately 51 audio and video recordings and 20 photographs that King had surreptitiously made of Cache employees and premises with her cell phone beginning on or about August 31, 2009, continuing through March 3, 2010. App195(MH30). Keeler provided copies of the recordings to Hornsby. App203(CK14).

49.   Hornsby discovered from the recordings that King had directly defied Hornsby's instruction not to record the meeting of February 5, 2010.[23] App196(MH31). The recordings also showed Hornsby that King had engaged in insubordinate conduct in an effort to undermine Keeler's authority and had repeatedly violated the rule prohibiting cell phones on the sales floor before and after the meeting of February 5, 2010.[24] App196(MH31).

50.   Hornsby considered King's defiance of the directive not to record the February 5, 2010, meeting to be not only insubordinate, but also deceptive and dishonest, since King had indicated that she was complying with Hornsby's directive not to record the meeting. App196(MH32). Hornsby also realized that King's surreptitious recording of employees began at the end of

---

[23] Surreptitious recording is considered underhanded and in violation of Cache's Code of Ethics and other written policies that require honesty from employees and is a crime in some states. MC14. Dishonesty and fraudulent and deceptive practices are grounds for termination under Cache's Employee Handbook. MC14(EXA).
[24] Insubordination, which includes undermining management authority, is grounds for immediate termination pursuant to Cache's Employee Handbook. App140(Cache000014).

August 2009, and that she had been engaging in deceptive conduct for over six months. App196(MH32).

51.     The content of the recordings indicated to Hornsby that King had made untrue statements about Keeler, inaccurately representing Keeler as provoking and/or creating an alleged hostile environment. App196(MH33).

52.     King's insubordination, dishonesty and deception, exhibited by and in the recordings, confirmed to Hornsby what employees had previously told her about the difficulty they had working with King. With King having a prior write-up for insubordinate conduct, Hornsby made the decision to terminate King.[25] After getting approval from Croasdaile and the Regional Manager, Patrick Doyle, Hornsby terminated King on March 26, 2010. App196(MH34).

53.     No one was promoted or hired to replace King since Store #246 did not have enough payroll hours to justify more than two full time managers. App196(MH35).

## IV. ARGUMENT AND AUTHORITIES

54.     Summary judgment is proper in a case in which there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### IV(a). TITLE VII DISCRIMINATION AND RETALIATION CLAIMS

### A.     THE BURDEN-SHIFTING ANALYSIS

55.     The Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), created a burden-shifting framework for discrimination claims which rely on circumstantial evidence

---

[25] Keeler did not participate in, influence, recommend or make the decision to terminate King. CK14.

under Title VII, TCHRA and Section 1981.[26] The factors necessary to establish a *prima facie* case[27] include: (1) membership in a protected class; (2) qualification for the position at issue; (3) subjection to an adverse employment action; and (4) treatment that was less favorable than similarly situated persons outside the protected class. *Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358, 360 (5th Cir.2004). Once a *prima facie* case has been established, the burden shifts to the employer to provide a non-discriminatory reason for the discharge. *Patrick v. Ridge,* 394 F.3d 311, 317 (5th Cir.2004). The plaintiff can still prevail if she can demonstrate that the proffered reason was a pretext for the discriminatory motive, *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 143 (2000). To show pretext, a plaintiff may prove that the reason proffered by the employer for termination is unworthy of credence. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 257 (1981).

**B.     THE RACE DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW.**

     **1.     Plaintiff fails to meet her *prima facie* elements of a race discrimination claim.**

56.     In order to establish a *prima facie* case, a plaintiff must show she was treated less favorably than similarly situated persons outside her protected class. *Oyoke v. The University of*

---

[26] Discrimination claims arising under the TCHRA and Section 1981 are also analyzed under the *McDonnell Douglas* analysis. See *AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex.2008); *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001);. *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir.2000), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006); *Lawrence v. Univ. of Tex. Med. Branch at Galveston,* 163 F.3d 309, 311 (5th Cir.1999)).

[27] King did not plead hostile environment/harassment claims based on her race, African American, but to the extent her pleadings may be construed as raising such claims, King cannot meet the elements required to prove such claims. To establish a claim of racial harassment based on a hostile work environment, King must establish four elements: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; and (3) the harassment affected a term, condition, or privilege of her employment. *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 353 (5th Cir.2001). The only factor King can meet is the first – she belongs to a protected group. There is no genuine issue of material fact that: (1) King was not subjected to unwelcome harassment, (2) that any alleged harassment was not based on race, and (3) any alleged harassment did not affect a term, condition, or privilege of King's employment. *Id.* Furthermore, King has not identified any conduct by Defendant that has "a racial character or purpose." *Harris-Childs v. Medco Health Solutions, Inc.,* No. 4:03-CV-77-Y, 2005 WL 562720, at *6 (N.D. Tex. Mar.10, 2005), *aff'd,* 169 Fed. Appx. 913 (5th Cir.2006) (not selected for publication). In other words if King's pleading raise a hostile environment claim, it would be her burden to demonstrate a connection between the allegedly harassing incidents and [her] protected status – race. *Id.* King's evidence fails to meet this burden.

*Tex. Houston Health Sci Ctr*, 245 F.3d 507, 513 (5th Cir. 2001); *Rutherford v. Harris County,* 197 F.3d 173, 184 (5th Cir. 1999). To establish a *prima facie* case in this manner, the plaintiff must show that employees outside his protected class were retained or were treated differently under <u>circumstances nearly identical to his</u>.[28] *Oyoke*, 245 F.3d at 514, *emphasis added* (citing *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

57.     King was the only full time Assistant Manager in Store #246, but, regardless, Cache knows of no employee in any position, other than King, who engaged in insubordinate and/or deceptive conduct over a period of months as King did.  This includes but is not limited to knowing of no employee who refused to obey the Store Manager's instructions unless the instructions were in writing, no employee who refused to give Cache's store keys to another manager upon the request of the Store Manager and no employee who secretly recorded his/her manager after being told recording it was not allowed. *See* Para. 29-30, 42, 46 *supra;* App170(MC18); App196(MH36). Cache would have terminated any employee, regardless of race, who engaged in such insubordinate and deceptive behavior. App196(MH37). King cannot identify *any* similarly-situated employee, who engaged in such conduct and who was of a different race than King, and was not terminated by Cache.

58.     That means there is no employee, regardless of race, who engaged conduct similar to the conduct for which King was terminated, and King cannot meet her burden to show there was an employee in similar circumstances who was treated more favorably than she. Therefore, she cannot meet her burden to show a *prima facie* case and her claim must be dismissed as a matter of law.

---

[28] King alleges that Defendant's failure to promote her was discriminatory but she admits there were no open positions above her position as Assistant Manager in Store #246. In order to be promoted King would have had to apply for a promotion and request a transfer to another store. King did neither, so there are no employees similarly situated to King as regards the promotion issue and such claim fails. App49-50(King111:13-112:10).

## 2.    Plaintiff fails to show pretext for race discrimination.

59.    Even if King could establish a *prima facie* case of discrimination, which she cannot, Defendant has met its burden to articulate legitimate, nondiscriminatory reasons for terminating King  – King's insubordinate, dishonest and deceptive conduct, substantiated by King's own covert recordings and own recorded admissions. *See* Para. 48-52 *supra*.

60.    That means that, in order to prevail, King must then offer sufficient evidence to create a genuine issue of material fact (i) that the defendant's reason is not true, but is instead a pretext for discrimination. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999). The U.S. Court of Appeals for the Fifth Circuit has consistently held that an employee's "subjective belief of discrimination" alone is not sufficient to warrant judicial relief.[29] *Id.* It is well known that "conclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden on a motion for summary judgment." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

61.    King cannot rebut the nondiscriminatory reasons which forced Defendant to terminate her employment. Indeed, King's own recordings establish that she was insubordinate and deceptive in the workplace and plainly dishonest at times.[30] Hornsby, who had previously given

---

[29] The evidence King identified as showing race discrimination is nothing more than her subjective beliefs. For example, King identified an alleged comment by Keeler, who recruited King, as racial. The alleged comment was that Cache would never open a store in South Dallas. App5(King24:12-25). When asked how the South Dallas comment was racial, King said, "Well, in my eyes, as a – she never said that's a black side of Dallas, but South Dallas is predominantly African American." App6(King25:1-4). King's own subjective belief that a facially nonracial comment had hidden racial meaning is no evidence of race discrimination. *Bauer,* 169 F.3d at 967. Indeed, King must not have considered the alleged comment racial when she filed her EEOC complaint because she did not inform the EEOC of it  *See* App143-48(Cache000160-63; 260-61).

[30] King testified that evidence of race discrimination and retaliation against her are contained in the recordings she made, and she tried to justify secretly recording co-workers by alleging it was to "protect" herself. App27-28, 117-18(King76:22-77:13; 266:6-267:12). Unable to point to anything in any recording that even appears to be related to

17

King a chance to remedy insubordinate conduct, made a legitimate nondiscriminatory decision to terminate King when she discovered King's continuing insubordinate and dishonest conduct. *See* Para. 48-52 *supra.*

## C.   THE RETALIATION CLAIM FAILS AS A MATTER OF LAW.

62.    To establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action. *Stewart v. Miss. Transp. Comm'n,* 586 F.3d 321, 331 (5th Cir.2009); *McCoy v. City of Shreveport,* 492 F.3d 551, 556–57 (5th Cir.2007). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. If the defendant succeeds in doing so, then the burden shifts back to the plaintiff to show that the defendant's reason is a pretext for retaliation. *McCoy,* 492 F.3d at 557; *Smith v. Xerox Corp.,* 602 F.3d 320 (5th Cir.2010).

### 1.   Plaintiff cannot establish a causal connection.

63.    It is uncontested that King engaged in a protected activity when she filed a charge of discrimination on or about October 26, 2009, but she fails to establish a causal connection between the protected activity and her termination in March 2010.[31] Indeed, the evidence

---

race or retaliation or the need for protection, King said she would review the recordings and provide her "evidence" to Defendant. App29-37(King78:17–86:19). Discovery closed December 2, 2011, and King has yet to point to any such evidence.

[31] King also identified Croasdaile's offer to King of four weeks' severance as a retaliatory act (App109(King241:9-11), but, as a matter of law, such severance offer was not a retaliatory act because King was not deprived of anything by the offer. *See EEOC v. SunDance Rehab. Corp.,* 466 F. 3d 490 (6th Cir. 2006). Furthermore, the severance offer cannot be viewed as a materially adverse action that was likely to deter victims of discrimination from complaining to the EEOC since it did not deter King from such action – she filed a second EEOC Charge ten days after she rejected the severance offer. *See* Para. 41-43 *supra. See Lynch v. Baylor University Medical Center,* 2006 WL 2456493 (N/D. Tex) (citing *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006)).

actually negates a "causal connection" since Hornsby[32] gave King another chance to turn her keys over to Baker in late November 2009, even though she knew that King had filed an EEOC Charge, and did not terminate King for losing her own store keys about one month later.[33] *See* Para. 31-34, Footnote 15 *supra*.

64.     Had Hornsby wanted to retaliate against King for filing an EEOC charge – an allegation Defendant disputes – the insubordinate "key" incident, followed by King losing her own set of store keys, gave Hornsby the opportunity to do so.[34] Instead, however, Hornsby retained King, who subsequently refused to sign the disciplinary write-ups for either incident. *See* Para. 31-34 *supra*. There is simply no causal connection between King's initial EEOC Charge and her termination months later for legitimate non-retaliatory reasons supported by the evidence. Accordingly, summary judgment is warranted on King's retaliation claim.

### 2.     Plaintiff fails to Show Pretext for Retaliation for Engaging in Protected Activity

65.     Defendant has articulated legitimate, non-retaliatory reasons for King's termination – insubordination, dishonesty and deceptiveness - and King has no evidence to show that Defendant's reasons constitute pretext for retaliation for engaging in activities protected by Title VII or TCHRA or Section 1981. Defendant's arguments and evidence establishing that King's termination was not a pretext for race discrimination also establish that the reasons for King's termination were not pretext for retaliation. *See* Para. 59-61 *supra*.

---

[32] Since Keeler had no knowledge of King engaging in protected activity under Title VII, she could not have retaliated against King for engaging in such activity. *See* Footnote 15 *supra*.
[33] Hornsby did not know that King had filed the second EEOC charge dated February 1, 2010, until after King was terminated, so she could have retaliated against King based on that charge. *See* Footnote 15 *supra*.
[34] King testified that Hornsby retaliated and/or discriminated against her in the meeting of February 5, 2010. App102-108(King209:9-215:1). King's own surreptitious recording of that meeting establishes conclusively that Hornsby did not engage in discriminatory or retaliatory conduct, but to the contrary, encouraged King to engage in self reflection to be able to grow and be a successful leader. App212(VN00056 (2/5/10)).

## IV(b). FMLA CLAIMS

**A.    NO INTERFERENCE WITH FMLA RIGHTS**

66.    To prove that Defendant interfered with her FMLA rights, King must demonstrate that: (1) she is an eligible employee under the FMLA; (2) Defendant is an employer subject to the FMLA; (3) King was entitled to FMLA leave; (4) she gave notice of intent to take her FMLA leave[35]; and (5) Defendant denied her benefits to which she was entitled under the FMLA. *Grant v. Specialty Hospital-South Dallas*, 2010 WL 3606029 (N.D. Tex. Sept. 2010) (citing *Schimek v. MCI, Inc.*, 2006 WL 2252034, at 11 (N.D. Tex. Aug.7, 2006); *Belgrave v. City of New York*, 1999 WL 692034, at 43 (E.D.N.Y. Aug.31, 1999) (tying the elements to requirements within 29 U.S.C. §§ 2611, 2612, and 29 C.F.R. §§ 825.302-.303).

**1.    King not entitled to FMLA leave because she did not have a serious health condition.**

67.    An eligible employee is entitled to a total of 12 workweeks of leave under the FMLA during a 12-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" in 29 U.S.C. § 2611(11) is defined as follows:

> The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves –
>
> > (A) inpatient care in a hospital, hospice, or residential medical care facility; or
> > (B) continuing treatment by a health care provider.

Under 29 U.S.C. § 2612(6) the term "health care provider" means –
> (A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or

---

[35] There is no evidence that King gave notice of intent to take leave of absence other than reporting to work on July 21, 2009, with what appeared to be an ankle injury that interfered with her ability to perform all the essential functions of her job. Indeed, she complained in her EEOC Charge that she was sent home because she was injured and "forced" to take leave, a statement inconsistent with giving notice of the intent to take or requesting FMLA leave. *See* Para. 15-25 and Footnote 12 *supra*.

(B) any other person determined by the Secretary to be capable of providing health care services.

Under the regulations at 29 C.F.R. § 825.115 "continuing treatment" means:

(a) *Incapacity and treatment.* A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services ( *e.g.* , physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

(3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

68.     According to King she neither sought nor received any treatment by any health care provider within seven days of the first incapacity alleged, as of July 21, 2009, nor did she get treatment within 30 days (*see* P. 15-16 *supra*), and, therefore, as a matter of law, did not have serious health condition pursuant to the FMLA and was not entitled to FMLA leave. *See generally, Lockhart v. Home Interiors & Gifts, Inc.*, 2006 WL 887387, at *6 (E.D. Tex. Mar. 29, 2006)(granting summary judgment on plaintiff's retaliation claim because she did not have a serious health condition). Furthermore, King did not provide Cache notice that she had a serious health condition and indicated to Croasdaile that she intended to obtain a doctor's note and return to work in early August. *See* Para. 19 *supra.* Indeed, King's actions and her statements to the EEOC establish that King did not consider her condition one that rendered her unable to perform the functions of her position (*see* 29 U.S.C. § 2612(a)(1)(D)) when she stated that was "sent home" and "forced" to take leave. *See* Footnote 12 *supra.* As a matter of law, King is not

21

entitled to the protections of the FMLA and summary judgment is warranted.

**2.   King's position was not changed so her FMLA claim fails as a matter of law.**

69.    An employee who takes leave of absence covered by the FMLA has a right to restoration to the position of employment (or equivalent position) held by the employee when the leave commenced. 29 U.S.C. § 2614(a)(1). This right is limited to the extent that the restored employee shall not be entitled to "any right, benefit, or position to which the employee would not have been entitled had the employee not taken the leave." 29. U.S.C. § 2614(a)(3)(B).

70.    Although King was not entitled to FMLA leave because she did not obtain treatment required to have a serious health condition under the FMLA, assuming *arguendo* for purposes of summary judgment only, that she had qualified for FMLA leave, King admitted that she was restored to the same position she held before she her absence – a full time Assistant Manager. *See* Para. 27 *supra*. King's position never changed and as a matter of law her FMLA claim fails.

71.    King's complaint is not that she was not restored to her position as full time Assistant Manager but seems to be the fact that she was scheduled for 30 to 35 hours a week when she returned to work. App110-11(King243:2-244:23). As a full time employee King was entitled to work an average of 30 hours a week, but no more than that. *See* Para. 9 *supra*. Since the FMLA does not give rights to employees that they did not have before taking leave, there is no claim based on working hours in excess of those to which King was entitled prior to her absence.[36] *See* 29 U.S.C. § 2614(a)(3)(B).

72.    Even if King qualified for FMLA leave, which she did not, she admits she was restored to the same position she held before her absence and that she was scheduled for the requisite number of hours for full time status in that position. *See* Para. 27 *supra*. Summary judgment

---

[36] King basically got the best of both worlds – restored to her job as if on FMLA leave without using any of her FMLA allotment of 12 weeks for the year. *See* Footnote 6 *supra*.

should be granted on King's FMLA claim as a matter of law.

**B.    KING'S FMLA RETALIATION CLAIM ALSO FAILS AS A MATTER OF LAW.**

73.    Retaliation against employees for invoking their rights under the FMLA is prohibited. 29 U.S.C. § 2614(a)(2).   Courts use the *McDonnell Douglas* framework to evaluate retaliation claims under the FMLA when there is no direct evidence of retaliation. *Grant v. Specialty Hospital-South Dallas*, 2010 WL 3606029 (N.D. Tex. Sept. 2010)  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir.2005); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973).  This framework requires King to present a *prima facie* case of retaliation. *Monitronics*, 434 F.3d at 332-33. If she does, the burden shifts to Defendant to give a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*   Then, King must prove by a preponderance of the evidence that the reason advanced is merely a pretext for discrimination. *Id.* The burden of proof throughout this process remains with King. *See Hoppens v. Gen. Nutrition Ctr.*, 129 F.3d 608, 608 (5th Cir.1997).

**1.    King Not Protected under the FMLA**

74.    To establish a *prima facie* case for retaliation, King must demonstrate that: (1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) she was treated less favorably than an employee who did not request FMLA leave or (3b) the adverse decision was made because of King's request for leave. *Monitronics*, 434 F.3d at 333.

75.    As shown above, King was not protected under the FMLA since she did not get any medical treatment by a health care provider for her apparent ankle injury, and therefore did not have serious health condition under the FMLA. Her retaliation claim fails to meet the first element, and summary judgment should be granted.

76.    Even had King qualified for FMLA leave, which she did not, King did not request FMLA

leave and instead, complained to the EEOC that she was not allowed to work while injured. *See* Footnotes 11 and 32 *supra*. Therefore, King cannot meet the third element of a retaliation claim, both prongs of which depend upon King showing that she requested FMLA leave, and the retaliation claim fails as a matter of law.

### 2.   Defendant's reasons for termination were not pretextual.

78.   Assuming *arguendo*, for purposes of summary judgment only, that King had requested FMLA leave and her absence had been protected by the FMLA, King has no evidence that her termination was because of such request.[37] Indeed, if Defendant had wanted to terminate King because of her absence, cause to do so arose in August 2009, when King failed to communicate with Defendant regarding her leave status and then failed to respond to Keeler's messages asking King to bring her store keys in and/or to return the call. *See* Para. 19-24 *supra*. King's failure to notify Defendant of her status and her irresponsibility regarding the store keys resulted in a security risk such that Defendant re-keyed the locks. *See* Para. 24 *supra*. Had Defendant wanted to terminate King for taking leave, it had the opportunity to do so upon King's failure to bring the store keys in or even respond to messages requesting she do so.   King's long unexcused absence from work was not protected by the FMLA and the evidence shows she was eventually terminated for non-retaliatory reasons unrelated to her absence.   Accordingly, her FMLA retaliation similarly fails.

79.   As a matter of law King has no valid retaliation claim under the FMLA, and summary judgment should be granted.

---

[37] The reasons for King's termination set out in Paragraphs 48-52, and the arguments and evidence referenced iParagraphs 59-61 establish that Defendant's reasons for terminating King were not pretextual and that, regardless of any protected activity in which King engaged, Defendant would have terminated King for the reasons articulated. Moreover, King indicated that her Title VII and FMLA retaliation claims are indistinguishable, effectively establishing that she has no evidence of a violation under either statute. App104(King211:7-20).

## IV. CONCLUSION

ACCORDINGLY, Defendant Cache, Inc. prays that the court grant summary judgment on all of Plaintiff's claims and enter an order finding that Plaintiff take nothing on her claims and dismiss those claims with prejudice. Defendant further requests an award of reasonable attorneys' fees and expenses for having to defend this action and for such other and further relief that this Court deems just and proper.

Respectfully submitted,

STRASBURGER PRICE OPPENHEIMER, BLEND

_/S/ M. CHERYL KIRBY_
REESE L. HARRISON, JR.
State Bar No. 09131000
M. CHERYL KIRBY
State Bar No. 00794097
711 Navarro, Suite 600
San Antonio, Texas 78205
Telephone: 210.224.2000
Facsimile: 210.224.7540

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

N. Sue Allen
Allen Law Firm
2200 Forest Park Blvd.
Suite 107
Fort Worth, Texas 76110

_/S/ M. CHERYL KIRBY_
M. CHERYL KIRBY

25