## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| Plaintiff | § | |
| v. | § | Civil Action No. 3:CV-11-0138-P |
| | § | |
| CACHE, INC. | § | |
| Defendant | § | |

## APPENDIX OF DEFENDANT'S SUMMARY JUDGMENT EVIDENCE

COME NOW Defendant CACHE, INC. ("Cache"), and, pursuant to the Federal Rule of Civil Procedure 56, files their *Appendix of Exhibits to Defendant's Brief in Support of Motion for Summary Judgment* (the "Appendix") and in support of their Appendix would respectfully show the Court as follows:

| | | App. Pages |
|---|---|---|
| **Exhibit 1** | Excerpts from the Deposition of Plaintiff LaChica King and Deposition Exhibits | 1 -138 |
| **Exhibit 2** | Bates Stamped Documents | 139 -167 |
| **Exhibit 3** | Declaration of Margarita Crosadaile | 168 - 191 |
| | • Exhibit A – Employee Handbook | |
| **Exhibit 4** | Declaration of Mareatha Hornsby | 192 - 201 |
| | • Exhibit A – Job Description | |
| | • Exhibit B – Security Policy | |
| | • Exhibit C – Email from Bobbye Villanueva | |
| **Exhibit 5** | Declaration of Carol Keeler | 202 - 210 |
| | • Exhibit A – List of rules signed by King and Baker | |
| | • Exhibit B – Write-up signed by King | |
| | • Exhibit C – Email from Bobbye Villanueva | |
| **Exhibit 6** | Declaration of Cheryl Kirby | 211 - 212 |
| | • Exhibit A - CD of Recordings | |

Dated this 22nd of December, 2011.

Respectfully submitted,

STRASBURGER PRICE OPPENHEIMER BLEND

_____/S/ M. CHERYL KIRBY_____
REESE L. HARRISON, JR.
State Bar No. 09131000
M. CHERYL KIRBY
State Bar No. 00794097
711 Navarro, Suite 600
San Antonio, Texas 78205
Telephone: 210.224.2000
Facsimile:  210.224.7540

ATTORNEYS FOR DEFENDANT CACHE, INC.


## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to N. Sue Allen, Allen Law Firm, 2200 Forest Park Blvd., Suite 107, Fort Worth, Texas 76110 and mailed a copy of page 212 of the Appendix of Defendant's Summary Judgment Evidence, containing a copy of the CD mailed to the court, to N. Sue Allen at the foregoing address.

N. Sue Allen
Allen Law Firm
2200 Forest Park Blvd.
Suite 107
Fort Worth, Texas 76110


_____/S/ M. CHERYL KIRBY_____
M. Cheryl Kirby

# Exhibit 1
## Excerpts Deposition/King and Deposition Exhibits

1    sales job was with Nordstrom when I was 17, but my

2    first sales job was The Gap Galleria in Houston, Texas,

3    and I worked there for a couple of weeks before I moved

4    to Dallas, Texas.

5        Q.  And then you worked for Nordstrom here.

6        A.  Yes, ma'am.

7        Q.  How long?

8        A.  I really don't remember.

9        Q.  Approximately?  A year, six months?

10       A.  A year -- six months to a year.

11       Q.  How did you find out about the job that was

12    available at Cache?

13       A.  I met Carol walking to make a deposit.  I met

14    her in the mall and she said that they were hiring.

15       Q.  Did you know her?

16       A.  No, ma'am.

17       Q.  So you just saw her.  You knew she worked at

18    Cache.

19       A.  No, I had never seen Carol.  I was making a

20    night deposit drop and she and another young lady, that

21    worked with her, were making the -- a deposit at the

22    Parks Mall.  And we just kind of ran into each other

23    and she asked -- we casually spoke, the three of us,

24    and then she asked where I worked or, you know, she had

25    never seen me in the mall.  And I explained to her that

1       I just moved out here.  I had only been out there maybe

2       a week or two because they had closed our store in

3       Zales in another mall.

4            Q.   So you were working for Zales --

5            A.   Yes, ma'am.

6            Q.   -- in the same mall where Cache was?

7            A.   Yes, ma'am.

8            Q.   Okay.  And so you applied for the job there

9       after she told you there was one available?

10           A.   Yes, ma'am.

11           Q.   And who interviewed you?

12           A.   Carol interviewed me --

13           Q.   She did.

14           A.   -- and then Julia -- she was an interim

15      district manager --

16           Q.   Uh-huh.

17           A.   -- interviewed me.  I -- I had two

18      interviews.

19           Q.   Okay.  And so do you know if they interviewed

20      anyone else?

21           A.   Yes.

22           Q.   Did they?

23           A.   Carol told me that another young lady had

24      applied for the position and she wanted $16 an hour,

25      and they didn't -- they were looking for someone that

**2**

Page 14

1    would take lesser pay.

2         Q.   And what did you take an hour?

3         A.   $14 an hour.

4         Q.   What -- so Carol, then, was your supervisor

5    from the beginning of your employment with Cache,

6    right?

7         A.   Yes, ma'am.

8         Q.   She was a store manager.

9         A.   Yes, ma'am.

10        Q.   Okay.  And April Baker was the comanager at

11   that time --

12        A.   Yes, ma'am.

13        Q.   -- right?

14             So they were already both there.

15        A.   Yes.

16        Q.   And they had no assistant manager at the

17   time.

18        A.   No, ma'am.

19        Q.   That's why they hired you.  Okay.

20        A.   Yes, ma'am.

21        Q.   Who trained you for your working at Cache?

22   Did Carol do that?

23        A.   Carol.  Carol trained me.

24        Q.   Okay.  And you got a copy of the employee

25   handbook, right?

**3**

```
 1        A.   Yes, ma'am.

 2        Q.   Did you read the whole thing?

 3        A.   No, ma'am.

 4        Q.   What part?  Do you remember what you did

 5   read?

 6        A.   I don't remember.

 7        Q.   Okay.  You do remember signing certain

 8   pages --

 9        A.   Yes.

10        Q.   -- in the handbook?

11        A.   I remember signing certain pages.  I just

12   don't remember.

13        Q.   Do you know if you read the pages that you

14   signed?

15        A.   Yes, ma'am.

16        Q.   Okay, okay.  And you were very successful in

17   sales, weren't you?

18        A.   Yes, ma'am.

19        Q.   Were you that successful at selling jewelry

20   as you were clothes?

21        A.   That's why Carol hired me.

22        Q.   You had a lot of loyal -- I have PCMs here.

23   That's preferred customer -- you tell me what that

24   means.  What's PCM?

25        A.   If I recall -- I don't remember what the M
```

**4**

1        Q.   All right.  Okay.  You can continue.

2        A.   She would reference that she would give me a

3    good reference if I were to, you know, go and apply for

4    jobs over there.  And then she -- you know, you're a

5    single mom.  It's closer to home to you, you know.  And

6    then I would say, Well, you know, I really love working

7    for Cache.  That would be my response.  And she was,

8    Well, you know, you're not going to find Cache over

9    there, but there are other, you know, stores.  They're

10   not going to compare to Cache, but, you know, I'll make

11   sure you get a good reference.

12            So then, another conversation in regards

13   to me applying at Uptown.  A lady had come in.  You

14   know, obviously, I don't know what her position is with

15   the Uptown Mall, but she was speaking to us about

16   possibly getting a Cache over there.  And after the

17   lady left, Carol referenced me, Isn't Cedar Hill in

18   South Dallas?  And I was like, Yes.  What does that

19   have to do with anything?  Well, they're not going to

20   put a Cache over in South Dallas.  I said, Why wouldn't

21   they put a Cache in South -- South Dallas?  She was

22   like, You know, they just wouldn't put it in South

23   Dallas, but they would put it in The Highlands, which

24   The Highlands is another outdoor mall in Arlington,

25   Texas.  So other than instances...

**5**

Page 25

```
 1          Q.   And how does that relate to race?

 2          A.   Well, in my eyes, as a -- she never said

 3    that's a black side of Dallas, but South Dallas is

 4    predominantly African-American.

 5          Q.   I didn't know that.

 6          A.   Okay.  But I know that and I live over there.

 7    Arlington isn't.  And just her tone and her direct

 8    response to they won't put a -- isn't that in -- isn't

 9    Cedar Hill in South Dallas?  They won't put a Cache in

10    South Dallas; they'll put it over in The Highlands

11    before they put it in South Dallas.

12               So because there was already -- already

13    the tension or the, you know -- what is the word I'm

14    looking for?  Just, we were already uncomfortable.  The

15    situation was already becoming uncomfortable.  And I

16    did leave out -- this wasn't directed to me initially

17    when I started.  Because your initial question was, if

18    I'm correct, when did the racial things begin.

19          Q.   My initial question was, yeah, do you -- Is

20    there anything you can identify that you consider is

21    racial discrimination in that first year?

22          A.   Yes, ma'am, in the first year.

23          Q.   Right.

24          A.   And so -- and I left out just ultimately when

25    I did start, when I began opening and closing on my own
```

**6**

1          A.    Okay.

2          Q.    Let's see.  Okay.  You injured your ankle or

3     leg?

4          A.    My ankle.

5          Q.    Ankle.  On July 20th, right?

6          A.    Yes, ma'am.

7          Q.    How did you injure it?

8          A.    I was at a skating function.

9          Q.    Oh.  And fell, right?

10         A.    Yes, ma'am.

11         Q.    So you came to work the next day on the 21st

12    and you were having difficulty walking, right?

13         A.    My ankle was swelling, but I was able to

14    walk.

15         Q.    Were you limping?

16         A.    Yes.

17         Q.    Okay.  And Carol wasn't there that day at

18    all, correct?

19         A.    No, ma'am.

20         Q.    She was not in the store.  But Mareatha

21    Hornsby just happened to come in the store -- is that

22    what happened -- and saw you?

23         A.    No, ma'am.

24         Q.    Okay.  I know when you said Mareatha --

25         A.    Let me --

**7**

1       Q.    -- sent you home.  How did that happen?

2       A.    Can I go -- can I go -- I --

3       Q.    Yeah.  Just -- just tell me what happened

4   when you got to work the day that -- injured ankle.

5       A.    When I got to work, specifically, I -- I was

6   going to work because --

7                 MS. ALLEN:  Answer her question, please.

8                 THE WITNESS:  Okay.

9       A.    When I woke up that morning --

10                THE WITNESS:  Just answer the question.

11                MS. ALLEN:  Yes.

12      A.    When I --

13                MS. ALLEN:  What happened to you?  It

14  was a simple question.

15      A.    All right.  Okay.  When I got to work, I

16  phoned Carol to let her know that my ankle was swollen,

17  that I had sprained my ankle the night before.  And I

18  asked Carol if she would come in.  I just came in

19  basically to open the store because it was too late to

20  call someone in.  I asked Carol if she would come in so

21  that I could go home because I couldn't be on my ankle.

22  The longer I was on my ankle, the more it would swell

23  and I was instructed to put my ankle up, get off of it

24  and just be off of it for a few days.

25      Q.    (By Ms. Kirby) By the doctor?

1       A.    No.   I consulted -- he's my uncle, but he's

2    a strength and conditioning coach.

3       Q.    Okay.

4       A.    He has --

5       Q.    Okay.   Yeah.

6       A.    That's his --

7       Q.    Okay.

8       A.    -- his profession --

9       Q.    Okay.

10       A.    -- at that time.

11              And Carol refused to come in.  She told

12    me, you know, when Bobbye comes in at 1:00 to just --

13    whenever I have the need or whenever it's slow, you

14    know, to go to the back and put my foot up.  But she

15    didn't want to come in to cover for me.  And I said,

16    Well, you know, I know that as I stand on my ankle,

17    it's going to continue to swell.  And I said, I really

18    need to go home.

19              And she said, Well, just go through the

20    day when -- by the time Bobbye gets there, you know, if

21    you still feel that way, then you just call me and I'll

22    come in.  So I just -- I mean, I said, Okay, but I

23    intended to have her come in so that I could go home

24    and be off of my foot.

25              And then Mareatha showed up, and

```
 1    Mareatha apparently saw that I was limping.  She asked,
 2    What was going on?  I told her that I called Carol to
 3    come in and Carol said she wouldn't come.  And Mareatha
 4    suggested, yes, you got to go home.  You can't work on
 5    that ankle.  I said, Well, I asked Carol -- I mean, I
 6    told Carol that.  I asked her to come in.  I was
 7    scheduled to work four days straight and I knew I was
 8    going to need at least three or four of those days off.
 9    I explained that to Mareatha.  She asked me to call
10    Carol.
11              I did that.  I called Carol, gave her
12    the phone and then her and Carol conversed.  When she
13    hung up with Carol, she said, Carol's going to come in
14    so that you can go home.
15         Q.   So you went home?
16         A.   Yes, ma'am.
17         Q.   And you used your sick and vacation time for
18    the next week?
19         A.   Yes, ma'am.
20         Q.   So you --
21         A.   I was scheduled to work four days straight.
22    And then that weekend, I was going to have five
23    vacation days off.  I was -- I already had that
24    scheduled to have those days off.  So in combination
25    with going home with the ankle for those four days, I
```

```
 1    was going to already have those extra vacation days

 2    off.

 3         Q.   So you came back to work on July 30th.

 4         A.   Yes.

 5         Q.   Did you work the whole day?

 6         A.   Yes.

 7         Q.   But your ankle was still swollen apparently.

 8         A.   My ankle -- when Carol -- when I had called I

 9    spoke with Carol.  She and I -- when she came in, we

10    agreed that upon my return, that we would see -- I

11    never had a sprained ankle.  I had never -- so I didn't

12    know how many days I would need, but I did want those

13    initial four days off.

14              And so under the assumption that I would

15    be, you know, okay, fit to put on heels and things like

16    that when I came back, that that's what it was

17    contingent upon me coming back on the 30th wearing

18    heels.  So -- and trying to wear heels on that day that

19    I returned, I wasn't able to wear the heels.  But I

20    could still do my job and I could still walk on my

21    foot.

22         Q.   So you worked that day and then she took you

23    off the schedule after that until you could get a

24    doctor's note?

25         A.   No.
```

**11**

1            MS. ALLEN:  I was going to object, but

2      that's fine.  Let me --

3            THE WITNESS:  Okay.

4       Q.  (By Ms. Kirby) Well, I -- I saw in some of

5      this paperwork that you called Margarita Croisdale, the

6      HR person, in New York and asked about the situation.

7      And she told you -- you told the EEOC that she told you

8      you needed to get a doctor's note to return to work?

9            MS. ALLEN:  Objection.  The question is

10     not clear and compound.

11      Q.  (By Ms. Kirby) Okay.  When did you first find

12     out you needed a doctor's note to return to work?

13      A.   August 3rd.

14      Q.   Okay.  And why didn't you get a doctor's note

15     that day if you were able to work?

16            MS. ALLEN:  Objection, compound.

17      Q.  (By Ms. Kirby) Why didn't you get a doctor's

18     note that day?

19      A.   Because I was searching for a doctor to go to

20     and I needed the money to be able to go to the doctor.

21      Q.   You didn't go to the doctor until

22     August 28th?

23      A.   Yes.

24      Q.   And no one from Cache told you during that

25     time from August 3rd to 28th, Don't go to the doctor,

```
 1    don't get a release yet, did they?

 2         A.    What is your -- can you rephrase the

 3    question?

 4         Q.    The ball was in your court at that point to

 5    get a doctor's release, wasn't it?

 6                    MS. ALLEN:  Objection.  Question is

 7    unclear.

 8         Q.    (By Ms. Kirby) It was your responsibility when

 9    you learned you needed a doctor's note to get that

10    doctor's note and bring it in to Cache to go back to

11    work, right?

12         A.    Yes, and I did that.

13         Q.    But you didn't do it for over three weeks.

14                    MS. ALLEN:  Objection.

15         Q.    (By Ms. Kirby) Why is that?  Why did you wait

16    so long to get a doctor's note?

17                    MS. ALLEN:  Objection.  Question is

18    argumentative.

19                    You may answer.

20         A.    During that time, I was still needing money.

21    I was off work without pay.  I couldn't afford, number

22    one, to go to the doctor because I was off work without

23    pay.  After speaking with Margarita -- first, let me

24    rewind.

25                    On the day that Carol -- when I returned
```

**13**

1    to work on the 30th, Carol suggested that I take the

2    weekend off so that she could revise the schedule so

3    that I -- so that -- she and I had a verbal agreement

4    that she would revise the schedule.  The intention was

5    never for me to be off.  The intention when I came back

6    on the 30th was for a trial run, basically, to see how

7    I did with my ankle in heels and to see if I could

8    stand for however long.

9              Carol was well aware of my financial

10   situation.  I'm a single mother.  She and I had had a

11   verbal agreement that she would revise the schedule so

12   that I wouldn't work longer than eight hours so that I

13   wouldn't be on my -- on my ankle for longer than eight

14   hours.  That was a verbal agreement she and I had

15   that -- so the intention was never for me to be off

16   work.

17             The intentions were -- when she told me

18   to take the weekend off after the 30th, she told me to

19   call back on August 2nd so that -- that was a Sunday.

20   She told me to call back on August 2nd so that she

21   could give me the revised schedule.  So I never

22   intended to be off for the duration that I was off.

23             When I -- when I called and spoke with

24   Carol that Sunday, she then told me that -- to call

25   back on Monday, which was August 3rd, because Mareatha

1    said she was going to -- these are Carol's words, that

2    Mareatha said she was going call HR to find out if I

3    qualify for short-term disability.  I questioned her

4    then, What was the purpose of short-term disability?

5    Because she and I had an agreement that I would just

6    work fewer hours in the day, not working open to close

7    like I had been.

8              And she said she didn't -- you know,

9    basically to just call back the next day.  So I

10   initially called the store and called Carol's home

11   phone to speak with her about receiving a new schedule

12   that would allow me shorter hours.  Carol never

13   returned my phone call.  She didn't work August 3rd,

14   April worked.

15             When I spoke with April, April looked at

16   the schedule and April told me that I was not on the

17   schedule for the next two weeks, that my hours were

18   being covered by other employees.  I -- that led me to

19   call Carol again to find out the discrepancy because we

20   had agreed on the 30th that she was going to revise the

21   schedule for me to work shorter hours in the -- in the

22   day.  When Carol didn't return my phone call, I

23   proceeded to call -- I mean Margarita in HR to make her

24   aware of the situation.  And that is when I --

25   August 3rd when I spoke with Margarita in regards to my

**15**

1    being off.

2            And she gave me -- she told me that all

3    I needed up to that point was a doctors's note to

4    return back, that she was not aware that I had been

5    sent home.  She said that Mareatha should have told her

6    on the day that she sent me home on July 21st that I

7    had, in fact, been sent home, and that she would call

8    and speak with Mareatha about that.  She said, I didn't

9    have anything to do with short-term disability.  There

10   was no reason for it.  But at that point, all I needed

11   was a doctor's excuse to return back to work.

12       Q.   (By Ms. Kirby) So are you aware that Carol has

13   no authority to enter -- enter into an agreement with

14   you about your hours in contradiction to what Mareatha

15   says?

16            MS. ALLEN:  Objection.  The question is

17   compound.

18       A.   Will you rephrase the question, please?

19       Q.   (By Ms. Kirby) Right.  Do -- do you think

20   that Carol has the authority to enter into an agreement

21   with you about your hours that's different from what

22   Mareatha tells her to do?

23            MS. ALLEN:  Objection.  Question is --

24   calls for speculation and the question assumes facts

25   that are not in evidence.

1    go to the doctor and get a release.  You didn't try to

2    get another job?

3                 MS. ALLEN:  Objection.  Question is

4    compound, question is argumentative.

5         Q.   (By Ms. Kirby) Did you try to get another job

6    during that period in August?

7         A.   No, ma'am.

8         Q.   Okay.  But as we sit here today, you think

9    you were able to work.  Is that what you're telling me?

10        A.   Yes, ma'am.

11        Q.   Okay.  So you got the release.  Did you

12   actually see the doctor to get the release, or did he

13   just write it and give it to you?

14        A.   No.  I saw the doctor.

15        Q.   And he said you still should not wear heels,

16   correct?

17        A.   Yes, ma'am, for two more weeks.

18        Q.   You didn't bring it in until Monday the 31st.

19   Why did you wait --

20        A.   I came in --

21        Q.   -- to bring it in?

22        A.   I brought it in Saturday on the -- August

23   29th and Carol wasn't there.  And by -- Bobbye told me

24   that Carol would be in on Monday and that's why I

25   brought it on Monday to her.

1       Q.   And you didn't call Carol to tell her you had

2   it?

3                   MS. ALLEN:  Objection.  Question is...

4       Q.   (By Ms. Kirby) I'll rephrase it.

5                   Did you call Carol before you brought it

6   on Monday the 31st to tell her you had the release?

7       A.   I don't remember calling her.

8       Q.   Okay.  Okay.  Let's see.  Do you know if it's

9   Cache's usual practice to require an employee to bring

10   a medical release to return to work after being out

11   with an illness or an injury for more than a few days?

12       A.   Can you define medical release?

13                   MS. ALLEN:  She asked you do you know.

14   Answer the --

15                   THE WITNESS:  Okay.

16                   MS. ALLEN:  But I understand.  It's okay

17   to ask her if she don't understand it, but I'm just

18   trying to get --

19                   MS. KIRBY:  Right.

20                   MS. ALLEN:  -- answer the question.

21                   THE WITNESS:  Okay.

22       Q.   (By Ms. Kirby) A medical release -- and what I

23   mean by a medical release is what you brought in, a

24   doctor saying -- a doctor's note -- she's been under my

25   care, she's now able to return to work.  That's what I

1      Q.   Okay.

2      A.   I can't remember her --

3      Q.   All right.

4      A.   -- schedule.

5      Q.   You had an issue when you came back with the

6 fact that the store keys were changed, didn't you?

7      A.   Yes, ma'am.

8      Q.   And I just heard the messages that Carol left

9 you asking you to bring them in, you know, while you

10 were out on leave.

11      A.   Okay.

12      Q.   Why didn't you bring the keys in as she asked

13 you to do?

14      A.   Because I was still employed with Cache.  I

15 had -- I was -- would be returning back to work soon.

16 I mean, I was still employed with Cache.

17      Q.   Right.  But I heard her.  She asked you to

18 bring them in for someone else to use until you came

19 back.  And you didn't do that, did you?

20      A.   She didn't ask for a specific day for me to

21 bring them in.  She just asked when I come in to pick

22 up my paycheck, would I bring the keys in.

23      Q.   Why didn't you return her call?

24      A.   Can you -- well --

25      Q.   Why didn't you return her calls to say I'm

**19**

1    not bringing the keys in?

2                   MS. ALLEN:  Let me say, Objection.  Your

3    question assumes facts not in evidence --

4                   MS. KIRBY:  Okay.

5                   MS. ALLEN:  -- that she didn't return

6    the call.  I don't know, but...

7        Q.  (By Ms. Kirby) Did you return her call?

8        A.   She didn't ask for me to return her phone

9    call.

10                   MS. ALLEN:  So the answer is?

11       A.   No.

12       Q.  (By Ms. Kirby) Okay.  Okay.  Do you know what

13   happens -- well, I think you do know.

14                   What happens when a manager loses their

15   store keys?

16       A.   Yes, ma'am.

17       Q.   What happens?

18       A.   When the store keys are lost, they're

19   supposed to change the locks.

20       Q.   Right.

21       A.   Yes, ma'am.

22       Q.   Okay.  Are you aware that because you didn't

23   bring the keys in and you didn't call with an

24   explanation, that's why they changed the locks?

25                   MS. ALLEN:  Objection.

Page 56

1       Q.  (By Ms. Kirby) Are you aware of that?

2               MS. ALLEN:  Assumes facts...

3               MS. KIRBY:  Okay.

4               MS. ALLEN:  I'm going to stop now.

5               MS. KIRBY:  Okay.  Go ahead.  I'm sorry.

6               MS. ALLEN:  The question assumes facts

7  not in evidence and calls for speculation.  You did ask

8  he, was she aware of it, though?

9               MS. KIRBY:  Right.

10              MS. ALLEN:  Take that out then.

11              MS. KIRBY:  Okay.

12     Q.  (By Ms. Kirby) Are you aware that Cache

13  changed the locks because you didn't bring the keys in

14  when asked twice and didn't call with an explanation?

15     A.  No, ma'am.

16     Q.  Okay.  And the reason you didn't respond to

17  Carol's messages about the keys is what?

18     A.  I didn't -- I just didn't.  I had intentions

19  to return back to work.  As it relates to the paycheck,

20  she -- I was under the impression that when I came in

21  to pick up my paycheck to bring the keys.  There was

22  no -- I was under the impression -- I mean, it wasn't

23  something that was mandatory or something that had to

24  be done right away.  The impression left on the voice

25  messages was for me to come -- when I come and pick up

Page 57

1    my paycheck, if I could.  To me, it was a casual

2    request.  It wasn't an emergency or something that I

3    needed to have done right away.

4         Q.   Well, you did notice she wanted it -- wanted

5    them back for someone else to use, right?

6         A.   Yes.

7         Q.   Okay.  I want to enter those two messages as

8    exhibits.  And I don't know how we're going to do them.

9              MS. ALLEN:  Let's just play the video

10   and she can transcribe them if you want.  Wouldn't that

11   work?

12             THE REPORTER:  Yeah, yes.

13             MS. ALLEN:  Can we do it that way or --

14             MS. KIRBY:  Well, I don't want to use my

15   time up --

16             MS. ALLEN:  Oh, okay.

17             MS. KIRBY:  -- that way.  Can we go off

18   the record a second?

19             MS. ALLEN:  Sure.

20             THE VIDEOGRAPHER:  We are off the record

21   at 10:30 a.m.

22             (Recess taken, 10:30 to 10:31)

23             THE VIDEOGRAPHER:  We are back on

24   record at 10:31 a.m.

25             MS. KIRBY:  Oh, we're going to enter as

22

```
 1    Exhibit 2 two telephone messages from Carol to the
 2    plaintiff regarding bringing the keys in.  And the only
 3    way we can do this is to play it and enter it because
 4    we're not able to transfer it to a disk.  So play it.
 5                   SPEAKER 1:  This message -- this
 6    message --
 7                   MS. KEELER:  LaChica, this is Carol.
 8    Hey, I know that you're coming in to pick up your check
 9    today.  If you could, please bring your keys with you
10    so that Bobbye can use them until you can come back.  I
11    haven't heard anything from HR so I don't know where
12    you're at on that.
13                   But if you could, just please bring your
14    keys so that we can have somebody else that open and
15    close.  That would be great.  So I'll speak to you
16    later or whenever you come in.  Thank you.  Bye.
17                   SPEAKER 1:  To play this message, press
18    1.  To delete, press 7.  To return the message center's
19    call, please 8.  To save, press 9.  For more options,
20    press 6.
21                   To replay this message, press 1.  To
22    forward this message, press 2.  To hear the date and
23    time when the message was received, press 5.  To
24    delete -- received Thursday, August 20th at 10:36 a.m.
25    To play this message, press 1.  Message saved.  Saved
```

```
 1    message.
 2                    MS. KEELER:  Hey, Chica.  This is Carol.
 3    I didn't hear back from you yesterday.  I just wanted
 4    to make sure you got my message.  You do have a
 5    paycheck here.  And if -- or when you come pick it up,
 6    if you could please bring your keys so that we can have
 7    an extra set of keys for someone to use while you're
 8    off.  So give us a call back or come up and get your
 9    check and we'll see you then.  Thanks a lot.  Bye.
10                    SPEAKER 1:  To replay this message,
11    press 1.  To delete, press 7.  To return the message
12    center's call, press 8.  To save, press 9.  For more
13    options, press 6.
14                    To replay this message, press 1.  To
15    forward this message, press 2.  To hear the date and
16    time when the message was received, press 5.  To
17    delete -- received, Friday, August 21st at 1:42 p.m.
18                    MS. KIRBY:  Okay.  Thank you.
19                    (Exhibit No. 2 marked)
20        Q.   (By Ms. Kirby) My question to you, Is that a
21    true and correct copy of the message that you recorded
22    from Carol?
23        A.   Yes, ma'am.
24        Q.   Okay.  Let's see.  You know that only the
25    front door key was changed, right, not the back door or
```

1        A.   Will you rephrase the question?

2        Q.   (By Ms. Kirby) What was the first recording

3    you made of a Cache employee?

4        A.   I don't have the records in front of me.   I

5    don't recall the very first.

6        Q.   The first one that I see is on August 31st

7    when you came in and brought your doctor's note.   Is

8    that what you -- do you think that's correct?

9             MS. ALLEN:   Objection.   Question is

10   vague.

11       Q.   (By Ms. Kirby) Well, will you agree with me

12   that you recorded your conversation with Carol when you

13   came in on August 31st and presented your doctor's note

14   to her?

15       A.   Yes, ma'am.

16       Q.   Okay.   Did you make any recordings prior to

17   that?

18       A.   I don't remember.   I don't have the list of

19   records before me right now.   If you could get me

20   those...

21       Q.   I've got them on disk.   You did not -- Carol

22   didn't know she was being recorded when you made that

23   tape on the 31st of August, did she?

24             MS. ALLEN:   Objection, calls for

25   speculation.

**25**

1      A.   Will you rephrase the question, please?

2      Q.   (By Ms. Kirby) Did you tell her you recording

3  her -- were recording her?

4      A.   No, ma'am.

5      Q.   You had the recorder hidden, right?

6      A.   I don't -- I don't remember whether I had it

7  hidden or in my hand.  I don't remember.

8      Q.   Well, you had the doctor's note in one hand,

9  didn't you?

10      A.   Yes, ma'am.

11      Q.   And gave it to her.

12      A.   Yes, ma'am.

13      Q.   What happened before that date that motivated

14  you to start recording Carol without letting her know

15  you were -- were recording her?

16              MS. ALLEN:  Objection.  Question is

17  compound.

18      Q.   (By Ms. Kirby) Why did you record her that

19  day?

20      A.   For previous -- several reasons.  There was a

21  lack of trust --

22      Q.   Now, what does that mean?

23      A.   -- at that point.

24      Q.   What does that mean?

25      A.   By the time I had brought in the doctor's

1          A.    I didn't say TWC makes mistakes.

2          Q.    Well, who made this mistake here?

3          A.    I didn't tell them I was fired.

4          Q.    Okay.  So you're saying that they made a

5     mistake and -- and put on there something you didn't

6     say, correct?

7          A.    Are you asking me a question?

8          Q.    Yeah.  Do you think they made a mistake in

9     putting you were fired?

10         A.    Yes.

11         Q.    Okay.  You think it's possible that they made

12    a mistake in saying that you quit for verifiable

13    illness based on what you told them -- or what they

14    thought you told them?

15         A.    That's possible.

16         Q.    Okay.  So that all could be just one big

17    mistake of TWC, right?

18         A.    That's possible.

19         Q.    Okay.  Let's see.  I'm trying to speed this

20    up.

21         A.    Okay.

22         Q.    Okay.  Your complaint, your lawsuit, says

23    that you recorded your manager to protect yourself from

24    lies she was telling.  Okay.  I've listened to all the

25    tape recordings and I haven't heard any lies that Carol

**27**

1     told you in those recordings.  I mean, you've got a

2     memory of what's in them.  I want you to tell me what's

3     in those recordings that Carol said was a lie to you.

4                    Are there any lies by Carol in the

5     recordings?

6          A.   I don't remember.

7          Q.   Okay.  And you listened -- I know you said

8     you haven't listened to them recently.

9                    Did you listen to them after you made

10    them?

11         A.   Yes, I've listened to them.

12         Q.   So you've listened to all of them.

13         A.   Yes, ma'am.

14         Q.   Okay.  Do you have any recordings that you've

15    not produced other than these -- well, those were

16    produced today.  We heard them.

17                    Do you have any other recordings that

18    you haven't produced?

19         A.   Other than the ones that my attorney has --

20         Q.   Well, your attorney --

21         A.   -- no, ma'am.

22         Q.   -- had recordings going up through, I believe

23    it's January 4th or maybe January 6th.

24                    Do you have any recordings made after

25    that?

**28**

Page 78

1        A.   My attorney has recordings through March of

2     20 -- March.

3        Q.   Well, we don't have those.  From you, we

4     don't.  We've got some from Dahran.  And it will just

5     be much easier to authenticate them if y'all have them.

6                  MS. ALLEN:  Well, I -- you basically

7     sent them all to me on a little file and I sent what

8     you sent --

9                  MS. KIRBY:  Let's go off the record.

10                 MS. ALLEN:  So let's see what the dates

11    are.

12                 THE VIDEOGRAPHER:  We are off record at

13    11:04 a.m.

14                 (Recess taken, 11:04 to 11:12)

15                 THE VIDEOGRAPHER:  We're back on record

16    at 11:12 a.m.

17       Q.   (By Ms. Kirby) Okay.  You've heard us talk

18    about all these recordings and the numbers of them.

19                 And you've listened to all of them at

20    some point in time, correct?

21       A.   Yes, ma'am.

22       Q.   Just off the top of your head, from your

23    memory of these tapes, is there anything that you can

24    point out in these recordings that shows Carol

25    discriminating against you because of your race?

**29**

Page 79

1        A.    Not at this time, I can't remember.  I would

2    have to be able to listen to them.

3        Q.    We'll -- after this deposition is over, would

4    you listen to them and then point out to your attorney

5    what you believe to be racial discrimination so that

6    she can identify it for me?

7        A.    Yes, ma'am.

8        Q.    Okay.  Same thing.  If there's anything you

9    can point out that shows Carol -- or retaliating

10   against you because you filed an EEOC complaint.

11       A.    Okay.

12       Q.    I mean, you may be able to think of

13   something, but...

14       A.    I can think of something now --

15       Q.    Okay.

16       A.    -- in regards to that.  And I will still go

17   back and listen to them --

18       Q.    Okay.

19       A.    -- and report it back to my attorney.

20       Q.    Okay.

21       A.    One thing specific is -- I lost my train of

22   thought.  I'm sorry.

23       Q.    It happens.

24       A.    I'm trying to remember the record, the

25   specific record, as it relates to retaliation.

**30**

```
 1        Q.   Right.
 2        A.   Because I'm going to go back and relisten
 3   for --
 4        Q.   Right.
 5        A.   -- for racial discrimination.  But during the
 6   retaliation process with regards to -- I believe
 7   there's a tape recording around Thanksgiving, just
 8   any -- any of the dates after my initial claim.  My
 9   initial claim was October, the end of October --
10        Q.   Right.
11        A.   -- 2010.  So anything after that was, for the
12   most part, retaliation.  I can't remember specifics,
13   but I do remember as it related to one -- when she
14   called me after the initial claim.  I worked for 30
15   hours and I had been trying to get my hours back
16   because I was under the impression that I was under
17   FMLA.  And under FMLA, I'm to be restored back to my
18   full-time position.  And when Carol gave me my initial
19   schedule, she only gave me 30 hours.  And so I, you
20   know, questioned why I was only getting 30 hours, and
21   she told me legally she had the right to do so.  I
22   can't remember if that's in -- in a record, but --
23        Q.   It's not.
24        A.   It's not in a record?  Okay.  Well, that was
25   something verbal.  I do remember -- anything after
```

Page 81

1    that, there was a voice record when she's wanting to

2    write me up for not giving April my -- my keys for

3    April to close the store.

4         Q.   And you consider that retaliation against

5    you.

6         A.   Yes.

7         Q.   When she wrote you up for not giving your

8    keys to -- to April.

9         A.   Yes.

10        Q.   Okay, okay.

11        A.   Because after the initial claim, it was just

12   repeated -- I felt as though I was repeatedly being

13   harassed for just multiple little -- little things.

14        Q.   Do you know when Carol -- oh, first of all,

15   do you know if Carol knew about this EEOC thing you

16   filed, EEOC charge?

17        A.   No.

18        Q.   You don't know.

19        A.   I don't know.

20        Q.   Okay.  So you wouldn't know when she found

21   out either, would you?

22        A.   No, ma'am.

23        Q.   Okay.

24        A.   I do know that she was only giving me 30

25   hours.  And then after I filed the EEOC claim, my hours

**32**

Page 82

1  were given back to me.  So I don't know why she gave me

2  my hours back after that.  It wasn't discussed.

3       Q.   Do you think it -- do you consider that

4  retaliation to give you the hours you're asking for?

5       A.   I had been --

6       Q.   I don't understand that.  How is that

7  retaliation?

8       A.   Just initially, I wasn't being given the

9  hours.  It took that measure for my hours to be given

10  back to me.  And then it also came with Carol wanting

11  to change my schedule.  When I was initially hired, I

12  requested the initial agreement and we have schedules

13  for that.  I requested to have Sundays off.  Carol

14  wanted to -- that was the Thanksgiving message, one of

15  the voice records where we're discussing -- discussing

16  her telling me I'm not available to work specific days

17  and so that's -- that could potentially be an issue.

18            I can't remember verbatim.  I would have

19  to go back and relisten to that record, but I recall

20  her trying to alter or have me work on Sundays and I --

21  my response to that was, You know, when I began working

22  with Cache, we had an initial agreement that I needed

23  Sundays off  because of my religious beliefs and my

24  activity with my religious beliefs.

25       Q.   What about Wednesday night?  Did you take --

**33**

Page 83

1    do you take off Wednesday evenings, too?

2         A.   It was Tuesdays.

3         Q.   Tuesday, okay.

4         A.   Yes, ma'am.

5         Q.   Sundays and Tuesday evening.

6              Anyone else have that special request?

7    Anyone else restricted like that?

8         A.   I'm --

9         Q.   April, did she have restrictions on days that

10   she could work?

11        A.   Everyone had their restrictions.  They put

12   them -- we had month -- monthly calendars --

13        Q.   Oh, I'm not asking that.

14             Did anyone else have their own personal

15   restrictions, Cache I won't work Sundays; Cache, I

16   don't work Fridays?  Anyone else have a restriction of

17   the type you had?

18             MS. ALLEN:  Objection, calls for

19   speculation.

20        A.   I'm not aware about anyone else.

21        Q.   (By Ms. Kirby) Okay.

22        A.   I just initially --

23        Q.   You don't know.

24        A.   -- that was one of my requests.  Before I was

25   hired, that was one of the requests that I had.

**34**

1        Q.   Okay.  So do you know -- would you listen to

2    these tapes for -- not just to tell me about what you

3    think is race discrimination in the tapes or

4    retaliation that are actually in the tapes, but also

5    anything that's denying you your FMLA rights or

6    retaliating against you because you took that leave

7    that was covered by FMLA?

8        A.   I will listen to the tapes.

9        Q.   And if you know -- think of any more than

10   what you've told me today, you're welcome to tell me

11   anytime during this, but I think it's fair for you to

12   listen to them and --

13       A.   Okay.

14       Q.   -- and tell me.

15            MS. ALLEN:  Specifically you want her to

16   tell you what is in the tapes.

17            MS. KIRBY:  Right.  Specifically I want

18   to know if she can point to anything in the tapes that

19   she considers discrimination based on race, retaliation

20   for filing EEOC charge, interference with FMLA rights

21   or retaliation against you for taking FMLA leave.

22       A.   I do recall one of the records, as we're

23   speaking.  One of the records, I have a conversation

24   with Carol and I tell her that I'm -- I have a hard

25   time believing that she doesn't know what's going on

**35**

1    with my situation.  And she initially says she didn't.

2    So I remembered telling her that, you know, in one

3    instance I was being told by HR, Margarita, that I was

4    the cause for all the tension in the store, and then in

5    another instance, I was told by Mareatha that only

6    80 percent of the employees -- the other 80 percent of

7    the employees said that I was the cause for all the --

8    all the tension in the store.

9            And then Carol relates that she didn't

10   agree with that.  She knew that Keely and Bobbye didn't

11   have any issues with me.  And I said, Well, that leaves

12   two -- two people to obviously have an issue with me.

13   And then she goes back.  She says, Well, she knows for

14   sure April -- and I'm not speaking verbatim because I'd

15   have to listen to the record.  But she referenced to

16   her knowing that April voiced her specifics about my

17   causing, creating tension in the store.  But then Carol

18   says she didn't say that.

19           And so then at the -- towards the end of

20   that conversation, she references initially -- she says

21   she didn't know what was going on with me, but then she

22   tells me that everything she's done to me up to that

23   point was directed by HR.  So she contradicted herself

24   saying that she didn't know what was going on with me,

25   but that, you know, at the end of that conversation,

1    everything that had been done to me by her up to that

2    point was directed by HR.

3         Q.   (By Ms. Kirby) By the way, you did have issues

4    with Bobbye.   I know that she left one time.   She felt

5    so threatened.   And you've got a video of her coming

6    back or you leaving when she came back.

7         A.   I have a voice record and a video of that

8    time.

9         Q.   You don't consider that tension between you

10   and Bobbye?

11        A.   Will you rephrase the question?

12        Q.   Was there tension between you and Bobbye?

13        A.   At some point, yes.

14        Q.   Okay.   When you listen to those recordings, I

15   want you to also let me know if there's anything in

16   there that indicates that you think Mareatha was

17   discriminating against you or retaliating against you

18   on any grounds.

19        A.   Okay.

20        Q.   Okay?   Have you ever secretly recorded anyone

21   other than Cache employees?

22             MS. ALLEN:   Objection.   Question is

23   compound.

24        Q.   (By Ms. Kirby) Did you secretly record Cache

25   employees?

**37**

1      Q.    Right.

2      A.    Are you asking do I hear a click?

3      Q.    Yeah.

4      A.    I don't remember.  I'd have to --

5      Q.    Okay.

6      A.    -- go back and try it.

7      Q.    Okay.  Well, you knew you weren't allowed to

8    have your cell phone on the sales floor, didn't you?

9      A.    ·At some point I knew I wasn't allowed.

10     Q.    Well, you were written up for it, let's

11   see -- let's see, 8/2 -- in May or June of '09.  Let's

12   see.  Right here.  If you'd take a -- you know what,

13   that's my copy.  I need to find that over here.

14            MS. ALLEN:  Are you going to mark this

15   as an exhibit?

16            MS. KIRBY:  Yes, I'm going to mark it as

17   an exhibit.  I really need -- let's see. That doesn't

18   have as many -- what did I just give you?  I think I

19   left out a page.

20            MS. ALLEN:  Oh, it's just two pages.

21            MS. KIRBY:  Just two pages, okay.  I

22   meant it to be --

23            MS. ALLEN:  It's marked already, but

24   I'll just hand it back to her.

25            MS. KIRBY:  It's these three pages.

1          MS. ALLEN:  You want to just put the

2    label on that one then?

3               (Exhibit No. 6 marked)

4          MS. KIRBY:  Okay.  And let me -- I

5    warned everybody, I'm not good with papers.

6       Q.  (By Ms. Kirby) Okay.  If you'll take a look at

7    the three documents that we've labled as Exhibit 6,

8    Chica.

9       A.  Yes, ma'am.

10      Q.  This was a write-up -- I guess it looks like

11   in May -- of you and April.  It's 5/26.  You see that?

12   It's the first page.

13      A.  Yes, ma'am.

14      Q.  The first page.

15      A.  Oh.

16      Q.  Number 4, No cell phones on floor or private

17   calls on store phone.  So -- and if you look at the

18   next page, I see you signed it up at the top.  It

19   repeats these things.  They're just in the -- they're

20   listed.

21              So you understood at least by May of '09

22   that you were not allowed to have your cell phone on

23   the  floor, didn't you?

24      A.  This initial, this first sheet, was never

25   given to me.  I never saw this.  This is my first time

**39**

1     seeing this sheet.

2          Q.   Oh, okay.  Well, this is the one you signed.

3          A.   This is what I received.

4          Q.   Okay.  All right.  So you understood on this

5     date that cell phones were not allowed on the floor,

6     didn't you?

7          A.   Yes, ma'am.

8          Q.   And you used your cell phone to make

9     recordings and videos knowing that was in violation of

10    the rule, right?

11         A.   I used my cell phone -- number 4, may I read

12    it, please?

13         Q.   Yes.

14         A.   It says, No cell phones on floor or private

15    calls on store phone.  I was under the impression that

16    as it relates to the cell phone, not using the cell

17    phone or being able to talk on personal phone calls on

18    the cell phone.  I wasn't using my cell phone as to

19    make conversation with anyone.  I was using it as a --

20    a recorder.

21         Q.   Right.  You were using it on the floor,

22    right?

23         A.   I didn't --

24         Q.   As a recorder?

25         A.   Yes, ma'am.

**40**

Page 91

1      Q.   And if you go by what this says, that's

2  against the rule, isn't it?

3            MS. ALLEN:  Objection.  See what this

4  exact point -- problem with that question.

5            I object to the question because it is

6  unclear and vague and calls for facts that are not in

7  evidence.

8      Q.  (By Ms. Kirby)  Okay.  Let's go to the next

9  page.  This is a progress report basically for the same

10  thing, then you signed it.  Do you remember this?

11     A.   I remember this progress report.

12     Q.   Okay.  You were observed having a

13  conversation on the sales floor while clocked in,

14  right?

15     A.   I disagreed with this.  As you can see,

16  this -- she's saying that I used my cell phone on

17  May 21st --

18     Q.   Right.

19     A.   -- 2009.

20     Q.   Right.

21     A.   As it relates to the cell phone, she brought

22  me this progress report on June 2nd, 2009.  It wasn't

23  until May 26th, 2009 that she wrote out this particular

24  No cell phone use on the floor.  So on May 21st, 2009,

25  I was not aware that it was an issue with the cell

**41**

Page 92

```
 1    phone being used on the floor.  And, also, I didn't
 2    recall having my cell phone on this particular day on
 3    May 21st, 2009.
 4         Q.   Okay.
 5         A.   I disputed this.
 6         Q.   Oh, okay.  So did -- you did sign it, though,
 7    right?
 8         A.   I signed that I acknowledged that we had this
 9    conversation.
10         Q.   Right.  Okay.  So, there again, you had two
11    conversations with her then about no cell phone use on
12    June 2nd and on May 25th, right?
13         A.   On May 26th, 2009.
14         Q.   Oh, 26, okay.  All right.  And then again
15    on -- let's see -- January 15th, you told the EEOC that
16    on that day Carol Keeler, the store manager -- I was
17    told by Carol Keeler, store manager, that I could not
18    use my cell phone on the floor.  Do you remember that?
19         A.   On what day?
20         Q.   January 15th.  I'll enter this into evidence
21    so you can look at it.  It's your second EEOC charge.
22         A.   Okay.
23              MS. KIRBY:  I want you to mark that as
24    an exhibit.
25              (Exhibit No. 7 marked)
```

**42**

1      Q.  (By Ms. Kirby) So you see, it's one, two,

2  three -- four down.

3      A.  On the 15th?

4      Q.  Right.

5      A.  On January 15th?

6      Q.  Right.

7      A.  I was told by Carol Keeler that I could not

8  use my cell phone on the floor.

9      Q.  Right.

10      A.  Yes.

11      Q.  And you were still using it, weren't you?

12      A.  I wasn't using it --

13      Q.  Using it --

14      A.  I wasn't using it to verbally make

15  conversations with -- personal phone calls.  I was

16  not -- that wasn't the intent for the phone.

17      Q.  Do you -- I mean, do you know what the intent

18  was?

19      A.  Meaning --

20      Q.  I mean, there's no way to know.  She said no

21  cell phones on -- on the floor.  And it was your

22  interpretation that that meant no talking on the cell

23  phone.

24      A.  That was my interpretation --

25      Q.  Okay.

```
 1        A.   -- exactly.

 2        Q.   So you just kept using it to record and take

 3   pictures after January 15th, right?

 4        A.   Yes, I used it.

 5        Q.   I've got some more questions to ask you about

 6   this while we're on it.

 7        A.   Okay.

 8        Q.   This -- this charge.

 9             This mandatory holiday meeting, what's

10   that?  What was that all about?

11        A.   It was a mandatory holiday meeting that was

12   scheduled for everyone to attend.

13        Q.   Uh-huh.  And who all attended?

14        A.   Carol Keeler, myself, Janice and Keely.

15        Q.   And April and Bobbye did not attend?

16        A.   No, ma'am.

17        Q.   Were you paid for your attendance?  Were you

18   on the clock?

19        A.   Yes.

20        Q.   Okay.

21        A.   Any meetings.

22        Q.   See this next one, it was a scheduled meeting

23   to meet -- okay.  On January 13th you did, in fact,

24   meet with Mareatha.

25        A.   Yes.
```

1        A.    In the meet -- no, ma'am.  Not in the meeting

2    that I had with her prior to January 13th.

3        Q.    No.  I mean on January 13th, she told you

4    what she was doing, that she was interviewing everyone,

5    right?

6        A.    Yes, ma'am.

7        Q.    To get to the bottom of things?

8        A.    Yes, ma'am.

9        Q.    Okay.  And how was that -- this is personal

10   harm.  How did that harm you that she interviewed

11   everyone?

12       A.    Because everyone wasn't in question at this

13   point.  She and I had --

14       Q.    No.  How did it harm you that she interviewed

15   everyone?

16       A.    Basically the meeting had to do with me.  It

17   was -- January 13th was set aside specifically for me

18   so...

19       Q.    You were the only one interviewed on the

20   13th?

21       A.    I wasn't the only one interviewed.  The

22   interviews were to find out how everybody felt about me

23   personally.

24       Q.    Because you had complained about problems --

25       A.    I complained about --

Page 97

1    Q.   -- in the store.

2    A.   I complained about two individuals, April

3   Baker and Carol Keeler.  I didn't complain about issues

4   with Bobbye and Keely and Janice.

5    Q.   Okay.  So how did it harm you that she

6   interviewed everyone?

7    A.   It directly affected my relationships with

8   everyone -- with everyone because they were being

9   questioned about their relationships with me.

10    Q.   Are you sure?  I mean, how do you know that

11   they were questioned like that?  You weren't in those

12   interviews, were you?

13    A.   I wasn't in the personal interviews.  I had

14   my interview with Mareatha and Mareatha, if I recall,

15   at that -- after the interview to go over, Mareatha

16   said that 80 percent of the employee staff had issues

17   with me.

18    Q.   Right.  But you don't know if Mareatha said,

19   Do you have issues with Chica, or if she said, Have you

20   got any issues, Is there any problems in the store?

21   You don't know if she specifically asked questions

22   related to you or not, do you?

23    A.   No, ma'am.

24    Q.   Okay.  This next one, you were written up by

25   Carol Keeler for -- that was for losing the keys,

**46**

1    my joy.  It was just an uncomfortable environment.

2         Q.   Do you think it's reasonable for someone to

3    think you're unhappy when they hear you say that you're

4    working in a stressful environment?

5                   MS. ALLEN:  Objection.

6         Q.  (By Ms. Kirby) Is that reasonable?

7                   MS. ALLEN:  Calls for speculation.

8         A.   Will you rephrase the question, please?

9         Q.  (By Ms. Kirby) Do you think it's reasonable

10   for a person to consider someone who is complaining

11   about a stressful work environment to think that

12   person's unhappy?

13        A.   Anyone can draw their own conclusions, but I

14   never told Margarita that I was unhappy.

15        Q.   You never used the words unhappy.

16        A.   You're correct.

17        Q.   Right.  Okay.  You also submitted -- this

18   wasn't produced, but you submitted a list to Mareatha,

19   in fact, to Margarita, that meeting that you had with

20   her when you were interviewed on the -- January 13th --

21        A.   Yes, ma'am.

22        Q.   -- do you remember that?

23        A.   Yes, ma'am.

24        Q.   Do you have a copy of that?

25        A.   I have a copy, not with me.

Page 108

1          Q.   Oh, okay.  Because it wasn't produced.

2                    MS. ALLEN:  What?

3                    MS. KIRBY:  I think I have the -- the --

4          A.   I provided Mareatha with that.

5                    MS. ALLEN:  Did you give it to me?

6                    THE WITNESS:  Yes.

7                    MS. ALLEN:  Okay.  What is it?

8                    MS. KIRBY:  Let's -- let's go off the

9     record.

10                   MS. ALLEN:  Okay.

11                   THE VIDEOGRAPHER:  We're off the record

12    at 11:52 a.m.

13                   (Recess taken, 11:52 to 11:54)

14                   THE VIDEOGRAPHER:  We're back on record

15    at 11:54 a.m.

16                   (Exhibit No. 8 marked)

17         Q.   (By Ms. Kirby) Okay.  You have in front of you

18    a list that you addressed to Margarita Croisdale

19    dated -- it's dated --

20         A.   January 13th.

21         Q.   Yeah, it is.  Oh, there it is right at the

22    top.  And it's marked as Exhibit 8.  I'm not going to

23    ask you much about this because we've already gone

24    through some of it.

25                   But the first issue, the scheduling

**48**

1   though, do you?  Her coming in early and doing whatever

2   she did was no harm to you?

3        A.   No direct harm to me.

4        Q.   Okay.  What about indirect harm?

5        A.   No.

6        Q.   Okay.  Okay.  No annual evaluation.  Did you

7   ever get an annual evaluation?

8        A.   No, ma'am.

9        Q.   Did anyone ever get one?  Did Carol do them?

10        A.   I don't know about anyone else.

11        Q.   Okay.

12        A.   But there -- I have been requesting.

13        Q.   And as far as promotion, I was going to ask

14   you about this.  Were you willing to move to another

15   store for a promotion?

16        A.   For a promotion, yes.

17        Q.   Did you ever tell anyone you'd move to --

18   you'd like to be promoted and moved to another store?

19        A.   I was never asked the question about being

20   promoted and moving to another store?

21        Q.   Because -- would you agree with me that there

22   was no store manager position open in that store.

23   Carol was in that position, right?

24        A.   Right.

25        Q.   And they only have one comanager in Cache.

**49**

1    Were you aware of that?

2        A.   Yes.

3        Q.   Each store just has -- so there was no

4    position open for a promotion for you in that store,

5    was there?

6        A.   Yes, ma'am, you're correct.  That's correct.

7        Q.   Oh, okay.  And if you had wanted, you could

8    have asked, Can I move to another store and get a

9    promotion?

10       A.   Yes.

11       Q.   Okay.  In this next paragraph, you basically

12   just think -- say that you deserve a working

13   environment that believes in integrity.  And, you know,

14   I just want to know if you think it's a lack of

15   integrity to secretly record people.

16       A.   No, I don't believe it's a lack of integrity.

17       Q.   Okay.  Now, it also says full -- you need --

18   wanted full-time hours, 40 hours, plus benefits.  I've

19   looked at your records.  You rarely worked 40 hours a

20   week.  It was -- you -- 37 to 38.  Wouldn't you agree

21   with me that that was --

22       A.   37 to 40.  There were weeks I worked 40

23   hours.

24       Q.   Not many, right?  In the entire period of

25   your employment, I think I saw maybe five weeks you

Page 122

1        A.    Yes.

2        Q.    Okay.  Let's see.

3              MS. KIRBY:  I want to enter this page

4    out of the employee handbook of Cache as an exhibit.

5              (Exhibit No. 9 marked)

6        Q.    (By Ms. Kirby) Do you need -- oh, she's going

7    to get it.

8        A.    Okay.

9        Q.    Do you remember this as a page of the

10   handbook you signed?

11       A.    I don't remember it.

12       Q.    Well, do you dispute that it was the -- a

13   page from the handbook at the time you were employed?

14             MS. ALLEN:  Object, calls for

15   speculation.

16             MS. KIRBY:  Well, I'm just asking if she

17   disputes it.

18       A.    I don't remember the sheet.

19       Q.    (By Ms. Kirby) Okay.  So you don't know, one

20   way or the other, whether this is a copy of a page of

21   the handbook that was in effect when you were employed?

22       A.    Correct.

23       Q.    Okay.  Now, would you read me the definition

24   of full-time employees.

25       A.    The term full-time applies to those employees

**51**

1    who normally work an average scheduled workweek of 30

2    hours or more and have completed their 90-day

3    introductory period.

4         Q.    And you told me earlier that you expected to

5    be returned to work after your leave as a full-time

6    employee, right?

7         A.    Yes, ma'am.

8         Q.    And would you agree with me that a full-time

9    employee is -- 30 hours is full-time under Cache's

10   definition?

11        A.    This that's in writing says 30 hours or more.

12        Q.    Right.  So do you -- do you know that

13   full-time employees get benefits that part-time

14   employees don't get?

15        A.    Yes.

16        Q.    What are they?  Do you know?  Do you

17   remember?

18        A.    As it relates to?

19        Q.    Well, vacation.  Do part-time employees get

20   vacation?

21        A.    Not to my knowledge.

22        Q.    Okay.  What about sick leave?

23        A.    Not to my knowledge.

24        Q.    And holiday pay.

25        A.    Not to my knowledge.

**52**

1        Q.    Okay.  So you did understand that there was a

2    distinction between full-time and part-time?

3        A.    Yes, ma'am.

4        Q.    You just didn't know what the distinction

5    was, the criteria was.

6        A.    That's correct.

7        Q.    Okay.  So Bobbye Villanueva is the part-time

8    assistant manager.  She didn't get any benefits then,

9    right, sick leave, holiday pay, any of that?

10       A.    I'm not aware of Bobbye's --

11       Q.    Okay.

12       A.    -- benefits.

13       Q.    Well, she didn't make as much an hour as you

14   either, did she -- or do you know that?

15       A.    I'm not aware of that either.

16       Q.    Okay.  Are you aware that just the part-time

17   sales associates make less than the managers?

18       A.    Yes.

19       Q.    Okay.  Would you agree with me that Cache

20   saved on payroll by using part-time employees who made

21   less than you for -- rather than give you 40 hours?  By

22   using some of the part-time employees, they saved on

23   payroll?

24              MS. ALLEN:  Objection.  Question calls

25   for speculation, and it's compound.

**53**

Page 134

1                    Did you go down to the EEOC office in

2      Dallas to file the charge?

3          A.   Yes, I went.

4          Q.   Anybody go with you?

5          A.   No, ma'am.

6          Q.   Did you have an appointment --

7          A.   No, ma'am --

8          Q.   -- or just show up?

9          A.   It's a first-come, first-serve basis.

10         Q.   Oh.  So did you have a long wait before you

11     could talk to them?

12         A.   No.

13         Q.   Did you go in the morning or afternoon?

14         A.   I went morning.

15         Q.   About how long did it take --

16         A.   I don't recall --

17         Q.   -- the whole process?

18         A.   -- the length of the process.

19         Q.   Well, like half a day?

20         A.   I would -- possibly.

21         Q.   Okay.  Did an EEOC investigator interview you

22     the same day you filed the charge?

23         A.   Yes.

24         Q.   That -- and that was a Monday, right,

25     October 26th?

**54**

Page 135

1          A.    I don't remember.

2          Q.    Well, let me get it.  I'm going to enter it

3     and ask you some questions about it.

4                MS. KIRBY:  Yeah.  If you could, mark

5     that as an exhibit.

6                (Exhibit No. 10 marked)

7          Q.  (By Ms. Kirby) Okay.  So it looks like you

8     signed it here on the -- October 26th.

9          A.    That's correct.

10         Q.    Correct?  Okay.

11               That same day -- I've got a recording of

12    you calling Carol the same day that you filed this

13    charge, and I want you to listen to it.

14               MS. KIRBY:  It's number -- let's see --

15    it's VN12 and 13.

16               THE WITNESS:  Before we go any further,

17    may I take a break?  May I go use the restroom real

18    quick?

19               MS. KIRBY:  Okay.

20               THE WITNESS:  Is that okay?

21               MS. ALLEN:  Yeah.  If you need to go,

22    you can take a break, yes.

23               THE WITNESS:  Okay.  Lunchtime.

24               THE VIDEOGRAPHER:  We are off record at

25    1:27 p.m.

**55**

1                  (Recess taken, 1:27 to 1:33)

2                  THE VIDEOGRAPHER:  We're back on record

3    at 1:33 p.m.

4        Q.  (By Ms. Kirby) Okay.  I've given the court

5    reporter the tape recording you made on October 26th at

6    11:11 a.m. when you called Carol.  And I want -- I want

7    to play it and I want to enter it as an exhibit and ask

8    if you remember this.

9                  (Exhibit No. 11 marked)

10                MS. KIRBY:  This is VN00012-2009,

11    10/26-11:11.

12                (Telephone ringing)

13                MS. KEELER:  Thank's for calling Cache.

14    This is Carol.  Can I help you?

15                MS. KING:  Hey, Carol.  It's Chica.  How

16    are you?

17                MS. KEELER:  Hello?

18                MS. KING:  Carol?  Hello, Carol?

19                MS. KEELER:  Yes.

20                MS. KING:  It's Chica.  How are you?

21                MS. KEELER:  Hello?

22                MS. KING:  Carol.  Can -- can you hear

23    me?

24                MS. KEELER:  Hello?

25                MS. KING:  Can you hear me, Carol?

Page 137

1                    MS. KEELER:  You keep coming -- keep

2       coming out.

3                    MS. KING:  I'm at the doctor.  Can you

4       hear me now?  Hello?

5                    MS. KEELER:  Hello?

6                    MS. KING:  Can you hear me now?

7                    MS. KEELER:  Yes.

8                    MS. KING:  Can you hear me now?

9                    MS. KEELER:  If you shout.

10                   MS. KING:  Okay.  Can you hear me now?

11      Can you hear me?

12                   MS. KEELER:  I lost you again.

13                   MS. KING:  Can you hear me?

14                   MS. KEELER:  Yeah.

15                   MS. KING:  Right here, can you hear me?

16                   MS. KEELER:  Yeah.

17                   MS. KING:  I am at -- at the doctor.

18                   MS. KEELER:  Okay.

19                   MS. KING:  And I was -- I called Janice

20      to see if she could come in for me and she told me she

21      was going to call -- I called her at like 10:00.

22                   MS. KEELER:  Okay.

23                   MS. KING:  And she was still in the bed.

24      And she said she was going to call me back in about an

25      hour and let me know if she could come for me or not.

**57**

Page 138

```
 1                    MS. KEELER:  Okay.  Are you sick?

 2                    MS. KING:  I've just -- I got this sinus

 3       headache, this migraine --

 4                    MS. KEELER:  Oh.

 5                    MS. KING:  -- that is --

 6                    MS. KEELER:  Okay.

 7                    MS. KING:  And a -- and my nose.  I

 8       mean, I was coughing up a little bit of -- a little

 9       phlegm.  And I just want to make sure I get some

10       antibiotics or something just 'cause the flu and all

11       that's going around.

12                    MS. KEELER:  Exactly.  Okay.

13                    MS. KING:  And -- but she's going to

14       call me back -- or I can just -- she said she was going

15       to call me back in an hour, so she ought to be calling

16       in a minute --

17                    MS. KEELER:  Okay.

18                    MS. KING:  -- and letting me know.  But

19       is it busy?  Is it --

20                    MS. KEELER:  Oh, no.

21                    MS. KING:  It's dead.

22                    MS. KEELER:  Yeah, it's dead.

23                    MS. KING:  So would I be okay?  I

24       mean --

25                    MS. KEELER:  Oh, yeah.  I don't -- I
```

**58**

1    shouldn't think it's going to be -- I mean, today is

2    Monday, anyway, so, you know, don't worry -- I mean,

3    don't worry about it.  If Janice can come in, then

4    that's great, but if she calls and -- just, you know,

5    get better.

6                  MS. KING:  Okay.  Well, no.  I'm -- it's

7    a -- I know it's a sinus headache.  And I mean, like I

8    said, my nose was running a little bit and I'm

9    coughing up a little phlegm.  I just want to get it

10   taken care of before it goes further.

11                 MS. KEELER:  Right.  Okay.

12                 MS. KING:  And I -- I'm -- I'm coming in

13   at 1:00.  So I'll get a good night's rest and I'll be

14   fine tomorrow.

15                 MS. KEELER:  Okay.

16                 MS. KING:  Okay.

17                 MS. KEELER:  Well, then, call me back as

18   soon as you hear from Janice.

19                 MS. KING:  Okay.  Thank you.

20                 MS. KEELER:  Okay.

21                 MS. KING:  Bye.

22        Q.   (By Ms. Kirby) And then I'm going to play the

23   one that you made at 11:48 about 30 minutes later.

24        A.   Okay.

25                 (Telephone ringing)

Page 140

1      MS. KEELER:  Thank you for calling

2  Cache.  This is Carol.  Could I help you?

3      MS. KING:  Hey, Carol.  It's Chica.

4      MS. KEELER:  Hey.

5      MS. KING:  Hey.  Janice just called me.

6  She says she's going to come in.

7      MS. KEELER:  I'm sorry.  I can't hear

8  you.

9      MS. KING:  Can you hear me now?

10      MS. KEELER:  Yes.

11      MS. KING:  Okay.  Janice called and

12  said she's going to come in at 1:00 for me.

13      MS. KEELER:  She's going to come in?

14      MS. KING:  Yes, she's coming in.

15      MS. KEELER:  Okay.

16      MS. KING:  Okay.

17      MS. KEELER:  Okay.  Thank you.

18      MS. KING:  Bye-bye.

19      Q.  (By Ms. Kirby) Okay.  So you were at the EEOC

20  when you called and said you were at the doctor's

21  office, weren't you?

22      A.  Yes.

23      Q.  You lied to Carol, didn't you?

24      A.  I was going to the doctor, but, yes, I was at

25  the EEOC office at the time I made the phone call.

**60**

1     Q.   And you got paid four hours of sick time for

2   that, didn't you?

3     A.   I was sick.  Carol was aware of my sinus

4   issue.  And it rained.  That's when we were getting a

5   lot of rain during that time.  And she was aware

6   actually the day before that I could possibly go to the

7   doctor.

8     Q.   She wasn't rude to you at all, was she?

9     A.   No, she wasn't rude.

10     Q.   She was very --

11     A.   Receptive?

12     Q.   -- very cordial, wasn't she, very courteous

13   and cordial?

14     A.   She knew I had been having sinus issues

15   throughout that week.  It had been raining, so she was

16   aware that I would possibly --

17     Q.   You didn't go to the doctor --

18     A.   -- go to the doctor.

19     Q.   -- though, did you?

20     A.   I didn't go that day.  I had intentions to

21   go.  Woke up that morning.  The voice message, as it

22   relates to waking up with a sinus headache and things

23   of that nature, that is true.  I had intentions to try

24   to make it to the doctor after I went to the EEOC.  I

25   didn't want to tell her.  I knew I was not going to be

1    complete -- apparently at that time I wasn't going to

2    be complete with my EEOC appointment.  I was trying to

3    do that before -- I was scheduled to be at work at

4    1:00.

5              So I was trying to get that done and

6    then try to get to the doctor after.  And I wasn't

7    going to be able to accomplish both with -- by 1:00 --

8    1:00 p.m.  So, yes, I was at the EEOC, but I didn't

9    want to tell her that I was specifically there because

10   I didn't want to have the result of retaliation and

11   further harassment based on everything else I had been

12   experiencing.

13        Q.   But you took it to another level and actually

14   lied about your whereabouts, didn't you?

15        A.   I told Carol I was at the doctor's office at

16   that time.

17        Q.   And you seem to be concerned about integrity.

18   That shows a lack of integrity.  Wouldn't you agree

19   with me?

20        A.   Will you rephrase the question?

21        Q.   No.  I don't need to ask that.  Just strike

22   it.

23             Were you able to afford to go the doctor

24   at that point in time?  Could you afford a doctor's

25   appointment just for a runny nose?

**62**

Page 146

1      Q.   Okay.

2      A.   Honestly, I don't remember.  I do -- I didn't

3   go to Houston.  I don't remember going to Houston that

4   year, though.

5      Q.   Okay.  Does your mother live in Houston?

6      A.   Yes.

7      Q.   All right.  Well, we're into November now,

8   and I'm going to talk to you about November 24th, the

9   day that April forgot her keys.

10     A.   Okay.

11     Q.   You remember that?

12     A.   Yes.

13     Q.   And we've got a recording of it.  I prefer

14   not to have to play it.

15          But is it true that April came in and

16   said she forgot her keys?

17     A.   No.

18     Q.   Okay.  Did she come in and ask you to loan

19   her your set of keys?

20     A.   Yes.

21     Q.   Okay.  And you knew she did not have a key at

22   that point, right?

23     A.   Yes.

24     Q.   Okay.  And you said no, didn't you?

25     A.   Yes.

1        Q.    And she's over you in the chain of command,

2    isn't she?

3        A.    Yes.

4        Q.    So what -- she went and called -- is it true

5    that she went and called Carol --

6        A.    No.

7        Q.    -- about the situation?

8        A.    That's not true.

9        Q.    She talked to Carol.

10       A.    She was already on the phone with Carol when

11    she asked me for the key.

12       Q.    Oh, okay.  So did she give you the phone then

13    to talk to Carol?

14       A.    Yes.

15       Q.    Okay.  And did Carol tell you to give your

16    keys to April?

17       A.    Carol asked me -- if I remember, if I

18    remember correctly, she didn't directly tell me to give

19    the keys.  She didn't understand why I didn't want to

20    give her the keys.

21       Q.    Wasn't it true that April would have to drive

22    40 minutes -- 45 minutes home and 45 minutes back to

23    get her keys?

24       A.    I don't know the distance between her home

25    and Cache.

1      Q.   Didn't Carol tell you it would be ridiculous

2  for her to have to drive an a hour and a half -- miss

3  an hour and a half of work when you could just give her

4  your keys?

5      A.   Yes.

6      Q.   And didn't she say, otherwise, she, Carol,

7  was going to come up and give her the keys?

8      A.   Yes.

9      Q.   And you still refused --

10     A.   Yes.

11     Q.   -- to give the keys?  Okay.

12          And Carol called.  Do you know that

13  Carol called Mareatha --

14     A.   I don't know --

15     Q.   -- What do I do?

16     A.   I don't know that Carol called Mareatha.  I

17  do know that I requested that Carol have someone --

18  Mareatha acknowledge that she knows about the situation

19  before I gave April my keys.

20     Q.   I thought you said if Mareatha or HR told

21  you, you'd do it.  You weren't going to do it with

22  Carol and April telling you to do it.

23     A.   I can't remember verbatim --

24     Q.   Well, we can play it.

25     A.   -- but I do remember -- we can play it.  I

1    don't -- I don't remember verbatim what was -- what was

2    said.

3         Q.   So you wouldn't give the keys over until

4    Margarita from New York called and asked you to give

5    the keys to April, right?

6         A.   I didn't request Margarita.  I requested

7    Mareatha or someone.  I didn't specifically request

8    Margarita to call me about the key situation.

9         Q.   Do you know how it got to Margarita?

10        A.   No, I don't.

11        Q.   Okay.  So the next day Carol wrote you up for

12   insubordination, right, for refusing to follow her

13   instruction to give the keys to April?

14        A.   I don't exactly remember --

15        Q.   Well --

16        A.   -- the write-up.  I do know that she intended

17   to give me a write-up.

18        Q.   I thought she did give you a write-up.  You

19   had a meeting with her.

20        A.   We had a meeting, yes.

21        Q.   Okay.  Let me see.  This is -- hang on one --

22   I'm going to find the write-up and enter it as an

23   exhibit.

24                    (Exhibit No. 12 marked)

25        Q.   (By Ms. Kirby) Okay.  Now, you refused to sign

1       the write-up, correct?

2           A.    Do you mind if I read -- read over this?

3           Q.    Yes.  Yeah, read it.

4           A.    Okay.

5           Q.    Okay.  I'm going to ask you about each one of

6       these statements and see if it's correct or not.

7                     On Tuesday, November 24th, the store

8       manager and comanager asked LaChica to give her store

9       keys to the comanager.  Is that true?

10          A.    That's true.

11          Q.    LaChica refused to do as she was asked.  Is

12      that true?

13          A.    Yes.

14          Q.    LaChica must --

15          A.    To --

16          Q.    LaChica must understand the store keys belong

17      to Cache and she must obey instructions regarding all

18      Cache property including said keys.  Is that true that

19      the store keys belong to Cache?

20          A.    Yes, the store keys belong to Cache.

21          Q.    Do you think it's a job requirement that you

22      obey instructions regarding Cache property including

23      keys?

24          A.    Yes, I do.  I did give April the keys after

25      Margarita called with the knowledge of the key

**67**

1    situation.  So April did receive the keys.

2         Q.   Right.  But you refused to obey Carol and

3    April's instructions to give you the keys, period,

4    didn't you?

5         A.   Yes.

6         Q.   Okay.  You agree with the statement in the

7    second paragraph that, You should cooperate when

8    instructed to perform duties that are required of you

9    by the store manager and comanager.

10        A.   Will you rephrase that question?

11        Q.   Okay.  This says, You must cooperate when

12   instructed to perform duties that are required of you

13   by the store manager and comanager.

14              Do you agree or disagree with that

15   that?

16        A.   I disagree with that.

17        Q.   So you didn't think it was part of your job

18   responsibility to obey the store manager?

19        A.   I agree that it is my responsibility to obey

20   the store manager.  We're speaking about the keys and I

21   didn't believe it was my responsibility to hand over my

22   key -- my assigned keys to another manager.

23        Q.   Which you were instructed to do by the store

24   manager.

25        A.   Yes, ma'am.

**68**

Page 152

1          Q.   Okay.  So is that the reason you didn't sign

2     it because you didn't think you had to obey Carol about

3     keys?

4                    MS. ALLEN:  Objection.

5          A.   That --

6                    MS. ALLEN:  -- question is argumentive.

7          A.   That's not the reason I didn't sign it.

8          Q.   (By Ms. Kirby) What's the reason you didn't

9     sign it?  We've gone through all this and it's correct.

10                   MS. ALLEN:  Same objection,

11    argumentative.

12         A.   The reason I didn't sign it is because it

13    related to April not having her keys.  And I explained

14    to Carol in the voice record that as a -- there's a

15    responsibility as a manager to maintain their property

16    given by Cache.  And there's also a responsibility to

17    have your property -- to have your keys to be able to

18    fulfill your responsibility as a manager.

19                   April came to work unprepared, without

20    her keys.  And I felt as though that was not my

21    responsibility as a employee of Cache, who had her

22    personal keys on her, myself, to have to -- that was

23    not a duty assigned by Cache to relinquish my keys to

24    someone else because they forgot the property that

25    Cache handed over to them.

**69**

1          Q.   (By Ms. Kirby) By the way, just to get it

2     clear on the record, you did give her the keys finally

3     and there was no negative impact on you, was there?

4     You weren't --

5                    MS. ALLEN:  Objection.  The question is

6     compound.

7          Q.   (By Ms. Kirby) Were you closing?

8          A.   No, I wasn't closing.

9          Q.   You didn't need them to close.  Did you need

10    them to open the next day?

11         A.   No, ma'am.

12         Q.   So you finally gave the keys and then April

13    gave them back to you when you came in the store the

14    next day, right?

15         A.   I did give her the keys per Margarita's

16    request --

17         Q.   Right.

18         A.   -- and I did write out a note just to

19    solidify the transaction that I was allowing her to

20    handle my keys until the next day.

21         Q.   So you think it's a proper way to run a

22    business that every time a store manager gives an

23    instruction to an employee about a key, it has to go

24    through New York?

25                    MS. ALLEN:  Objection.  Question is

**70**

Page 154

```
 1    compound and argumentative.
 2        A.   I didn't request it to go through New York.
 3        Q.  (By Ms. Kirby) Do you know of any other
 4    employee in all the history of Cache who has flat
 5    refused to loan their key to another manager?
 6             MS. ALLEN:  Objection.  Question is
 7    compound, question is argumentative and question
 8    assumes facts not in evidence and question calls for
 9    speculation.
10        Q.  (By Ms. Kirby) Okay.  Do you know of any
11    employee, any manager in Cache, who has refused to loan
12    their set of keys to another manager when the other
13    manager needed them?
14        A.   No.
15        Q.   Okay.  And all this responsibility about
16    keys, I want to play another tape recording of when you
17    lost your keys.
18        A.   Uh-huh.
19        Q.   Did Carol refuse to help?  Did she say,
20    That's your responsibility, I'm not helping?  How did
21    Carol treat you when you lost your keys -- not forgot
22    them, lost them?
23             MS. ALLEN:  Objection.  Question is
24    compound, question is vague, plus going on and on about
25    it, and question is unclear for that same reason.
```

**71**

1          A.    Will you rephrase the question?

2          Q.    (By Ms. Kirby) How did Carol treat you when

3     you called and told her you lost your keys?

4          A.    Carol allowed me to use her keys.

5          Q.    What, did she chastise you, what do you mean

6     you lost your keys, or was she kind and understanding?

7          A.    No.  She allowed me to use her keys.  And

8     that was the very thing she would have allowed April to

9     do in April's case also.  She didn't want to drive to

10    bring April her keys.

11         Q.    But she drove to bring you a set of keys to

12    open, didn't she?

13         A.    Yes, she did.

14         Q.    Because there was no one for you to borrow

15    the keys from, right?

16              MS. ALLEN:  Objection, calls for

17    speculation.  Question is unclear.

18         Q.    (By Ms. Kirby) Was there anyone scheduled --

19    another key holder scheduled to open the day you lost

20    your keys?

21         A.    Carol wasn't scheduled to open.  I was the

22    only opener.  So there are other managers with keys in

23    the event if we had to go that route.

24         Q.    But my point is the day you lost your keys,

25    was there another manager scheduled to be at the store

1    keys the following day to open.  So Carol arranged to

2    meet with me to bring me her keys.  It wasn't a issue

3    of having to ask anyone else because I was at the store

4    with Carol with the store already open the day before.

5        Q.   And so then you lost that key?

6        A.   No, I didn't lose her key.

7        Q.   Oh, okay.

8        A.   No.  Carol gave me her key to make copies so

9    that I would have a set of keys.

10        Q.   Well, why were you not able to get in on New

11    Year's Day?  Let me play this recording and ask you.

12    You said you lost the keys.

13              MS. KIRBY:  Can you give me -- it's

14    number -- you know what, I can play it from this.

15    Let's see.  This is January 1st.

16              THE WITNESS:  Okay.

17              (Telephone ringing)

18              SPEAKER 1:  Hello.

19              MS. KING:  May I speak with Carol?

20              SPEAKER 1:  Yeah.  Hold on.

21              MS. KING:  Okay.

22              MS. KEELER:  Hello?

23              MS. KING:  Good morning.

24              MS. KEELER:  Hey.

25              MS. KING:  Hey.  Carol, I can't find my

```
 1    key.

 2                   MS. KEELER:  Okay.  (Inaudible)

 3                   MS. KING:  I have been up since 6:00

 4    searching for -- I searched every corner of my house.

 5    And I'm -- I've only been two places and I didn't have

 6    my purse either time.  I went to Wal-Mart when I got

 7    off Monday night.  I took my wallet in.  And I called

 8    them and they didn't have anything in lost and found.

 9    And I went over to my cousin's house.  So I promise I

10    only had -- I don't even think I had my driver's

11    license.  I had my keys and my phone.

12                   MS. KEELER:  Wow.

13                   MS. KING:  So the only other place I

14    could think is they're in the trash.

15                   MS. KEELER:  Oh, my gosh.

16                   MS. KING:  I mean, I would hope not,

17    but...

18                   MS. KEELER:  What about at, like, your

19    boyfriend's?

20                   MS. KING:  No, 'cause he's been over

21    here.

22                   MS. KEELER:  Oh.

23                   MS. KING:  And he doesn't have them.

24    And the people at the --

25                   MS. KEELER:  (Inaudible) -- can you
```

**74**

```
 1    call anyone?
 2                MS. KING:  No.  I searched -- I know --
 3    I mean, I always put them in my purse.  And Monday I --
 4    I remember when I got off, it was me and Keely.  I
 5    locked the door.  Now, you remember once before, I
 6    dropped them in the -- in the night deposit?
 7                MS. KEELER:  Yeah.
 8                MS. KING:  So I could go by the bank
 9    just to see.  But I took the deposit and then Keely and
10    I left.  We walked out of Barnes & Noble, and I got in
11    my car, and I just remember putting the keys in my
12    purse at that time.  And I left my purse in the car
13    when I went to Wal-Mart.  I just grabbed my wallet
14    and -- and  I ran in.  And I came home and I cooked
15    spaghetti Monday night.  And that was it.  I dropped
16    everything at the kitchen.  And that's what I'm
17    thinking.
18                MS. KEELER:  Okay.  (Inaudible.)
19                MS. KING:  Okay.
20                MS. KEELER:  Come tomorrow.  I'll give
21    you mine.
22                MS. KING:  Okay.  I'm open to close
23    today and tomorrow.
24                MS. KEELER:  Right.
25                MS. KING:  And do you work Sunday?
```

Page 160

```
 1                    MS. KEELER:  No.

 2                    MS. KING:  April there?

 3                    MS. KEELER:  Monday morning I open.

 4                    MS. KING:  Huh?

 5                    MS. KEELER:  Monday morning I open.

 6                    MS. KING:  Okay.  Because I'm off

 7     Sunday, Monday and Tuesday.

 8                    MS. KEELER:  Right.

 9                    MS. KING:  Okay.

10                    MS. KEELER:  I'll be there Monday

11     morning.

12                    MS. KING:  Okay.

13                    MS. KEELER:  Meet me in back.

14                    MS. KING:  Okay.  Well, when I visit the

15     mall -- well, no.  I'll go by the bank.  No.  The

16     bank's not open today.

17                    MS. KEELER:  Huh-uh.

18                    MS. KING:  Okay.

19                    MS. KEELER:  (Inaudible)

20                    MS. KING:  Well, I searched -- I mean,

21     I'm going to have to (inaudible) and him just really go

22     through all the toys.  It's Christmas.

23                    MS. KEELER:  I know.

24                    MS. KING:  And I just have a lot of

25     extra stuff here --
```

**76**

Page 161

```
 1                    MS. KEELER:  Yeah.

 2                    MS. KING:  -- that doesn't belong.  So

 3     they need to go through their clothes.  But I did

 4     laundry and everything Monday morning, so I mean, it --

 5     it would be have to be between Monday night when I got

 6     off and -- I guess it -- well, I know I hadn't seen

 7     them since Monday night.

 8                    MS. KEELER:  Wow.

 9                    MS. KING:  And I remember when I got in

10     the car I dropped them in my purse.  So there is no --

11                    MS. KEELER:  No.

12                    MS. KING:  -- no other -- you know, we

13     would have known if they would have fallen.  The only

14     thing I can think if I didn't drop them in my purse I

15     dropped them in the night deposit because they can't be

16     anywhere else.

17                    MS. KEELER:  Well...

18                    MS. KING:  But I'll keep thinking.

19                    MS. KEELER:  (Inaudible.)

20                    MS. KING:  Is there a way that --

21                    MS. KEELER:  (Inaudible.)

22                    MS. KING:  Those -- that's what I was

23     about to ask.  Do those keys, can you remake them?

24                    MS. KEELER:  (Inaudible) door, yeah.

25                    MS. KING:  Okay.
```

**77**

Page 162

1              MS. KEELER:  The only -- the only one

2       that we don't have is (inaudible) --

3              MS. KING:  Mailbox -- oh, store key.

4              MS. KEELER:  (Inaudible.)

5              MS. KING:  Oh.  Can that one be remade?

6              MS. KEELER:  I don't know.  I can find

7       out, but I don't know if there might be a spare one

8       maybe.  I mean, in the lock -- in the drawer, but we

9       don't know what they are.

10             MS. KING:  Okay.

11             MS. KEELER:  (Inaudible) in the back

12      door.  You know, there shouldn't be one in there, but

13      you never know.

14             MS. KING:  I'll look.

15             MS. KEELER:  (Inaudible) over the

16      weekend I'll (inaudible) -- I'll find out if they can

17      make one of those little door ones.

18             MS. KING:  Okay.

19             MS. KEELER:  (Inaudible) I mean, that

20      would be the three, wouldn't it?

21             MS. KING:  Yeah.  I'm sorry.

22             MS. KEELER:  No.  That's okay.  It

23      happens.

24             MS. KING:  I know.  I -- wow.

25             MS. KEELER:  I will meet you there and

**78**

Page 163

1    we can (inaudible) and we'll go from there.

2                    MS. KING:  Okay.

3                    MS. KEELER:  All right.

4                    MS. KING:  And I'm going to have these

5    kids go through their clothes and toys.

6                    MS. KEELER:  Okay.

7                    MS. KING:  Okay.  I'll see you in a bit.

8                    MS. KEELER:  Bye.

9         Q.   (By Ms. Kirby) I guess one thing I'd like to

10   ask you -- this is on January 1st.  And you made the

11   call to Margarita on December 28th saying how terrible

12   Carol was and how much stress she created.

13                    How do you explain her treating you so

14   nicely when you do something as serious as losing the

15   keys?

16        A.   There have been -- that -- that's repetitive

17   as it relates to Carol having moments.  When I called

18   Mareatha on December 28th, it -- Margarita on

19   December 28th, it was for a specific reason.  It was

20   for a specific circumstance that had happened that

21   promoted the hostility.  This situation --

22        Q.   What was the circumstance?  I forgot to ask

23   that a while ago.

24        A.   It was dealing with a sale -- a sale of a

25   customer.

**79**

1          Q.   Okay.  Here's a copy.

2                MS. KIRBY:  Oh, you know what, before we

3     enter that, I need to enter this tape that we just

4     listened to.  It also has the recording of 12/31, on

5     December 31st, about the keys.  And you explained how

6     all that happened so they're both on here.  Twenty --

7     the numbers on your list, it's VN0029 and VN0030.

8                (Exhibit No. 13 marked)

9          Q.   (By Ms. Kirby) And then here's the next

10    exhibit I want to have marked.  It's the write-up

11    progress report for --

12                (Exhibit No. 14 marked)

13         A.   I have two sheets.

14                MS. ALLEN:  I think she just gave you

15    two copies.

16         A.   Okay.  I have two copies.

17                MS. KIRBY:  Okay.  Throw it on the

18    floor.  All right.  Okay.  I'll give it to you.

19                MS. ALLEN:  What number is this?

20                THE WITNESS:  14.

21                MS. KIRBY:  Would you -- what mark is

22    this?

23                THE REPORTER:  Fourteen.

24                MS. KIRBY:  This is 14.

25         Q.   (By Ms. Kirby) Would you take a quick look at

Page 170

1    that --

2         A.   Uh-huh.

3         Q.   -- to refresh your memory on that?

4         A.   Okay.

5         Q.   Okay.  So is it true you refused to sign it?

6         A.   Yes.

7         Q.   And apparently you disagreed with something

8    in here.  What is it you disagreed with?

9         A.   I made Carol aware of the keys on

10   December 31st, the possibility that I -- I had

11   misplaced them.  I didn't have them at work on

12   December 31st.  Carol and I discussed that there

13   wouldn't be any course of action, that it was okay,

14   basically that she was -- I can't quote this verbatim,

15   but she asked not to tell Mareatha.  There wouldn't be

16   any course of action.  The keys had already -- the

17   locks had already been changed and we had all already

18   been issued new keys for this issue prior to January

19   14th, and I didn't agree with her writing me up because

20   she --

21        Q.   Didn't she tell you that Mareatha did this

22   write-up?

23        A.   I don't recall who she said did the write-up.

24        Q.   Okay.  If it's in a recording, you won't

25   dispute that she told you Mareatha did the write-up,

**81**

1     will you?

2          A.   Correct.

3          Q.   Okay.  Now, I understand all about the 12/31,

4     but --

5          A.   Carol signed this write-up.

6          Q.   But -- well, she was there.

7          A.   Okay.

8          Q.   Mareatha wasn't there, right?

9          A.   Okay.

10         Q.   Okay.  Isn't it true that on Friday, January

11    1st, LaChica lost her store keys and has no

12    recollection of where she placed them?

13         A.   That's not true.

14         Q.   That's the day you validated to her over the

15    phone, I can't find them.

16         A.   Yes, that's true.

17         Q.   Yeah.  And Chica is an assistant manager and

18    responsible for protecting the assets of the store.  Is

19    that true?

20         A.   That's true.

21         Q.   Okay.  So you refused to sign because Carol

22    says she wouldn't have written you up if it were up to

23    her.

24         A.   Carol said -- no.  Carol said that there

25    wouldn't be any course of action.  I can't recall the

1    day -- the dates the locks were changed, but it was

2    prior to the 14th.  And it was my understanding that

3    once the locks were changed and everybody received

4    keys, that that was the end of the situation.

5        Q.   Do you think you deserved being written up

6    for losing the keys?

7        A.   No, I don't.

8        Q.   So you think an employee can lose keys and

9    that shouldn't be disciplined?

10        A.   I -- it didn't appear that I had done

11    anything wrong as it relates to my losing the keys.  I

12    was honest about losing the keys.  We discussed -- I

13    discussed with Carol the repercussions of losing the

14    keys and she said that there wouldn't be any, other

15    than the locks would need to be changed, which that had

16    taken place, and everybody was issued a new key.

17        Q.   And it cost money to change the locks, right?

18            MS. ALLEN:  Objection, calls for

19    speculation.

20        Q.   (By Ms. Kirby) That's not for free.  Do you

21    think changing the lock is a free service?

22        A.   No, ma'am, I don't think --

23        Q.   Okay.

24        A.   -- it's free.

25        Q.   Okay.  But you failed in your responsibility

Page 173

1    to protect the assets of Cache when you lost the keys,

2    right?

3         A.   Will you repeat that question?

4         Q.   Do you believe you failed in your

5    responsibility to protect the assets of Cache when you

6    lost the keys?

7         A.   I believe I made a mistake by misplacing the

8    keys.

9         Q.   A failure of your responsibility to protect

10   the assets, right?

11             MS. ALLEN:   Objection.   Question's been

12   asked and answered.

13             MS. KIRBY:   She didn't answer it.

14        A.   My answer was, I felt -- I misplaced the

15   keys.

16        Q.   (By Ms. Kirby) Do you consider that a failure

17   of your responsibilities to protect the assets of Cache

18   when you lost the keys?

19        A.   A failure of my responsibility?   Can you

20   rephrase the question?

21        Q.   No.   That's pretty clear.

22             MS. ALLEN:   Just -- just if you don't

23   feel it, say no.

24        A.   I don't feel -- I don't feel that I failed to

25   protect the assets of the store.

**84**

Page 174

1    Q.   (By Ms. Kirby) So do you think the keys are an

2    asset?

3    A.    The keys are an asset to the store.

4    Q.   Okay.  Let's see.  I'm going to skip over to

5    the fact that employees said you caused tension in the

6    store.

7                 Will you agree with me that you had

8    several arguments with April in the store?

9    A.    I agree that I had arguments with April in

10   the store.

11   Q.   And you had enough of an incident with Bobbye

12   that she felt she had to leave the store, right?

13              MS. ALLEN:  Enough -- pardon me.

14              Objection, calls for speculation --

15              MS. KIRBY:  Okay.

16              MS. ALLEN:  -- as to what was in the

17   mind of Bobbye.

18   Q.   (By Ms. Kirby) You had an argument with Bobbye

19   in the store in front of customers that caused her to

20   leave for two hours, right?

21   A.    Will you rephrase the question?

22              MS. ALLEN:  Objection.  The question

23   does cause for why Bobby left and her knowledge of why

24   Bobbye left (sic).

25              MS. KIRBY:  Yeah.  Okay.

**85**

Page 178

1    can't.  There is a voice record that is -- is
2    available.
3        Q.   Did -- well, I -- I'll just go ahead and ask
4    this.  Did she threaten, If you don't resign, we're
5    going to fire you?
6        A.   No.
7        Q.   Okay.  There's a recording.  It's fairly
8    long.  I don't want to play it, so I'm going to ask you
9    if you remember.  It was on January 30th and it's
10   number -- it's number 51.
11             But in it, do you remember her asking
12   you to staple receipts to coupons?
13       A.   Yes, I remember that.
14       Q.   Okay.  And do you remember just saying, No,
15   I'm not going to do that?
16       A.   I didn't -- I don't recall saying no.  I
17   asked her why -- I do remember asking her, Why did I
18   need to staple them to the coupon.
19       Q.   And what did she say?
20       A.   I don't recall verbatim.  She gave some
21   excuse that Mareatha is coming in to audit the
22   receipts -- and this is not verbatim.  There is a voice
23   record.
24       Q.   Right.  I know.
25       A.   Her excuse was Mareatha's coming in to do an

**86**

1    audit on the receipts and that we need to staple

2    receipts to the coupons.

3        Q.    Did she tell you it would make it easier for

4    Mareatha to do the audit that way?

5        A.    That's a possibility.

6        Q.    And did you tell her that it wasn't

7    mandatory, you weren't going to do it?

8        A.    That -- I didn't say that verbatim.  I don't

9    recall saying that in that manner.  I do remember --

10   and this is not verbatim.  I do remember my telling her

11   that it's not a requirement.  It's not written that we

12   reprint and staple receipts to coupons.  I recall that

13   I -- I reminded her -- I remember telling her that

14   initially this was just something we decided to do as a

15   store to make it easier for us.

16             Given -- and I -- I recall -- and I'm

17   not quoting this verbatim.  But because it is a voice

18   record, I recall explaining to her that given the

19   sensitivity of my situation and because I was already

20   having issues and going through things, I had requested

21   that if there be any definite changes to the policies

22   that I receive it in writing.  If -- if there was going

23   to be any mandatory things having to be done, that I

24   would appreciate it if I received it in writing, given

25   the sensitivity of my situation.

**87**

Page 180

1            I remember -- and this is not verbatim

2    because that's been over a year ago -- a year and a

3    half.  But she went ahead and agreed that if I didn't

4    want to do it, or whatever, that I didn't have to.  It

5    was just going to make it easier for Mareatha.  And

6    I -- I remember -- and I recall -- not verbatim -- in

7    the conversation that I reminded her that Mareatha has

8    access to be able -- electronic journal which is

9    something we all had access to, for her to view the

10   coupons and that there was no real reason to have to

11   always reprint the coupon -- I mean the receipt, to

12   attach to the coupons, because the bar codes are

13   scanned.  There are numbers that specifically are

14   assigned to the  customers.

15           So that is the way it's tracked

16   basically, so that there was no real reason to make

17   that mandatory to do except for the fact that I was

18   being made to do something extra, something else.

19        Q.   It was something that --

20        A.   It was --

21        Q.   -- that Carol did always, right?

22        A.   That is not true.

23        Q.   That's what she says in the recording --

24        A.   No.

25        Q.   -- she's always done it that way.

Page 181

```
 1          A.   That's not true.  It wasn't --

 2          Q.   Did she do it that way from this date

 3     forward to make it--

 4          A.   I can't recall how often she did it.  I don't

 5     stand over her and watch -- at the end of the day,

 6     the -- the register doesn't automatically reprint

 7     receipts to staple to the coupons.  We scan the coupons

 8     and at the end of the day -- at the end of close of

 9     business, part of our job was tally up the coupons, see

10     how many have been used, how many discounts have been

11     given.  So it was -- it was easier for us, as a store.

12     This was something we had come up with, but it wasn't

13     done mandatory and it wasn't done consistently every

14     day.

15               There was some days it was really slow.

16     We had two coupons, so we didn't reprint the coupons.

17     There were other days when it was extremely busy, and

18     to make our evening, our closing, easier, if we

19     remembered to reprint the coupons, we did so.  But it

20     wasn't a mandatory assignment that we had to do.  And I

21     don't recall if -- I can't tell you whether or not

22     Carol reprinted and stapled all of her coupons.

23          Q.   So Carol giving you an instruction, you

24     didn't consider that mandatory.  That was you didn't

25     have to do it just 'cause it came from Carol.  Is that
```

**89**

1    what you're telling me?

2        A.   Can you rephrase the question?

3             MS. ALLEN:   Objection.   Question is

4    argumentative.

5        A.   Will you rephrase the question?

6        Q.   (By Ms. Kirby) If it wasn't in the Cache

7    handbook you thought you didn't have to do it?

8             MS. ALLEN:   Objection.   The question

9    recharacterizes the testimony of the witness.

10       Q.   (By Ms. Kirby) What do you mean mandatory, it

11   wasn't mandatory?   What would be mandatory?

12       A.   I mean, that that wasn't standard daily

13   business.   That wasn't -- we didn't -- when I was

14   hired, this wasn't a requirement, just --

15       Q.   Okay.   So let me ask you this.   So you think

16   that Cache can't make -- or the store manager can't

17   make new requirements as she goes along?

18       A.   Will you rephrase that?

19       Q.   Yeah.   Do you think a store manager of a

20   Cache store has the authority to make small operational

21   changes when she sees the need?

22       A.   I believe she can within means given the

23   circumstances.

24       Q.   And do you think the employees -- the

25   employees who work for her are required to follow her

1    new procedures if she tells them to do it?

2         A.    I believe so given the -- given the

3    circumstances because I had already reported harassment

4    and continued hostility.  These things that were being

5    brought about, I believed had to do with repeated

6    harassment on my part, given my situation.  So I

7    believe that that could be situational.

8         Q.    So you think that -- at the time you thought

9    that because I've complained about Carol, now I don't

10   have to follow her instructions.  That's what it's

11   sounding like you said to me.  Is that true?

12              MS. ALLEN:  Objection.  Question

13   mischaracterizes the witness's testimony and is

14   argumentative.

15         A.    Will you rephrase the question, please?

16         Q.    (By Ms. Kirby) You just told me because of

17   your situation of complaining about Carol, you weren't

18   going to do all these things.

19         A.    That's not what --

20         Q.    So --

21         A.    -- I told you.

22         Q.    -- what would it have taken for Carol -- for

23   you to have obeyed Carol in this?  How long did it

24   take --

25         A.    I specifically asked --

Page 184

1          Q.   -- to print out a receipt?

2                    MS. ALLEN:  I'm --

3          Q.  (By Ms. Kirby) How long would that have taken?

4                    MS. ALLEN:  Objection.

5                    THE WITNESS:  Okay.

6                    MS. ALLEN:  Objection.  The question is

7     argumentative, except for she's asking a specific

8     different question now, so it's compound.  How long did

9     it take, that's a fair question.

10         Q.  (By Ms. Kirby) All right.  My question is, How

11    long would it have taken you to have stapled and

12    printed out the receipt and stapled to the coupon?

13         A.   A couple of seconds.

14         Q.   Yeah.

15         A.   Less than a minute.

16         Q.   And so I still don't understand your real

17    reason for saying, No, I'm not going to do this.

18                    MS. ALLEN:  Objection.  I think it

19    mischaracterizes witness's prior testimony and is

20    argumentative.

21         A.   Will you rephrase the question?

22         Q.  (By Ms. Kirby) Why did you argue with her

23    about this for however many minutes, rather than just

24    say, Okay, that makes sense?

25         A.   I didn't argue with her.  I -- I asked her

**92**

1    going forward -- and those aren't my specific words.

2    You have the voice record.

3        Q.    Yeah, I do.

4        A.    Going forward, given the sensitivity of my

5    situation, because this was situational because I had

6    already repeatedly informed Mareatha, Margarita, the

7    EEOC of my harassment issues, I just -- I asked if

8    anything specific to us having do anything throughout

9    the store, if it could be in writing.  That is -- that

10   is what I asked, given my situation, given the

11   harassment --

12       Q.    Okay.

13       A.    -- given --

14       Q.    So you wanted special treatment because you

15   had complained?  Is that what you're saying?  You

16   wanted every little thing in writing because you had

17   complained?

18              MS. ALLEN:  Objection.  Question is

19   argumentative and question is compound.

20       A.    Will you rephrase the question, please?

21       Q.    (By Ms. Kirby) She asked you to do a simple

22   thing and you argued and argued and argued.

23              What would it have taken for you to have

24   said, Okay, I'll staple the receipts to the coupons?

25       A.    I've answered the question.

**93**

1      Q.   No.  What would it have taken for you to do

2    that?  What did Carol have to do to get you to do that?

3                MS. ALLEN:  Objection.  Question is

4    argumentative.  Question has been asked and answered.

5                MS. KIRBY:  It hasn't been answered.

6      Q.  (By Ms. Kirby) I do not know what it would

7    have taken for you to have followed Carol's

8    instructions on that.

9                MS. ALLEN:  She said it was situational.

10   She's telling you -- she's telling you why she didn't

11   do it.

12               MS. KIRBY:  I know why she didn't do it.

13     Q.  (By Ms. Kirby) I'm saying, What would it take

14   for you to have done it?

15     A.   I asked that it be in writing.

16     Q.   By Carol?

17     A.   By Cache.

18     Q.   And who -- what did that mean?

19     A.   Just initially, Carol, when I went off with

20   my ankle, Carol --

21     Q.   I'm not asking you about that.  I want to

22   know, What would it have taken for you on January 30th

23   to have said, Okay, I'll staple the receipts to the

24   coupons?

25     A.   And for it to be in writing.

**94**

1      Q.   (By Ms. Kirby)  By whom?  Who is Cache?

2      A.   Cache, Incorporated, whoever writes the --

3    the employee hand -- I don't know -- in the employee

4    handbook.

5      Q.   Just this is your criteria.  You're the one

6    that knows.  Who has to write this up for you to do

7    this simple two-second thing?

8           MS. ALLEN:  Objection.  Question is

9    argumentative.

10          MS. KIRBY:  It was her testimony.

11     Q.   (By Ms. Kirby)  Who had to write this up for

12   you to do it?

13          MS. ALLEN:  I'm going to object to the

14   question because it is argumentative.  And it's

15   argumentive because she said that under these

16   circumstances, in my situation because of repeated

17   harassment, then I required this.

18          MS. KIRBY:  Right.  So I'm finding --

19          MS. ALLEN:  So you --

20          MS. KIRBY:  -- absent all of that --

21          MS. ALLEN:  -- what would it have taken?

22   If it hadn't been off --

23          MS. KIRBY:  No, no.  I want to know what

24   did it take in her situation.  What would it have taken

25   for her in her situation to have just said, Okay, I'll

1        do this?

2                     MS. ALLEN:   Then my objection is asked

3        and answered.

4                     MS. KIRBY:   I still don't know.   She --

5            Q.   (By Ms. Kirby) Would you have done it if Carol

6        had written it up and signed it?

7            A.   No.

8            Q.   What about Mareatha?   If Mareatha had written

9        up and signed it, would you have done it?

10           A.   I don't know.   I -- that was situational.   It

11       was -- that -- that was based on my situation so I

12       hadn't given any thought to who would have to write it

13       up.   I just requested that it be in writing.

14           Q.   But you don't know if you would have done it

15       if Mareatha had written it up?

16                    MS. ALLEN:   Objection, calls for

17       speculation.

18           Q.   (By Ms. Kirby) Now, did anybody else have that

19       requirement?

20                    MS. ALLEN:   Objection.   Question is

21       vague.

22           Q.   (By Ms. Kirby) Do you know, did any other

23       employee require someone at Cache to write out an

24       instruction before they would follow it?

25           A.   I wasn't aware of anyone having to deal with

1       my particular issue.

2              Q.   That's not what I asked you.

3                   Did anybody else make the requirement

4       that in order to get me to do something, you're going

5       to have to put it in writing?

6                   MS. ALLEN:   Objection.   The question is

7       argumentative and misstates prior testimony.

8              A.   Not to my knowledge.

9              Q.   (By Ms. Kirby) Okay.   Do you know if Carol

10      instructed anyone else to staple coupons to receipts?

11             A.   Not to my knowledge.

12             Q.   No.   Do you know one way or the other?   Does

13      that not to my knowledge mean you don't know whether

14      she instructed anyone?

15             A.   I don't recall her instructing anyone else.

16             Q.   Who else was there the day that she

17      instructed you?

18             A.   No one.   It was Carol and myself.

19             Q.   Okay.   So is it possible she instructed

20      someone else to do this when you weren't present?

21                  MS. ALLEN:   Objection.   The question

22      calls for speculation.

23             A.   I don't know.

24             Q.   (By Ms. Kirby) Okay.   In the end, she just

25      gave up and said, Okay, do you want, didn't she?

1       MS. HORNSBY:  (inaudible)  Yeah.

2       THE WITNESS:  Okay.

3       MS. KIRBY:.  I've got it transcribed.  My

4  secretary could hear it better with the little things

5  in her ears.

6       MS. ALLEN:  I heard you say something

7  about something.

8       THE WITNESS:  I --

9       MS. ALLEN:  Do you know what you said?

10  Can you tell her what you said?

11       THE WITNESS:  Uh-huh.  I asked her about

12  the -- Christine Weathersby.  She was standing outside

13  the door and I asked her if she could come in.  And she

14  immediately said, No, Cache doesn't allow outside

15  parties to be involved.  And then I said, As it relates

16  to my recording the conversation?  She went ahead and

17  said, No, you cannot record the conversation.  I can't

18  remember verbatim, but she also said, And per Cache --

19  I didn't know that.  She says, She didn't know that the

20  first time I asked her to record, but that we can't

21  have any outside sources.

22       MS. KIRBY:  It says, You cannot -- as it

23  relates to my being able to record the conversation,

24  you cannot record this conversation, no.  I didn't know

25  that last time we spoke that we do not allow

```
 1        A.    No.   I knew that there was contradiction.
 2   There had been contradictions in communications outside
 3   of the records.   There had been -- in verbal
 4   conversations, there had been several contradictions
 5   with why we were even having that meeting that day.
 6   That January 13th, I was under the impression initially
 7   that we were going to have a meeting solely between
 8   myself, Carol, April and Mareatha per Margarita's
 9   request.   So I wanted to have something valid -- I -- I
10   just -- I just asked her.   There was no...
11        Q.    Okay.   What if she had said no, would you
12   turn the recorder off?
13        A.    The recorder was in my hand, so I don't know.
14        Q.    And then you ask her again -- in between that
15   date and February the 5th, we've got several recordings
16   you made and you didn't ask anybody if you could record
17   them, did you?
18        A.    No, ma'am.
19        Q.    Okay.   And so then you ask again on
20   February 5th and she does say, No, you cannot record,
21   doesn't she?
22        A.    Yes, ma'am.
23        Q.    And you went right ahead and did it, didn't
24   you, recorded the whole meeting?
25        A.    That day the recorder was in my hand and
```

**99**

1   still on and it -- I did record it, though.  I recorded

2   the meeting.

3          Q.   Well, Mareatha didn't see the recorder.  Do

4   you know if Mareatha saw it?

5          A.   My phone was in my hand.

6          Q.   You mean on January 13th?

7          A.   On January 13th, on February -- what day is

8   in question right now --

9          Q.   February 5th.

10         A.   -- February 5th?  On February 5th, the

11   recorder was in my hand.  The phone was in my hand.

12         Q.   Okay.  And so you don't know if she saw it or

13   not.

14         A.   It was in my hand.  I don't know.

15         Q.   Okay.  All right.  Your hand was in your lap,

16   I'm assuming, right?

17         A.   My hand is on my body.

18         Q.   All right.  So if she saw the recorder then,

19   you want -- and you said, Okay, fine.  She said, No,

20   you cannot record.  And you said, Okay, okay, fine.

21         A.   I don't recall saying, Okay, okay, fine.

22         Q.   Well, let's see.

23         A.   If we can listen to it --

24         Q.   We just --

25         A.   -- I probably said, Okay.

**100**

1          Q.    Anyway, you just went right on and recorded

2     in the face of her saying no, you can't record, didn't

3     you?

4          A.    The recorder was still on, yes.

5          Q.    And you never told her, Oh, I've already got

6     the recorder on, did you?

7          A.    No.

8          Q.    Okay.   Okay, okay, that's fine.

9          A.    Okay.

10         Q.    All right.   The rest of the meeting she

11    doesn't know you're recording, right?

12                    MS. ALLEN:   Objection, calls for

13    speculation.

14         Q.    (By Ms. Kirby) Yeah.   To your knowledge, she

15    doesn't know that you're recording it?

16         A.    That's correct.

17         Q.    So she told you -- remember her telling you

18    that the investigation revealed other employees thought

19    you were hard to work with and some were uncomfortable

20    working with you?

21         A.    I remember her specifically saying -- I don't

22    remember verbatim.   But I do remember her specifically

23    saying 80 percent of the other employees had an issue

24    with me or thought I was the cause for all the -- the

25    tension.   I don't remember verbatim what she said.

**101**

1    anything in that meeting to you that you took as she's

2    discriminating against me because of my race?

3               MS. ALLEN:  My objection is that I don't

4    know what meeting we're talking about.  Maybe I missed

5    it?

6               MS. KIRBY:  Oh, I'm sorry.  The meeting

7    of February 5th.

8        A.    Now can you repeat the question?

9        Q.    (By Ms. Kirby) Yeah.  In that meeting of

10   February 5th where she's giving you the results of the

11   investigation --

12       A.    Okay.

13       Q.    -- did Mareatha, in particular, say or do

14   anything that you considered harassing or

15   discriminatory based on your race?

16       A.    Yes.

17       Q.    What was that?

18       A.    As it related to her results.  Her results

19   were 80 percent of the other employees had an issue.

20   There were only five other employees.  80 percent means

21   four of the five employees, and four of the five

22   employees are Caucasian and the other employee is

23   African-American.

24       Q.    Well, let me ask you this.  Are you saying

25   that Mareatha was untruthful when she told you what the

1    other employees said?

2         A.   I don't believe that all the employees had an

3    issue with me.  That's correct.

4         Q.   Do you believe that four of them had issues

5    with you?

6         A.   No, I don't believe all four had an issue

7    with me.

8         Q.   Well, do you think they told Mareatha they

9    had an issue with you?  Do you --

10        A.   I don't know.

11        Q.   Okay.  So you think it was discriminatory for

12   Mareatha to give you the results of her investigation.

13                  MS. ALLEN:  Objection.  Question

14   mischaracterizes prior testimony.

15        A.   Will you rephrase the question?

16        Q.   (By Ms. Kirby) Do you think it was

17   discriminatory for Mareatha to say to you, 80 percent

18   of the employees have difficulty working with you?

19        A.   Yes.

20        Q.   Okay.  Did Carol say or do anything in that

21   meeting that you considered to be either harassing or

22   discriminatory?

23        A.   Mareatha read the results.  Carol was a

24   witness.

25        Q.   Did Mareatha say or do anything that you

1    thought was retaliatory against you in that meeting of

2    February 5th?

3          A.    Yes.   Requesting -- and I can't remember

4    verbatim.   I -- like I said, if we could play the

5    record, we'd hear everything that was said in that

6    meeting.   But in Mareatha's request -- I vaguely

7    remember verbatim what was said.   But in her request --

8    or her acknowledgement of my being the cause for the --

9    the tension in the store and that this was served as an

10   evaluation, there was -- the meeting was left unclear

11   as to why, but I do believe that that -- it was

12   retaliation.

13         Q.    For filing the EEOC complaint or for FMLA

14   leave?

15         A.    Retaliation goes with FMLA and the EEOC

16   claims.

17         Q.    So you think Mareatha retaliated against you

18   in that meeting because you had filed an EEOC complaint

19   and you had taken FMLA leave?

20         A.    Yes.

21         Q.    Okay.   What did she say, just the gist of it,

22   that you considered retaliatory?

23         A.    I can't -- if we can play the record, I can

24   point out exactly --

25         Q.    We may.   I may go off the record and let you

**104**

```
 1    listen to it and then ask these questions.

 2         A.   Okay.

 3         Q.   Let's do that.

 4              MS. ALLEN:  It's 25 minutes?

 5              MS. KIRBY:  No.  This one is 22.

 6         A.   Because we've gotten past.  What did it stop

 7    with, her saying no, I couldn't record it?

 8         Q.   (By Ms. Kirby) Yeah.

 9         A.   How many minutes was that?  We've already...

10              MS. KIRBY:  Yeah.  Let's go off the

11    record.

12              THE VIDEOGRAPHER:  We're off record at

13    3:25 p.m.

14              (Recess taken, 3:25 to 3:52)

15              THE VIDEOGRAPHER:  We're back on record

16    at 3:52 p.m.

17         Q.   (By Ms. Kirby) Okay.  We just listened to the

18    tape recording of the meeting that you had with

19    Mareatha on February 5th off the record, correct?

20         A.   Yes.

21              MS. KIRBY:  And I'm going to enter that

22    as an exhibit.  So it's number 56.  Well, I mean the

23    recording.  This is 51.

24              MS. HORNSBY:  I thought you already gave

25    it to her.
```

1          Q.   (By Ms. Kirby) Did I already give you 56?

2                    MS. HORNSBY:   I thought you gave her --

3                    MS. KIRBY:   Okay.  All right.

4          Q.   (By Ms. Kirby) Okay.  It's already entered as

5     an exhibit.  And I just have one question about it.

6                    After just listening to it a few minutes

7     ago, do you still contend that Mareatha said or did

8     anything retaliatory against you in that meeting?

9          A.   Yes.

10         Q.   And what was that?

11         A.   I believe the entire meeting was retaliation.

12         Q.   You did request her to investigate your

13    complaints of unfair treatment, correct?

14         A.   I didn't request --

15         Q.   Did you complain to her that you were getting

16    unfair treatment?

17         A.   Yes.

18         Q.   Did you complain to her that you thought you

19    were being harassed?

20         A.   Yes.

21         Q.   Is it her prerogative to investigate?  Do you

22    think she has a duty to investigate those complaints?

23         A.   Yes.

24         Q.   Okay.  So she did.  She -- her investigation

25    was conducted because of your complaints, right?

Page 214

1          MS. ALLEN:   Objection, calls for

2     speculation.

3          A.    I -- I don't know.

4          Q.   (By Ms. Kirby) Do you remember what she said

5     on here on the tape?

6          A.    Yes.

7          Q.    Did you hear what she said?  Did you believe

8     her?

9          A.    No.

10         Q.    So why do you think she conducted the

11    investigation?

12         A.    I believed she conducted the investigate -- I

13    don't know.  I don't -- can you --

14              THE WITNESS:   Can I ask her to rephrase

15    the question?

16         Q.   (By Ms. Kirby) Do you know why she conducted

17    the investigation?

18         A.    She -- based on what she said -- and it's not

19    verbatim.  But to my understanding she conducted the

20    investigation because I said that I was being harassed

21    and she felt the need to question everyone in the store

22    to validate my issues.

23         Q.    And you consider her questioning --

24    interviewing everyone in the store as discriminatory

25    treatment of you?

1        A.   Yes.

2        Q.   Okay.  So after this February 5th meeting,

3   you continued to secretly record conversations with

4   Carol, didn't you?

5        A.   Yes.

6        Q.   And you knew that Mareatha had said you're

7   not allowed to record at this point?

8        A.   I know Mareatha specifically addressed the

9   February 5th conversation.

10       Q.   Okay.  You didn't take that to apply going

11  forward?

12       A.   No, ma'am.

13       Q.   And I've listened to the other tapes and I

14  found Carol treating you with utmost professionalism.

15  Is there anything that you can remember where she

16  wasn't professional and courteous to you?

17       A.   Specifically -- well, there -- I'm -- what

18  other records did you...

19       Q.   Well, I've listened to them all up to -- the

20  ones that I had.  And the only one where I heard her

21  even really argue with you was the meeting where you

22  wouldn't sign the write-up after you refused to give

23  the keys to April.

24            Are there any other instances where you

25  think Carol treated you in an unprofessional manner?

**108**

Page 241

1     off.

2          Q.   Is there anyone -- tell me everyone

3     associated with Cache that you believe discriminated

4     against you for either -- for race, because of race.

5          A.   Carol Keeler and April Baker.

6          Q.   Retaliated against you for -- because you

7     filed the EEOC complaint.

8          A.   Mareatha Hornsby, Carol Keeler, Margarita.

9          Q.   And Margarita's retaliation was asking you if

10    you wanted the deal to resign?

11         A.   Yes.

12         Q.   Okay.  And then, let's see, tell me everyone

13    who interfered with your FMLA rights.

14         A.   Can you rephrase the question, please?

15         Q.   Tell me the names of anyone who interfered

16    with your FMLA rights.

17         A.   Margarita Croisdale.

18         Q.   And how did she interfere?

19              MS. ALLEN:  I'm objecting to the extent

20    you're asking for a legal opinion or conclusion.  I

21    have specific facts I've alleged in our petition that

22    constitute by law interference.

23              But you can testify, if you know.

24         A.   I don't know.

25         Q.   (By Ms. Kirby) Were you told you -- the -- you

Page 243

1       came from the Department of Labor.

2            Q.   Okay.  And did you understand that your

3       rights were to be reinstated to the job you'd had

4       before you went out?

5            A.   Yes, ma'am.

6            Q.   Okay.  And you were reinstated to a position

7       as full-time assistant manager when you came back,

8       correct?

9            A.   I was not fully reinstated.

10           Q.   You weren't fully --

11           A.   Based on my hours.  I didn't receive --

12                     MS. KIRBY:  Oh, it's time?

13                     THE VIDEOGRAPHER:  Yes.

14                     MS. KIRBY:  Okay.  We're going to have

15      to take a break.

16                     THE WITNESS:  Okay.

17                     THE VIDEOGRAPHER:  We're off the record

18      at 4:34 p.m.

19                     (Recess taken, 4:34 to 4:39)

20                     THE VIDEOGRAPHER:  We're back on record

21      at 4:39 p.m.

22           Q.   (By Ms. Kirby)  Okay.  I was asking you about

23      being restored to your position.  Would you agree with

24      me that you were restored to a position as a full-time

25      assistant manager under Cache's rules of full-time

*110*

Page 244

1    employees working at least 30 hours a week?

2         A.   In reference -- will you repeat the question?

3         Q.   Would you agree with me that when you

4    returned from leave you were put back in a position as

5    a full-time assistant manager working at least 30 hours

6    a week under Cache's definition of full-time employee?

7         A.   Under the definition that I'm presented to

8    today, yes.

9         Q.   Okay.

10        A.   Prior to, no.

11        Q.   Prior to what, no?

12        A.   When I was restored this -- because I have

13   this in front of me and I'm reading it --

14        Q.   Right.

15        A.   -- I agree to what's written here today.

16        Q.   Right.

17        A.   But --

18        Q.   Was that handbook available to you when you

19   were employed?  Was the handbook available to you when

20   you were employed?

21        A.   Yes.

22        Q.   Were you given a copy of it?

23        A.   To my knowledge, yes.

24        Q.   Okay.  Where was I in this?

25             Anybody else interfere with your FMLA

*111*

1    rights?

2         A.   Yes.

3         Q.   Who?

4         A.   Carol Keeler.

5         Q.   How?

6         A.   When I requested for her to come in so that I

7    could leave and go home and be off for a few days, she

8    refused.

9         Q.   Well, do you know if she had something that

10   she was doing and couldn't come in?

11        A.   No.

12        Q.   Do you know?

13        A.   I don't know.

14        Q.   Okay.

15        A.   She didn't state that.

16        Q.   Why do you think she came in to bring you

17   keys and let you be off other times and then wouldn't

18   come in for this?

19             MS. ALLEN:  Objection, calls for

20   speculation.

21        Q.   (By Ms. Kirby) You agree with me there's

22   nothing in the tape recordings that shows her ever

23   refusing to help you out?

24             MS. ALLEN:  Objection.  Question is

25   unclear and vague.

**112**

1          Q.   My question is, When you found out that you

2     needed the doctor's note, did you try at all to get a

3     doctor to write a note saying Chica can work four hours

4     a day or Chica can work on this restricted schedule?

5          A.   I got a doctor's note.

6          Q.   Did you try to get one that would let you

7     come back working fewer hours, the way you and Carol

8     had agreed?

9          A.   I wasn't required -- I wasn't asked to get

10    that note, get a note to ask -- I wasn't asked to get a

11    note from the doctor about shortening my hours.

12         Q.   But you knew you had to get a note to come

13    back to work at all, didn't you?

14              MS. ALLEN:   Objection.   Question is

15    vague and not limited to time.

16         Q.   (By Ms. Kirby) Did you know you had to get a

17    doctor's note to be allowed to return to work?

18         A.   On August 3rd, I became aware of needing a

19    doctor's note to return to work.

20         Q.   Right.

21         A.   But I had already returned to work on

22    July 30th.

23         Q.   And didn't you tell me earlier that you

24    agreed to take the weekend off and you'd come back on

25    Monday and figure out where you were going from there

Page 248

1    with Carol?

2         A.   Yes.

3         Q.   Okay.  So you took off when you wanted and

4    then on Monday the -- August 3rd, you found out you

5    needed a doctor's note.  So I'm not seeing the harm

6    here.

7                   MS. ALLEN:  Objection.  Question is

8    compound.  Question assumes facts not in evidence and

9    question is vague.

10        A.   Will you rephrase the --

11                  MS. ALLEN:  And the question calls for a

12   legal conclusion.  Sorry.

13                  THE WITNESS:  Okay.

14        Q.   (By Ms. Kirby) So the -- you knew you could

15   not come back to work without a doctor's note on

16   August 3rd.

17        A.   On August 3rd.

18        Q.   Right.  And you chose not to get a doctor's

19   note because you felt you couldn't afford to go to the

20   doctor, correct?

21                  MS. ALLEN:  Objection.  The question --

22        Q.   (By Ms. Kirby) I mean, wasn't it your

23   voluntary choice to not go to the doctor and get a note

24   until August 28th?

25        A.   Yes, based --

**114**

Page 250

1     Q.   And what did she do?

2     A.   I didn't personally speak with her -- through

3  Carol.  Carol suggested that Mareatha would call and

4  find out if I qualified for short-term disability and

5  that was never a request of mine.

6     Q.   Now, what?  What did Mareatha do?

7     A.   Per Carol, the reason Carol had me take the

8  weekend off after July 30th to call back on Sunday to

9  receive a revised schedule, which I did.  And on

10  August 2nd, Sunday, I was instructed from Carol that

11  Mareatha had instructed her to -- that she was going to

12  call human resources on the Monday, August 3rd, to find

13  out if I qualified for short-term disability.

14     Q.   And how did that deny you FMLA rights?  I

15  don't understand the connection.

16     A.   Short-term disability had nothing to do with

17  FMLA.

18     Q.   Right.

19     A.   I was already under the impression that I was

20  under the FMLA act, so I didn't need short-term

21  disability.

22     Q.   Do you know what short-term disability is?

23     A.   Can you give me a definition of it?

24     Q.   No.  I'm just asking if you know.

25     A.   No.

Electronically signed by deborah marks (501-186-068-8645)       7f0414e7-f5ae-4b4f-8663-0f562c124f05

**115**

Page 265

1      A.   No.

2      Q.   Did you know why you weren't fired for that?

3      A.   No.

4      Q.   Were you surprised you weren't fired for

5   that?

6      A.   No.

7      Q.   Do you blame yourself at all for your

8   termination?

9      A.   No.

10     Q.   Do you contend that you were not

11  insubordinate when you kept on recording Mareatha when

12  she said you can't record?

13              MS. ALLEN:  Objection.  Question is

14  vague and it's not specified to a time and a particular

15  conversation.

16     Q.   (By Ms. Kirby)  Okay.  Do you contend that you

17  were not insubordinate when you kept recording the

18  February 5th meeting after Mareatha told you recordings

19  were not allowed?

20     A.   Will you -- will you repeat the question?

21     Q.   See if I can simplify it.

22              Will you agree with me it was

23  insubordinate for you to keep on recording Mareatha in

24  the meeting of February 5th when she said you're not

25  allowed to record?

116

Page 266

1     A.   Yes.

2     Q.   Okay.  Do you contend that someone provoked

3  you to be insubordinate?

4     A.   Yes.

5     Q.   Okay.  Tell me about that.

6     A.   The reason I recorded -- did the records was

7  to protect my job, to protect my position as assistant

8  manager at Cache.  There were false reasons from my not

9  returning to work.  There was -- after there was a

10  verbal agreement that we would -- that I would continue

11  working, that's why I came back on July 30th.  So

12  during the time that I was off and call -- making phone

13  calls to try to get back on the schedule, making phone

14  calls to find out why I was completely taken off the

15  schedule, there were issues with why I was taken off

16  the schedule -- the -- after having that verbal

17  agreement that we would just shorten my hours.

18          So because I didn't trust verbal

19  conversations, I needed something to protect me for

20  further conversations that I would have with those that

21  were responsible for keeping me employed with Cache.

22     Q.   So you think that provoked you to be

23  insubordinate?

24     A.   That provoked me to record --

25     Q.   Regardless --

**117**

1      A.    -- conversations.

2      Q.    Regardless whether you're allowed to or not?

3      A.    Yes.

4      Q.    I haven't heard any lies in listening to

5   these tapes.  Do you know of any lies that you

6   protected yourself because you've caught people lying

7   in these tapes?  Can you point to any lies?

8      A.    I can point to -- right now, I can't point to

9   specific lies.  I -- I'm going to go back and listen to

10  the voice records again.  But I can point back to

11  differences in statements from Margarita, Mareatha and

12  Carol.

13     Q.    Which could be they hadn't talked to each

14  other and there was misunderstandings, correct?

15     A.    In the case of the investigation on

16  January 13th in the store, on January 20th Margarita

17  told me that I was the cause for all the tension in the

18  store and nobody wanted to work with me.  Carol, in

19  turn, told me that -- there's a difference in

20  statements.  Carol, in turn, told me that she was sure

21  that Janice, Bobbye and Keely didn't have any issues

22  with me, but that -- and I responded to, Well, that

23  leaves Carol and April.  And Carol says, Well, I really

24  didn't say that either.

25              And so Carol vouches for only one person

1   you as a store manager?

2       A.   Yes.

3       Q.   Okay.  Could that have been because she

4   didn't want to train someone to replace her?

5               MS. ALLEN:  Objection.

6       Q.   (By Ms. Kirby) She didn't want -- she wanted

7   to keep her job?

8               MS. ALLEN:  Objection, calls for

9   speculation.

10      A.   I don't know.

11      Q.   (By Ms. Kirby) Was that your understanding

12  that you were going to be trained for the store manager

13  in that store?

14      A.   No.

15      Q.   A transfer?

16      A.    It wasn't specific.  She was just instructed

17  to train me as store manager.

18      Q.   Okay.  Now, you said -- your lawyer asked you

19  questions about whether there's a written policy about

20  no tape recording in Cache.  And you said you read and

21  looked for it and you couldn't find one.

22               So what I'm asking you is, When Mareatha

23  Hornsby told you you were not allowed to tape record

24  that conversation, did you consider that an instruction

25  from your superior that you were to obey?

Page 332

1      A.   I considered it -- it an instruction from my

2    superior.

3           Q.   Okay.  And because it wasn't in writing, did

4    that give you some kind of an idea you didn't have to

5    obey?

6      A.   Yes.

7           Q.   Okay.  On the FMLA leave, do you know whether

8    Cache designated the days you took off as FMLA leave?

9      A.   No.

10          Q.   Okay.  So you don't -- did you know how much

11   FMLA leave you had left in that year?

12     A.   I didn't know anything about my FMLA.

13          Q.   After you got the information from the DOL,

14   did you ever ask anybody if that time was counted

15   against your FMLA allotment?

16     A.   Marie -- not Mareatha.  Margarita told me it

17   was.  I didn't ask.  I didn't have to ask.  She told me

18   it was.

19          Q.   What did she tell you specifically?

20     A.   Her words were, I have you under FMLA.

21          Q.   Oh, okay.  So she was letting you know that

22   your job was protected.

23     A.   Yes.

24          Q.   But she never said whether the days were

25   counted off against your allotment, did she?

**120**

3

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 450-2010-01422 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Lachica O. King** | **(469) 879-0182** | |

Street Address — **1000 E. Pleasant Run, Apartment 4424, Cedar Hill, TX 75104**   City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CACHE** | 15 - 100 | (212) 575-3209 |

Street Address — **The Parks Mall @ Arlington,  Arlington, TX 76015**   City, State and ZIP Code

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address   City, State and ZIP Code

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (*Specify*)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest  **11-22-2009**    Latest  **01-30-2010**

☐ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s).*):

**PERSONAL HARM:**

In November of 2009 I was told by Carol Keeler, Store Manager that I had to attend a mandatory holiday meeting.  Other managers were not forced to attend.

On January 13, 2010 there was a schedule meeting with Mareatha Hornsby, District Manager to meet with all employees about my reported issues.

On January 14, 2010, I was written up by Carol Keeler, Store Manager.

On January 15, 2010, I was told by Carol Keeler, Store Manager that I could not use my cell phone on the floor.

On January 20, 2010, I was called by Margarita Croisdale, Senior Compliance Officer with an offer and a deal if I resigned and signed a waiver.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

Feb 01, 2010
Date — *Charging Party Signature*

02/01/2010   Karen P. Hary

EXHIBIT 1
Deponent KING
8/9/11  Rptr. OLL

**121**

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 450-2010-01422 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

### RESPONDENT'S REASON FOR ADVERSE ACTION:

No reason given.

I was told by Mareatha Hornsby that she was going to conduct an investigation.

I lost my store key.

I was told by Carol Keeler that she had to enforce the no cell phone on the floor rule.

I was told by Margarita Croisdale that the EEOC ruled in their favor, I was unhappy, I was the reason for the tension in the store and nobody wanted to work with me.

### DISCRIMINATION STATEMENT:

I believe I have been retaliated against for filing a previous EEOC charge number, 450-2010-00314 in violation of Section 704 (a) of Title VII of the Civil Rights Act of 1964, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Feb 01, 2010

Date

Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

02/01/2010     Karen Heard

**122**

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 450-2010-01422 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Lachica O. King | (469) 879-0182 | |

Street Address                    City, State and ZIP Code

**1000 E. Pleasant Run, Apartment 4424, Cedar Hill, TX 75104**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CACHE | 15 - 100 | (212) 575-3209 |

Street Address                    City, State and ZIP Code

**The Parks Mall @ Arlington,  Arlington, TX 76015**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                    City, State and ZIP Code

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **11-22-2009**   Latest **01-30-2010**

☐ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s).*):

**PERSONAL HARM:**

In November of 2009 I was told by Carol Keeler, Store Manager that I had to attend a mandatory holiday meeting. Other managers were not forced to attend.

On January 13, 2010 there was a schedule meeting with Mareatha Hornsby, District Manager to meet with all employees about my reported issues.

On January 14, 2010, I was written up by Carol Keeler, Store Manager.

On January 15, 2010, I was told by Carol Keeler, Store Manager that I could not use my cell phone on the floor.

On January 20, 2010, I was called by Margarita Croisdale, Senior Compliance Officer with an offer and a deal if I resigned and signed a waiver.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| Feb 01, 2010 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | 02/01/2010   Karon C. Heard |

**123**

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 450-2010-01422 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s))*:

### RESPONDENT'S REASON FOR ADVERSE ACTION:

No reason given.

I was told by Mareatha Hornsby that she was going to conduct an investigation.

I lost my store key.

I was told by Carol Keeler that she had to enforce the no cell phone on the floor rule.

I was told by Margarita Croisdale that the EEOC ruled in their favor, I was unhappy, I was the reason for the tension in the store and nobody wanted to work with me.

### DISCRIMINATION STATEMENT:

I believe I have been retaliated against for filing a previous EEOC charge number, 450-2010-00314 in violation of Section 704 (a) of Title VII of the Civil Rights Act of 1964, as amended.

---

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |
| **Feb 01, 2010** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date   Charging Party Signature | 02/01/2010   Karen C. Heang |

**124**

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Cheryl Kirby<br>Attorney<br>OPPENHEIMER BLEND HARRISON & TATE INC.<br>711 Navarro Sixth Floor<br>San Antonio, TX 78205 | **Lachica O. King** |

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**450-2010-01422**

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to

If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Karen C. Heard,
Investigator

*EEOC Representative*

Telephone **(214) 253-2873**

**Dallas District Office**
207 S. Houston St.
3rd Floor
Dallas, TX 75202

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race  [ ] Color  [ ] Sex  [ ] Religion  [ ] National Origin  [ ] Age  [ ] Disability  [X] Retaliation  [ ] Genetic Information  [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| February 1, 2010 | Michael C. Fetzer,<br>Director | |

**125**

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms.  Cheryl Kirby<br>Attorney<br>OPPENHEIMER BLEND HARRISON & TATE INC.<br>711 Navarro Sixth Floor<br>San Antonio, TX 78205 | **Lachica O. King** |
| | THIS PERSON (check one or both) |
| | [X] Claims To Be Aggrieved |
| | [ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**450-2010-01422** |

## NOTICE OF CHARGE OF DISCRIMINATION
(See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)     [ ] The Equal Pay Act (EPA)     [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)     [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by _____ to _____
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Karen C. Heard,<br>Investigator | Dallas District Office<br>207 S. Houston St.<br>3rd Floor<br>Dallas, TX 75202 |
|---|---|
| EEOC Representative | |
| Telephone  **(214) 253-2873** | |

Enclosure(s):  [X] Copy of Charge

| CIRCUMSTANCES OF ALLEGED DISCRIMINATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [ ] Race | [ ] Color | [ ] Sex | [ ] Religion | [ ] National Origin | [ ] Age | [ ] Disability | [X] Retaliation | [ ] Genetic Information | [ ] Other |

See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **February 1, 2010** | **Michael C. Fetzer,**<br>**Director** | |

**126**

EEOC Form 212-A (3/98)

# U.S. Equal Employment Opportunity Commission

TO: **Texas Workforce Commission Civil Rights Division**
**101 East 15th St**
**Room 144T**
**Austin, TX 78778**

Date **February 1, 2010**
EEOC Charge No.
**450-2010-01422**

FEPA Charge No.

CHARGE TRANSMITTAL

SUBJECT:

| **Lachica O. King** | v. | **CACHE** |
|---|---|---|
| *Charging Party* | | *Respondent* |

Transmitted herewith is a charge of employment discrimination initially received by the:

☒ EEOC      ☐ _____ on _____
_____ *Name of FEPA* _____ *Date of Receipt*

[X] Pursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC.

☐ Pursuant to the worksharing agreement, this charge is to be initially investigated by the FEPA.

☐ The worksharing agreement does not determine which agency is to initially investigate the charge.

☐ EEOC requests a waiver      ☐ FEPA waives

☐ No waiver requested      ☐ FEPA will investigate the charge initially

*Please complete the bottom portion of this form to acknowledge the receipt of the charge and, where appropriate, to indicate whether the Agency will initially investigate the charge.*

| Typed Name and Title of EEOC or FEPA Official | Signature/Initials |
|---|---|
| **Michael C. Fetzer, Director** | |

| **Lachica O. King** | v. | **CACHE** |
|---|---|---|
| *Charging Party* | | *Respondent* |

**TO WHOM IT MAY CONCERN:**

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially investigate the charge.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially investigate the charge.

☐ This will acknowledge receipt of the referenced charge and request a waiver of initial investigation by the receiving agency.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/not docket the charge for the following reasons:

| Typed Name and Title of EEOC or FEPA Official | Signature/Initials |
|---|---|
| **Robert Gomez, Director** | |

TO: **Dallas District Office**
**207 S. Houston St.**
**3rd Floor**
**Dallas, TX 75202**

Date **February 1, 2010**
EEOC Charge No.
**450-2010-01422**
FEPA Charge No.

**127**

Jul 13 08 05:35a                                                                    P.1

Jan 15, 2010

To: Margarita Croisdale, HR/Benefits
Cache, Inc.

I, LaChica O. King, Asst Manager for
Cache, Inc. Store #846, am formally writing
to acknowledge that I've received repeated
harassment from my SM, Carol Keeler, and
Co-Man, April Baker. I strongly believe
and have valid evidence that I've been
treated differently including but not
limited to the reasons listed below.

1.) Scheduling
Example - Completely removed from
schedule due to sprained ankle when
there was a verbal agreement between
Carol Keeler, SM, and I that I would
work more days during the week with
fewer hours (shorter work days 6-8 hrs)
in order to still receive my hours.
- Scheduling is repeatedly adjusted due
to other employees needs ie doctors
appts, illnesses, family emergencies etc.

2) Not having the current key upon
my return back to work on Sept 14, 2009.
- Left under the impression that



Δπ EXHIBIT 8
Deponent KING
Date 8/9/11  Rptr OU
WWW.DEPOBOOK.COM

**128**

the initial key issued to me when
I first started working for Cache, Inc.
Store #246 June 30, 2008 still worked.
- Was made aware the locks had been
changed by Bobbye Villanueva, part-time
asst man, on Sept 19 2009. She wanted
to call in due to illness and was told
by Carol Keeler that she had to come
in because I didn't have a key to
close the store.
- Sept 22 2009 - Confronted by Carol
Keeler about "badgering" other employees
and "if I had any questions about the
way things were run to come to her
because she's the Store Manager". I
then preceded to ask about my not
possessing a new key and was told
"you don't need it". Furthermore I asked
if there should always be a key holder
in the store at all times and she said
"Yes". I was left in the store alone
during breaks and I explained to Carol
Keeler that "if there was a fire at
the front door, I wouldn't be able to
go out the back because I don't have
a key".

2

**129**

Sept 23 2009 - Carol Keeler gave
me a new key. My first day to
open store was Sept 29, 2009 on
which Carol Keeler came and reportedly
clocked in at 0458 am for some
unknown reason.

8) No annual evaluation or raise/promotion
Example: Bobbye Villanueva has been
promoted within 6 months of being
with Cache store #246 : Part-time
sales to Part-time Asst Man.

I have repeatedly, month after month
proven to be a diligent and effective asset
to Cache, Inc. I deserve a working environment
that believes in integrity, that will provide
me with full time (40) hours plus benefits, and
one that allows room for advancement
and promotion to insure stability for
my family.

I conclude with months of proven
evidence that I have been discriminated
against due to race, religion and my
abilities to perform at high levels reregardless
of having to work in a hostile environment.

**130**

I, Lashica King, am hereby requesting compensation for high levels of stress, loss of wages, denial of hours, late fees and/or other fees that have been acquired during this time.

Timeline of Events:

July 20, 2009 - I injured myself OFF the job.

July 21, 2009 - I reported to work. Notified Carol at ≈ 1030 am and was asked by Carol Keeler if I could try to make it through the day.
Sent home by Mareatha Hornsby.

July 30, 2009 - I returned to work

July 31, 2009 - Carol Keeler advises me to take additional days off and call her on Sun Aug 2 for a new schedule.

4

**131**

Aug 2 - Carol tells me to call back on
        Mon Aug 3 because "Mareatha
        is going to call HR to see if I
        qualify for short-term disability".

Aug 3 - April Baker, co-man, informs me
        that I've been completely taken off
        the schedule with my hours being
        covered by other employees.

Aug 3 - I called HR myself and spoke
        with Margarita Crosdale who told
        me all I needed was a doctor's
        note to return back to work.
        She went on to ask when I hurt myself
        and stated that Mareatha should have
        contacted her the first day I was
        sent home.

Aug 4 - Spoke with Carol Keeler and was
        told by her "Mareatha said you've
        already gone over our heads so
        we don't need to talk to you. You
        deal with HR yourself".

5

**132**

Aug 20 @ 10:36 am -
with Carol Keeler requesting that I
come pick up my check and for me
to bring in your keys so that Bobbye
could use them until I come back".

Aug 21 @ 1:42 pm -
with Carol again telling me when I
come to "pick up my check if I would
bring in my keys".

Aug 31 - I turned in my doctors note to
Carol Keeler and I also faxed it to
Margarita Croasdale, HR. Margarita
said I just needed to be put back
on the schedule.

Aug 31 @ 7 pm -
with Carol Keeler saying that per
HR's request I needed to submit
a note saying that I was under
the doctors care be anything could
be done.

**133**

Sept 1 - I phoned Margarita again to
acknowledge the conflict on Aug 31
and she said that she would contact
Carol

Sept 2 - Carol Keeler called me saying she
spoke with Margarita and that
it was OK to put me back on the
schedule. Carol said she would call
me with the new schedule but that
she didn't have to schedule me
until Sept 14.

Sept - After repeatedly calling for my
schedule and being told by Carol
that she was waiting for Mareatha
to approve it I received it at
6 pm on 9/10/2009.

Loss of Wages - July 31 - Sept 13
Denied Hours - Sept 14 - Nov 2009.

1/13/2010

7.

**134**

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 450-2010-00314 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Lachica O. King** | **(469) 879-0182** | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **Legacy of Cedar Hill** **1000 E. Pleasant Run** | **Cedar Hill, TX 75104** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CACHE** | **15 - 100** | **(817) 467-3100** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **3811 S. Cooper St.** | **Arlington, Texas 76015** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| **07/20/09** | **10/26/09** |

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).):

I.   **Personal Harm:**

On July 20, 2009, I injured myself.

On July 21, 2009, I came to work, but was sent home by Mareatha Hornsby, District Manager.

On July 30, 2009, I return to work.

On July 31, 2009, Ms. Keeler advises me that I was to take some additional days off.

On August 2, 2009, I called Ms. Keeler to find out my schedule, and told that she was going to find out if I was eligible for short term disability and to take some additional days off.

On August 3, 2009, I called April Baker, Co-Manager to find out on when I was scheduled to work. Ms. Baker informed me that I was not scheduled for the next several weeks.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

| Oct 26, 2009 | |
|---|---|
| Date | Charging Party Signature |

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

10/26/9

Δ π EXHIBIT 10
Deponent KING
Date 8/9/11 Rptr. OU

**135**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 450-2010-00314 |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On August 3, 2009, I speak with Margarita Croisdale, Human Resources Manager/Benefits.

On August 28, 2009, I turn in my doctor's note to Carol Keeler and I also faxed it to Margarita Croisdale.

On September 14, 2009, I returned to work.

From September 14, 2009 through the present I have been scheduled to work less than 35 hours a week. The additional hours are being given to Bobbye Villanueva. Part-time Assistant Manager.

II.     Respondent's Reason:

Same as above.
Same as above.
Same as above.
Same as above.
Same as above.
Same as above.
Same as above.
Same as above.
Same as above.
Same as above.

III.    Discrimination Statement:

I believe that I have been discriminated against because of my race, Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Oct 26, 2009 _____  Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)          10/26/9 |

**136**

# PROGRESS REPORT

Name of Employee: ___LaChica King_____

Store # ___246_____

Date of Last
Conference  04/13/09 _____

Areas of Performance: Please check areas involved.

Quantity of work ___  Cooperation _X__ Action Plan ___

Quality of work ___ Attendance ___ Other ___

Reliability ___ Lateness ___

REVIEW:

The intent of this Progress Report is to identify LaChica's Leadership opportunities and to improve her overall performance as an Asst Manager at store #246.

On Tuesday, November 24, 2009, the Store Manager and Co-Manager asked LaChica to give her store keys to the Co-Manager.  LaChica refused to do as she was asked.

LaChica must understand that the store keys belong to Cache and she must obey instructions regarding all Cache property including said keys.

LaChica's behavior must improve immediately in order for her to remain successful as an Assistant Manager at Cache.  LaChica, I am here to support you and help you succeed, however, the final accountability for your performance and success rest with you.  You must cooperate when instructed to perform duties that are required of you by the Store Manager and Co-Manager.   It is important that you are clear in your understanding of what is expected of you going forward and that you know the consequences should this behavior continue will result in further action leading up to or resulting in your separation from Cache.

Date of Next Conference: _____

Signature of Employee _____  Date Signed  11/25/09

Signature of Manager/Supervisor           Date Signed

*Refused to sign*           11/25/09

Δ π EXHIBIT 12
Deponent KING
Date 8/9/11  Rptr. QLL
www.deposbook.com

**137**

# PROGRESS REPORT

NAME OF EMPLOYEE:  LaChica King

STORE #  246

DATE OF LAST
CONFERENCE

AREAS OF PERFORMANCE:   Please check areas involved.

| | | | | | | |
|---|---|---|---|---|---|---|
| Quantity of work | ☐ | Cooperation | ☐ | Other | ☐ |
| Quality of work | ☐ | Attendance | ☐ | | |
| Reliability | ☐ | Lateness | ☐ | | |

REVIEW:
The intent of this Progress Report is to identify LaChica's Leadership opportunities and to improve her overall performance as an Assistant Manager at store #246

On Friday, January 1, 2010 LaChica lost her store keys and has no recollection of where she placed them. LaChica is an Assistant manager and responsible for protecting the assets of the store.

LaChica I am here to support you and help you succeed, however, the final accountability for your performance and success rest with you. Please sign below indicating that you have read, discussed and understand this to be a final warning and any other violations of company policy will result in further action leading up to or resulting in your separation from Cache.

DATE OF NEXT CONFERENCE:

refused to sign

1/14/10

SIGNATURE OF EMPLOYEE

DATE SIGNED

*Carol Keel*

1/14/10

SIGNATURE OF MANAGER

DATE SIGNED

Δ π EXHIBIT 14
Deponent KING
Date 8/9/4  Rptr. DLL
WWW.DEPOBOOK.COM

*138*

# Exhibit 2
Bates Stamped Documents

# EXPRESSIONS
### Chiropractic & Rehab, P.A.
### Kirkland Speaks, DC

516 FM 1382
Cedar Hill, TX 75104

Phone 972-291-4455
Fax 972-291-5076

Name: LaChica King

Diagnosis: (R) hair hold S/P

LaChica is free to return to work, but recommended she not wear heels for 6 more weeks

Referring Dr: _Kirkland_

Date: _____   Phone: _972-291-4455_

Notes: _____

REDACTED

King, LaChica
177

## ACTION THAT MAY RESULT IN IMMEDIATE DISMISSAL:

### ACTS OF A CRIMINAL NATURE

An act or acts of a criminal nature including but not limited to: theft, fraud, embezzlement, or larceny.

### INSUBORDINATION

Failure or refusal to follow instructions, to perform work in the manner assigned, or to comply with Company rules and including conduct which undermines management authority by word or action.

### POSSESSION OF WEAPONS

Unauthorized use or possession of explosives, firearms, or other weapons on Company premises or while performing Company business.

### IRESPONSIBLE ACTIONS

Behavior which creates a substantial and unjustifiable risk or harm to another person or to the business or reputation of the Company: serious damage to Company's property: damage to the property or person of others while on Company time or premises; includes, but is not limited to: rudeness, harassment, or defamatory communications to any customer, vendor, visitor, or fellow employee; reckless use of Company equipment, actual, attempted, or threatened physical assault on any fellow employee, customer, vendor, or visitor.

### TRAFFICKING OR USE OF DRUGS/ALCOHOL

Sale, possession, use, or failure to report the sale, possession or use of alcohol or any controlled substance on Company premises; use of Company premises for sale or distribution of drugs or any controlled substance; reporting for work under the influence of alcohol or any controlled substance.

### FRAUDULENT/DECEPTIVE PRACTICES

Use of the Company's property, credit, services or employment relationship in a manner other than prescribed by Company policy, federal, state or local laws. This includes, but is not limited to: willful manipulation or falsification of any Company document (s): misappropriation of Company, vendor or customer property: fraud or engaging in bait and switch practices.

### COUNTER PRODUCTIVE BEHAVIOR

Any personal conduct which substantially limits your effectiveness as a Cache employee by reason of its detrimental effect on the business or reputation of the Company. This includes, but is not limited to: violation of Company conflict of interest policies; unauthorized possession or disclosure of confidential information.

## OTHER ACTS THAT WILL RESULT IN DISCIPLINARY ACTION:

- ❖ Violation of applicable safety rules, which are in fact unsafe work practices.
- ❖ Excessive absences from work, late reporting, long breaks, leaving early, or other violations of company work schedules.
- ❖ Failure to follow a standard of dress appropriate for the business situation involved as established by management.
- ❖ Failure to meet the company's standard for work performance.
- ❖ Failure to follow Company rules, procedures and policies.
- ❖ Abuse of discount privilege.
- ❖ Dishonesty
- ❖ Disorderly conduct or use of foul or abusive language.
- ❖ Falsification of Company documents, including time sheets.

Cache, Inc.                                                                                          13
February 2002

Cache000014

**140**

## HANDBOOK ACKNOWLEDGMENT FORM
### PERSONNEL FILE COPY

I acknowledge that I have received a copy of the Cache Employee Handbook. I understand that this edition of the Handbook supersedes all previous descriptions of the Company's policies, procedures, and employee benefits.

I understand that the Handbook describes important information about the Company, and I agree to read the entire Handbook. I agree to abide by all policies and procedures contained in the Handbook. If I have any questions about the Handbook, or about other issues regarding my employment, I will consult with my Store Manager or District Manager.

Cache's personnel policies and benefits are regularly reviewed and maybe modified or supplemented without notice; we will do our best to keep you posted of any changes. However, the Company does not intend by this Handbook to create any contractual obligations, express or implied, on the part of the Company. The Company retains the sole right to interpret the Handbook provisions.

**I understand and agree that, unless I am subject to an employment contract, my employment with the Company is "at will," that is, that both the Company and I are free to terminate my employment at any time, with or without cause or advance notice. I understand that while other personnel policies, procedures, and benefits of the Company may change from time to time in Company's discretion, this at-will employment relationship can only be changed by an express written employment contract signed by an Executive Vice President of the Company.**

_____  
Employee's Signature

6/29/08  
Date

LaChica King  
Employee's Name (typed or printed)

246  
Store #

Cache, Inc.  
February 2002

19

Cache000032

**141**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Dallas District Office**

207 S. Houston Street, 3rd Floor
Dallas, TX 75202-4726
Dallas Status Line: (866) 408-8075
Dallas Direct Dial: (214) 253-2885
TTY (214) 253-2710
FAX (214) 253-2746

Dallas District Office
  San Antonio Field Office
  El Paso Area Office

January 13, 2010

Ms. Lachica King
Legacy of Cedar Hill
1000 E. Pleasant Run
Cedar Hill, Texas 75104

Dear Ms. King:

    This is to advise that we have determined to dismiss your charge of employment discrimination (charge number 450201000314) against Cache. Our assessment of the charge included careful consideration of all the information offered by the employer and you.

    As you probably know, in 1995, our agency moved toward a more strategic enforcement approach with the adoption of new priority charge handling procedures which require our staff to make careful decisions to ensure that our available resources are focused on those charges which we believe, based on our extensive experience in interpreting the laws we enforce, are most likely to result in findings of violation. While reasonable persons may differ in their views of the available evidence pertaining to individual charges, the overall effect of our operational approach has been that a very large number of non-meritorious cases have been eliminated from our national workload, allowing for more timely and careful attention to other charges more likely to result in significant civil rights enforcement gains.

    Our review of your charge indicated that it is very unlikely that further investigation would establish a violation of the laws we enforce. The available evidence is insufficient to impugn the validity of the employer's contention that it had valid business reasons for its scheduling decisions which were made without regard to your race. While not inherently controlling our evaluation of the charge, we note the absence of significant direct evidence of discrimination and the lack of potentially relevant witnesses who could provide specific, relevant evidence in support of your allegations.

    Although you may have received unemployment compensation, the standards for approving unemployment claims are different and less stringent than those applicable to establishing a violation of the federal laws we enforce. Accordingly, we decline to take further action on the charge. The enclosed **Determination and Notice of Rights** represents a final determination by the U.S. Equal Employment Opportunity Commission (EEOC) and describes your right to pursue the matter by filing a lawsuit within 90 days of receipt of the notice. If you fail to file a lawsuit within the statutory 90-day period, your right to sue in federal court will expire and cannot be restored by EEOC.

    You may wish to consider consultation with private counsel who specialize in employment law for an assessment of your circumstances and the likelihood of prevailing in any litigation you may initiate. Your local bar association may be able to provide referrals to local attorneys.

    We hope this information is helpful to you.

Sincerely,

Michael C. Fetzer
District Director

Cache000051

**142**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**INTAKE QUESTIONNAIRE**

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). REMEMBER, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. Answer all questions as completely as possible, and attach additional pages if needed to complete your response. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
DALLAS DISTRICT OFFICE

**1. Personal Information**

Last Name: King   First Name: LaChica   MI: O

Street or Mailing Address: 1000 E. Pleasant Run   Apt or Unit #: 4424   Legacy O Cedar Hill

City: Cedar Hill   County: Dalla   State: TX   Zip: 75104

Phone Numbers: Home:

Cell: (469) 879 0182   Email Address: praiseangels2001@yahoo.com

Date of Birth:   Sex: ☐ Male ☒ Female   Do You Have a Disability? ☐ Yes ☒ No

Please answer each of the next three questions.

i. Are you Hispanic or Latino?  ☐ Yes  ☒ No

ii. What is your Race?   Please choose all that apply. ☐ American Indian or Alaskan Native ☐ Asian ☐ White ☒ Black or African American ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? US

Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:

Name: Elizabeth Taylor   Relationship: close friend/neighbor

Address: 1000 E. Pleasant Run #4414   City: Cedar Hill   State: TX   Zip Code: 75104

Home Phone: (b) (7)(C)   Other Phone: ( )

**2. I believe that I was discriminated against by the following organization(s): (Check those that apply)**

☒ Employer  ☐ Union  ☐ Employment Agency  ☐ Other (Please Specify) _____

Organization Contact Information (If the organization is an employer, provide the address where you actually worked. If you work from home, check here__ and provide the address of the office to which you reported.) If more than one employer is involved, attach additional sheets.

Organization Name: Criché - The Parks Mall @ Arlington

Address: 3811 S. Cooper St   County:

City: Arlington   State: TX Zip: 76015   Phone: (817) 467 3100

Type of Business: Retail   Job Location if different from Org. Address:

Human Resources Director or Owner Name: Margarita   Phone: (212) 575 3209

Number of Employees in the Organization at All Locations: Please Check (✓) One

☒ Fewer Than 15  ☐ 15 – 100  ☐ 101 – 200  ☐ 201 – 500  ☐ More than 500

**3. Your Employment Data (Complete as many items as you are able)**

Date Hired: 06/30/2008   Job Title At Hire: Assistant Manager

Pay Rate When Hired: $14⁰⁰ + commission   Last or Current Pay Rate: same

Job Title at Time of Alleged Discrimination: Asst. Man

Name and Title of Immediate Supervisor: Carol Keeler, Store Manager

Cache000160

143

If Job Applicant, Date You Applied for Job ___N/A___ Job Title Applied Fo: ___

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☒ Race  ☐ Sex  ☒ Age  ☐ Disability  ☐ National Origin  ☐ Color  ☒ Religion  ☒ Retaliation  ☐ Pregnancy

If you checked color or religion, please specify: __Christian__

Other reason (basis) for discrimination (Explain): _____

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed.
*(Example: 10/03/06 – Discharged by Mr. John Soto, Production Supervisor)*

A. Date: 7/21/09 Action: Sent home by Mareatha Hornsby, after having spoken with Store Man about remaining at work with sprained ankle.
Name and Title of Person(s) Responsible: Carol Keeler Store Manager / Mareatha Hornsby District Man

B. Date: 8/2/09 Action: Told I was taken off the schedule for a "couple more days" but had been taken off for the next 2 weeks after returning back on 7/30/0
Name and Title of Person(s) Responsible: Carol Keeler, Store Manager

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.

Carol and I had agreed that I would work more days, fewer hours so that my sprain would heal. She and Mareatha collaborated and decided that I take a "forced" leave of absence. I personally called HR and Margeril said they should have notified her about this and that all I needed was a doctor note to return back to work.

**7. What reason(s) were given to you for the acts you consider discriminatory?** By whom? His or Her Job Title?

Upon return with doctors note, I took them 2wks to put me back on the schedule. They had changed locks which should only be done if employee has resigned or been terminated. They didn't give me a key but Jeff messages to me to bring
**8. Describe who was in the same situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same situation as you, who was treated better than you?

| Full Name | Race, sex, age, national origin, religion or disability | Job Title | Description of Treatment |
|---|---|---|---|

A. April Baker, white ≈45 yrs old American female, non practicing Christian – Co-Manager. She has had the schedule adjusted many times & stomach and psychological problems. She never

B. needed doctor's notes. I was told by Carol, SM, to watch her behavior because Carol had noticed she was coming in "under the influence"

Of the persons in the same situation as you, who was treated worse than you?

| Full Name | Race, sex, age, national origin, religion or disability | Job Title | Description of Treatment |
|---|---|---|---|

A. No one

Cache000161

2

**144**

*I have voice messages, voice records, pictures and videos, copies of time sheets, schedules, evaluations and job performances*

**13. Are there any witnesses to the alleged discriminatory incidents?** If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|
| A. Janice "Precious" Flowers | PT Sales | (b)(7)(C) | (everything) |
| Julie Tran | customer/mall Employee for Gordons | (b)(7)(C) | |
| Joyce Stokes | customer | 8174533493 | was questioned by our SM whether or not I told her anything about what's going on |
| Rose Puga | customer | 4694566009 | she called store to come in and shop with me and was told by April Baker that I probably wasn't coming back but that she could help her |
| Dori Coleman | customer | 817 714 0665 | has witness the tension |

**14. Have you filed a charge previously on this matter with the EEOC or another agency?** ☐ Yes ☒ No

**15. If you filed a complaint with another agency, provide the name of agency and the date of filing:** _____

**16. Have you sought help about this situation from a union, an attorney, or any other source?** ☒ Yes ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

Doug Daniel, lawyer for Bracewell and Antonini in Houston Tx. - I first called upon return back to work around 9/14/07
Last conversation with Secretary on 10/22/07 Liz

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire. If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before deciding whether to file a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your filing a charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

**BOX 1** ___ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

**BOX 2** ✓ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, or retaliation for opposing discrimination.

_____ Signature          10/23/07   Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters. 5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Cache000162

4

**145**

3. _____

Of the persons in the same situation as you, who was treated the same as you?

| Full Name | Race, sex, age, national origin, religion or disability | Job Title | Description of Treatment |
|---|---|---|---|

A. No one _____

B. _____

Answer questions 9-12 **only** if you are claiming discrimination based on disability. If not, skip to question 13.

9. Please check all that apply:
☐ Yes, I have a disability
☐ I do not have a disability now but I did have one
☐ No disability but the organization treats me as if I am disabled

10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything? (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

_____
_____
_____

11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?
☐ Yes ☐ No
If "Yes," what medication, medical equipment or other assistance do you use?
_____
_____

12. Did you ask your employer for any changes or assistance to do your job because of your disability?
☐ Yes ☐ No

If "Yes," when did you ask? _____ How did you ask (verbally or in writing)? _____
Who did you ask? (Provide full name of person) _____
Describe the changes or assistance that you asked for: _____
_____
_____

How did your employer respond to your request? _____
_____
_____

*******************************************************************************
*

Cache000163

3

**146**

EEOC Form 5 (501)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 450-2010-00314 |

**Texas Workforce Commission Civil Rights Division** and EEOC

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Lachica O. King | (469) 879-0182 | 01-23-1980 |

| Street Address | City, State and ZIP Code |
|---|---|
| Legacy of Cedar Hill<br>1000 E. Pleasant Run | Cedar Hill, TX 75104 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CACHE | 15 - 100 | (817) 467-3100 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 3811 S. Cooper St. | Arlington, Texas 76015 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 07/20/09   Latest 10/26/09

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. Personal Harm:

On July 20, 2009, I injured myself.

On July 21, 2009, I came to work, but was sent home by Mareatha Hornsby, District Manager.

On July 30, 2009, I return to work.

On July 31, 2009, Ms. Keeler advises me that I was to take some additional days off.

On August 2, 2009, I called Ms. Keeler to find out my schedule, and told that she was going to find out if I was eligible for short term disability and to take some additional days off.

On August 3, 2009, I called April Baker, Co-Manager to find out on when I was scheduled to work. Ms. Baker informed me that I was not scheduled for the next several weeks.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Oct 26, 2009 _Date_    _Charging Party Signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)   10/26/9 |

Cache000260

**147**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 450-2010-00314 |
| Texas Workforce Commission Civil Rights Division | | and EEOC |
| State or local Agency, if any | | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On August 3, 2009, I speak with Margarita Croisdale, Human Resources Manager/Benefits.

On August 28, 2009, I turn in my doctor's note to Carol Keeler and I also faxed it to Margarita Croisdale.

On September 14, 2009, I returned to work.

From September 14, 2009 through the present I have been scheduled to work less than 35 hours a week. The additional hours are being given to Bobbye Villanueva, Part-time Assistant Manager.

II.    Respondent's Reason:

   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.
   Same as above.

III.    Discrimination Statement:

   I believe that I have been discriminated against because of my race, Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Oct 26, 2009 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | 10/26/9 |

Cache000261

**148**

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**DISMISSAL AND NOTICE OF RIGHTS**

| To: | Lachica O. King<br>1000 E. Pleasant Run<br>Apartment 4424<br>Cedar Hill, TX 75104 | From: | Dallas District Office<br>207 S. Houston St.<br>3rd Floor<br>Dallas, TX 75202 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 450-2010-01422 | Karen C. Heard,<br>Investigator | (214) 253-2873 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

**- NOTICE OF SUIT RIGHTS -**
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Karen C Heard* *2/1/10*

Enclosures(s)                                              **Michael C. Fetzer,**                              (Date Mailed)
                                                                        **Director**

cc:      **Cheryl Kirby**
           **Attorney**
           **OPPENHEIMER BLEND HARRISON & TATE INC.**
           **711 Navarro Sixth Floor**
           **San Antonio, TX 78205**

Cache000272

***149***

      

3BThumbs.dat (569 KB) | IMG00190-2009112 7-1100.jpg (64... | IMG00320-2010011 4-1350.jpg (60... | IMG00321-2010011 4-2059.jpg (51... | IMG00322-2010011 4-2100.jpg (65... | IMG00323-2010011 0-1042.jpg (59... | IMG00324-2010012 0-1939.jpg (63...

      

IMG00325-2010012 1-1027.jpg (62... | IMG00390-2010021 5-1309.jpg (61... | IMG00391-2010021 5-1310.jpg (56... | IMG00392-2010021 5-1432.jpg (53... | IMG00393-2010021 6-1146.jpg (16... | IMG00395-2010021 6-1326.jpg (17... | IMG00397-2010021 6-1326.jpg (47...

  

IMG00413-2010022 2-1054.jpg (65... | IMG00414-2010022 3-1056.jpg (63... | IMG00415-2010022 3-1058.jpg (75...

Margarita Croasdaile
Human Resources Manager
Cache, Inc.
mcroasdaile@cache.cm
212.575.3209

-----Original Message-----
From: Mareatha Hornsby
Sent: Thursday, March 18, 2010 10:09 AM
To: Margarita Croasdaile
Subject: FW: Forward Lachica King files


Mareatha Hornsby
District Sales Manager
Caché, Inc.
mhornsby@cache.com
Cell: 318-218-0779


-----Original Message-----
From: Carol Keeler [mailto:cpruitt123@msn.com]
Sent: Wed 3/17/2010 11:15 AM
To: Mareatha Hornsby
Subject: FW: Forward Lachica King files

I don't know why these are taken.  The black bag with clothes in are what you damaged.  If
I need to take the Lord's Pray down let me know.  And why would she take a picture of a
book I was reading?


Carol
_____

Date: Wed, 17 Mar 2010 12:48:40 -0500
Subject: Forward Lachica King files
From: dehranwatson@gmail.com
To: Cpruitt123@msn.com

1

Cache000366

*150*

These are some of the jpegs that Lachica force me to download and put on a flash drive.  I will send more in the other emails.

---

Hotmail: Trusted email with powerful SPAM protection. Sign up now.
<http://clk.atdmt.com/GBL/go/210850553/direct/01/>

2

Cache000367

*151*



Cache000368

*152*



Cache000369



Cache000370

*154*



## PROGRESS REPORT

NAME OF EMPLOYEE: LaChea King

STORE # 246                    DATE OF LAST
                               CONFERENCE

**AREAS OF PERFORMANCE**   Please check areas involved.

| Quantity of work | ☐ | Cooperation | ☐ | Other | ☐ |
| Quality of work | ☐ | Attendance | ☐ | | |
| Reliability | ☐ | Lateness | ☐ | | |

**REVIEW**

**DATE OF NEXT CONFERENCE**

Cache000371

*155*



Cache000372



Cache000373



Cache000374



Cache000375



Cache000376

*160*



Cache000377



Cache000378



Cache000379



Cache000380



Cache000381



Everyone must have coupon with them. Place item on hold until they bring it in (24 hrs.)

No extended holds once clearance items are used up - this affects our special order score on our reviews when we cannot fill special orders because an item is on hold.

No special orders for clearance unless they are ordering a full price item as well.

No cell phones on floor - not in stores opening hrs. ever.

Cache000382

*166*



**From:** Carol Keeler [mailto:cpruitt123@msn.com]
**Sent:** Wed 3/17/2010 11:10 PM
**To:** Mareatha Hornsby
**Subject:** FW: About Lachica Kings

Pruitt is my married name I do not use.

Cache000383

**167**

**Exhibit 3**
Declaration of Margarita Crosadaile

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
(Dallas Division)

| | | |
|---|---|---|
| LACHICA KING | § | |
|     Plaintiff | § | |
| | § | |
| | § | Civil Action No. 3:CV-11-0138-P |
| v. | § | |
| | § | |
| CACHE, INC. | § | |
|     Defendant | § | |

## DECLARATION OF MARGARITA CROASDAILE

    I, Margarita Croasdaile, hereby give this statement under oath voluntarily. I am over the age of 21 years and am competent to testify to the matters stated herein. I have personal knowledge of the facts, events, and circumstances stated in this declaration, and they are true and correct.

1.    I am currently employed as the Manager of Human Resources ("HR") for Cache, Inc. ("Cache") and was in this position during the entire period of Cache's employment of LaChica King ("King"), the Plaintiff in the above styled matter. My office is located in New York City, New York.

2.    As HR Manager, I understand Cache's polices and procedures for employee leave and for classification of full time employees, who should average working 30 hours a week to maintain full time status. A true and correct copy of Cache's Employee Handbook, which contains the criteria for full time status on page 4, is attached hereto as Exhibit A. Full time employees during King's employment were not entitled to work more than 30 hours a week nor are they currently.

3.    All Cache employees are expected to comply with the policies and procedures in the Employee Handbook, and managers are also expected to read, comply with and enforce Cache's operational policies and procedures contained in an in-store binder and/or on Cache's intranet.

4.    On Monday, August 3, 2009, King called me and indicated she had been out due to an injury and was ready to return to work. I told her that she needed a return to work release from a doctor, and, from our discussion, I thought she intended to get a release and return to work soon.

5.    It is Cache's policy that employees who are out for their own serious health condition under the FMLA must submit a medical release before they return to work.

1

**168**

This policy is contained on page 8 of the Employee Handbook that is attached hereto as Exhibit A.

6.      Since it is my understanding that a serious health condition under the FMLA is one that lasts more than 3 days consecutive days, when I get notice that an employee is out sick or injured for at least four days, my practice is to require the employee to submit a medical release before returning to work, regardless of whether the absence is covered by the FMLA.

7.      I am the person who designates absences as FMLA leave, and I did not designate King's absence as FMLA leave, because, to my knowledge, King did not request FMLA leave, and I thought she was returning to work soon after she called me in early August 2009.

8.      Since I did not designate King's absence as FMLA leave, the days she was out did not count against the 12 weeks of FMLA leave available to her for the year.

9.      It was around the end of August 2009, when I learned that King had gotten a return to work doctor's note. Since I had not heard from King for about a month, I told the Store Manager, Carol Keeler ("Keeler") and/or the acting District Manager while Hornsby, Rachel Dandeneau, that the doctor's note should state that King had been under a doctor's care.

10.     When I saw the doctor's note from King's doctor, on or about August 31, 2009, or September 1, 2009, I thought it was sufficient for King to return to work, even though it did not state that King had been under his care during the absence. I told Keeler and/or Rachel Dandeneau, to put King back on the schedule for the next two week cycle that began September 13, 2009, which was a Sunday, for no less than 30 hours a week and to accommodate the footwear restriction.

11.     In mid January, 2010, I received by fax a written list of King's complaints and her demands for compensation that she had given Hornsby. I talked to Hornsby, who said that her investigation showed that most employees thought King created tension in the store and did not want to work with her.

12.     Hornsby also told me that King had asked to record the interview and Hornsby had allowed her to do so. I told Hornsby that recording is not allowed without corporate authorization.

13.     It was my understanding that the rule prohibiting cell phones on the sales floor and requiring the phones to be turned off during working hours, even if off the sales floor, in effect, prohibited employees' from recording their conversations since most cell phones are recorders.

14.     I consider surreptitiously recording one's conversation with someone at work without disclosing it to be underhanded and in violation of Cache's Code of Ethics and

2

**169**

other written policies that require honesty from employees. It is also my understanding that it is a crime in some states to record someone without his/her consent. Dishonesty and fraudulent and deceptive practices are grounds for termination under Cache's Employee Handbook on page 13 that is attached hereto as Exhibit A.

15.     When I reviewed King's written complaints and demands for compensation, I thought King was unhappy and decided to offer her a severance deal. On or about January 20, 2010, I called King to tell her that her demand for compensation was denied and offered her a severance amount of four weeks' wages if she resigned and signed a release of claims. A couple of days later King rejected the offer.

16.     Sometime in February 2010, I learned that King had filed another EEOC Charge that had been dismissed the same day. Since the Charge had already been dismissed, I did not disclose it to Hornsby before King was terminated.

17.     In mid to late March 2010, Hornsby told me that she had decided to terminate King based on recordings King had made with her cell phone. I did not listen to the recording made by King and so was not involved in the decision to terminate King, but I approved Hornsby's decision to terminate King.

18.     I am not aware of any employee, other than King, who engaged in the type of insubordinate and/or deceptive conduct that King did. For example, I am not aware of any employee, other than King, who refused to follow directions from his/her supervisor unless the directions were in writing or who refused to give Cache's keys to another manager upon the request of the Store Manager. I know of no employee, other than King, who secretly recorded his/her manager after being told recording was not allowed, and I know of no employee who surreptitiously recorded other employees on the sales floor as King did.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts stated above are true and correct.

Executed on this _21_ day of December, 2011.

_Margarita Croasdaile_
Margarita Croasdaile

3

**170**



# EMPLOYEE HANDBOOK



Cache000001

**171**

# *WELCOME*

Welcome to Cache, America's premier fashion retailer. During the next few weeks you will be learning all about Cache.

The success of Cache is based on its people. Each employee is a representative of Cache. We are proud of the Cache team of retail professionals. Being a member of this organization requires cooperation, dedication and effort.

This Handbook has been written to provide you with basic information concerning the many benefits you will enjoy as an employee of Cache. It also establishes and explains the basic rules and regulations of our company.

Please read this Handbook and become familiar with its contents. If there are any questions you have, please feel free to ask your Store Manager, District Manager, Regional Manager or call the Human Resource Manager at the home office.

We hope that you have a long prosperous career with Cache.

Cache, Inc.
February 2002

1

Cache000002

*172*

# TABLE OF CONTENTS

ABOUT THIS HANDBOOK ................................................................. 3

EQUAL OPPORTUNITY ................................................................. 3

EMPLOYMENT STATUS ................................................................ 4

BENEFITS................................................................................ 4

WORK SCHEDULES AND PAYROLL................................................. 9

PERSONNEL POLICIES................................................................10

PERSONAL CONDUCT EXPECTATIONS...........................................12

CORRECTIVE ACTION GUIDELINES................................................14

POLICY PROHIBITING HARASSMENT..............................................14

PROBLEM SOLVING PROCEDURE..................................................16

TERMINATIONS AND RESIGNATIONS.............................................16

HANDBOOK ACKNOWLEDGEMENT FORM.........................................18

ARBITRATION POLICY................................................................20

Cache, Inc.
February 2002

2

Cache000003

***173***

# ABOUT THIS HANDBOOK

We at Cache hope that your employment with the Company is rewarding and satisfying for both you and the Company. We believe that Cache offers exceptional employment opportunities. However, it is important that all employees understand the terms and conditions of their employment status with the Company, and that business needs and requirements often fluctuate in our industry. **Your employment is on an "at will" basis for no definite period and may be terminated at any time by you or Cache without advance notice and with or without cause.**

**The provisions in this booklet do not constitute an employment contract or other form of a legal contract with you. Unless modified by written agreement, signed by both the employee and an Executive Vice President, no supervisor or other representative of Cache has the authority to enter into any agreement for employment for any specified period of time or to make any agreement contrary to those listed in this booklet or any other policies or procedures of Cache's.**

**Due to the ever-changing environment in which we do business and our desire to always improve, Cache reserves the right to interpret, modify or discontinue any of it's policies.**

All policies contained herein of Cache, Inc. apply to all employees of Cache and Lillie Rubin stores.

## EQUAL OPPORTUNITY

It is the policy of Cache to implement equal opportunity to all qualified employees and applicants for employment and to administer its personnel practices without regard to race, religion, color, creed, sex, national origin, age, veterans status, the presence of any disability or any other basis protected by applicable law.

Cache, Inc.
February 2002

3

Cache000004

**174**

# EMPLOYMENT STATUS

When you are hired you will be informed whether you are considered a nonexempt or exempt employee. The "exempt" category applies to certain administrative, sales, professional and executive staff. The "nonexempt" category applies to all other employees. "Nonexempt" employees receive extra pay for overtime work after 40 hours. Exempt employee's salaries already account for the fact that they sometimes work long hours.

Under federal immigration law, each employee hired must provide certain documentation and complete an "I-9" form demonstrating that he or she is authorized to work in the United States. Failure to provide such documentation in a timely manner will result in discharge of the employee.

Should an employee subsequently become unauthorized to work, the law requires that he or she be discharged pending receipt of additional documentation demonstrating an extension of the authorization to work in the United States.

## FULL TIME EMPLOYEES

The term "full time" applies to those employees who normally work an average scheduled workweek of 30 hours or more and have completed their 90-day introductory period.

## PART TIME EMPLOYEES

The term "part time" applies to those employees who normally work an average schedule workweek of less than 30 hours and have completed their 90-day introductory period.

# BENEFITS

The following is a summary of benefits offered by Cache. The company reserves the right to modify, amend or terminate these benefits at any time. The Administrator of each plan has discretionary authority to determine eligibility for benefits and interpret the plan's terms. There are more formal documents that apply to some of these benefits and describe them in more detail. To the extent there are any differences between these summaries and the official documents, the official documents are controlling. The official documents are available from the Human Resource Department for review by all employees.

There are summary plan descriptions with regard to some of the benefits described below. Employees should refer to summary plan description for information about these plans. Summary plan descriptions are available at each store or call the Human Resource Department for a copy.

Full time employees are eligible for most benefits (except 401(k)) after completing their 90-day introductory period.

## MEDICAL AND DENTAL INSURANCE (AVAILABLE TO FULL TIME EMPLOYEES ONLY)

All full time employees are eligible for coverage under our group insurance plan, subject to conditions, limitations and exclusions contained in the plan, the first month following successful completion of the 90-day introductory period. Coverage and exclusions may change at anytime. Employees who elect to enroll in group medical and or dental are required to contribute a portion of the cost of the insurance they select. This is done through payroll deductions and is done on a pre-tax basis. The amount varies based on the plans and coverage elected. Rate schedules are available at all stores or by contacting the Human Resource Department in the Home Office.

Cache, Inc.                                                                                          4
February 2002

Cache000005

**175**

## COBRA

Under Federal law most employers sponsoring group health plans are required to offer employees and their families the opportunity for a temporary extension of health coverage (called "continuation of coverage") at group rates in certain instances where coverage under the plan would otherwise end. You and your eligible dependants covered under the Company plan will be provided additional information when you experience a "qualifying event", such as reducing your work hours from full time to part time or termination of your employment.

## LIFE INSURANCE (AVAILABLE TO FULL TIME EMPLOYEES ONLY)

All full time employees are eligible for Life Insurance and Accidental Death and Dismemberment. The full amount of the premium is paid for by Cache.

## LONG TERM DISABILITY (AVAILABLE TO FULL TIME STORE MANAGERS AND ABOVE ONLY):

Full time Store Managers and more senior management are covered by this policy after 90 days of continuous employment. The purpose of LTD coverage is to provide for some salary continuation, in the event you become totally disabled and are unable to continue work. Consult your LTD insurance booklet for specific details of coverage.

## 401(k) (AVAILABLE TO FULL TIME EMPLOYEES)

The 401(k) plan allows employees to make pretax payroll deductions to save for their future financial needs during retirement. Cache contributes matching funds to your account which are subject to vesting (please inquire about current matching and vesting schedules). An employee is eligible to participate in the 401(k) plan after completing one year of service and having worked at least 1,000 hours in the past year. An eligible employee may enroll in the plan the first day of the quarter following his/her anniversary date.

## EMPLOYEE DISCOUNT (AVAILABLE TO ALL EMPLOYEES)

We like to encourage you to wear the clothes you sell. One way of doing this is to allow you a 40% DISCOUNT on all merchandise you purchase at Cache, for you and members of your immediate family only (i.e., your tax-deductible dependents). All purchases must be paid in cash, personal check, or a valid major credit card. Misuse of your employee discount privilege can result in immediate dismissal.

Employees cannot transfer merchandise from another store for employee purchases. The purchase must be made at the store where the merchandise is located.

Employees cannot place merchandise on hold for the purpose of purchasing at a later date.

All employee shopping, including trying on of merchandise must be done at approved times and only with the permission of your store manager.

A member of management must handle all employee purchases. An assistant manager should supervise purchases made by a store manager.

## VACATION (AVAILABLE TO FULL TIME EMPLOYEES):

The purpose of vacation is to enable employees to enjoy rest and recreation from the job.

After 90 days of continuos employment with Cache, full time employees will accrue vacation benefits based on the hours worked from date of hire or anniversary date. All compensated hours will be used to compute vacation accrual.

Cache, Inc.
February 2002

5

Cache000006

*176*

Vacation is earned as of the employee's anniversary. You will receive the following paid vacation computed on average hours worked:

1. After one year of full time employment two weeks, employees are eligible to take one of the two weeks after 6 months of full time employment.
2. Two to four years of employment two weeks.
3. Five to nine years of employment, three weeks.
4. After ten years of employment, four weeks.

You must request your vacation at least 30 days in advance.

The request for vacation must be submitted to the Company on a Personal Action Notice (PAN) form.

Vacation days must be used in the present vacation year or be forfeited.

Vacation must be taken during non-peak sales periods and must be approved by your Store Manager or District Manager. Due to staffing needs in our stores; vacations are limited to one week at a time.

## SICK LEAVE PAY (AVAILABLE TO FULL TIME EMPLOYEES):

After being employed with Cache for 90 days continuously, all full time employees become eligible for sick leave pay. Sick leave pay is based on an employee's average workday.

The number of sick days per year you are entitled to is dependent upon your length of continuous service with the Company:

| TERM OF SERVICE | DAYS ALLOWED |
|---|---|
| 3 Months or less | 0 Days |
| 3 Months to 1 year | ½ Day Per Month (Maximum 4 ½ Days) |
| Over one year | 6 Days Per Calendar Year |

For employees with less than one year of service, sick pay is not available until earned. Once you have completed one year of service, a bank of sick days is credited to you on the 1st of January each year there after.

Unused sick days may not accumulate from year to year and are forfeited upon separation from the Company.

Sick days will only be paid for regularly scheduled worked days and will be calculated on regular based pay rates, **excluding** commissions.

Management reserves the right to request a doctor's notification that an employee is unable to work.

## HOLIDAYS

Full time employees are eligible for holiday pay if you have worked 90 days of employment prior to the holiday. You must also be at work on your scheduled workday before and after the holiday, unless your immediate supervisor approves your absence.

The Company grants a total of six paid holidays to eligible employees. These paid holidays consist of the following nationally recognized holidays:

New Year's Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

Cache, Inc.
February 2002

6

Cache000007

**177**

If you are sick the regular scheduled shift of the day before or after the holiday, you must present a doctor's note stating you were unable to work in order to be eligible for holiday pay.

## UNPAID LEAVES OF ABSENCE

All employees are eligible for leaves of absence. The following are reasons that a leave of absence may be granted:

1) **MEDICAL AND CHILD CARE LEAVE** All employees, after 90 of continuous days of employment with Cache will be eligible for up to 90 days of unpaid medical leave of absence for illness, accident, or maternity. Employees who have been with Cache for more than 12 months may be eligible for leave under the Family and Medical Leave Act (see section 1 below). The employee is responsible for the full premium cost of any health and or dental insurance they are enrolled in while on leave. Employees will not accrue vacation and sick leave during the leave period.

2) **PERSONAL** All full time employees, after their 90 day introductory period will be eligible for up to 90 days unpaid personal leave, with advance request, for religious, legal, financial, or personal reasons. The employee is responsible for the full premium cost of any health and or dental insurance they are enrolled in while on leave. Employees will not accrue vacation and sick leave during the leave period.

3) **FAMILY AND MEDICAL LEAVE (FMLA)** In accordance with the Family and Medical Leave Act of 1993 (FMLA), Cache will grant up to 12 weeks of unpaid family and medical leave during a 12 month period to eligible employees.

### Eligibility
To be eligible for a family and medical leave an employee must have at least twelve (12) months of employment with Cache and at least 1250 hours of service during the previous twelve months. The employee must be employed at a worksite where 50 or more employees are employed by Cache within 75 miles of that worksite.

### Reasons for Leave
Eligible employees may take an unpaid leave of absence under the following circumstances: (1) the birth of the employee's son or daughter; (2) the placement of a son or daughter with the employee for adoption or foster care; (3) the care of the employee's spouse, parent or child who has a serious health condition; or (4) because the employee's own serious health condition. Leave taken in connection with the birth or placement of a child must be taken within the first twelve months of the birth or placement.

### Procedures
a.   In requesting a family or medical leave for any reasons that are foreseeable, employees must give written notice to their supervisor at least thirty (30) days in advance of the need for a leave. If an employee fails to give advance written notice for foreseeable leave, the leave may be denied until at least 30 days after the date notice is provided. If the leave is not foreseeable and the leave must begin in less than thirty (30) days, employees must give their supervisor as much advance notice as is practicable.

b.   If a leave is necessary for planned medical treatment, employees must attempt to schedule treatment so as not to disrupt the operations of Cache. Employees should consult with their supervisor prior to the scheduling of treatment. If it is medically necessary for an employee to take intermittent leave or work a reduced schedule, Cache may transfer the employee temporarily to an alternative position that better accommodates this type of leave.

c.   Cache will require employees to provide documentation of the need for a leave for the employee's own serious health condition or the serious health condition of a family member. A "serious health condition" is defined as an illness, injury, impairment, or physical or mental condition that involves inpatient care at a hospital or residential medical care facility, absence from work for more than three days for a condition that requires continuing treatment by a health care provider, or a chronic long-term health condition.

Cache, Inc.
February 2002

7

Cache000008

**178**

d. Employees must provide a completed medical certification by a health care provider as to: (a) the date the condition commenced; (b) its probable duration; (c) appropriate medical facts regarding the condition; (d) in the case of a family member, a statement that the employee is needed to care for the family member and the expected duration of such need; and (e) in the case of an employee's own illness, a statement that the employee is unable to perform the functions of the employee's position. Medical certification forms are available from Cache. If an employee requests intermittent leave or a reduced work schedule, Cache also will require certification that such type of leave is medically necessary and verification as to the dates and duration of treatment and of the expected duration of the leave.

e. Employees must submit medical certification within 15 days of requesting family and medical leave in connection with a serious health condition. Failure to provide adequate certification in a timely manner may result in delay of leave. If Cache has reason to doubt the validity of the medical certification, it may require that the employee obtain a second opinion from a health care provider selected by Cache' at Cache's expense. If this opinion differs from the employee's certification, Cache will require, at its expense, a third opinion that is final and binding.

## Substitution of Paid Leave

Employees must first use all accrued vacation and personal days for any family and medical leave and take the remainder of the 12 weeks as unpaid leave. If the leave is for the employee's own serious health condition or for the serious health condition of a family member, employees also must use all accrued sick days during the leave period.

## Employees Status During Leave

During the period of family and medical leave, Cache will continue the employee's group health care benefits under the same terms and conditions as if the employee was not on leave. The employee must make arrangements with the Human Resource Department at the corporate office to pay on a monthly basis the amount that would normally be their payroll deduction for the employee's contribution to medical and or dental coverage. If an employee does not return to work following the leave for reasons within the employee's control, the employee will be required to reimburse Cache for any health insurance premiums it paid during the leave.

Employees will not accrue vacation and sick leave during the leave period.

During the leave, Cache may require employees to report periodically on their status and their intent to return to work. Employees on leave for their own serious health condition or the serious health condition of a close family member may be asked to submit medical recertifications from time to time during the leave.

Employees are not permitted to engage in other employment while they are absent from Cache under this policy, without prior approval from Cache. Violation of this policy may lead to disciplinary action, up to and including discharge.

## Employee Status After Leave

When an employee returns from leave, Cache will return the employee to the same position, or to another position that has equivalent benefits, pay and other terms and conditions of employment. Cache may choose to exempt certain highly compensated employees from this requirement.

Cache will require employees on leave for their own serious health condition to submit, prior to their return, a medical certification from their health care provider of their ability to return to work.

Employees who do not return to work within the approved leave period or twelve (12) weeks, whichever comes first, may be terminated as of the scheduled return date.

Any employee who fraudulently obtains family and medical leave will be subject to immediate discipline, up to and including discharge.

Cache, Inc.
February 2002

8

Cache000009

**179**

**PAID LEAVE**

### 1) SICK LEAVE (See Sick Leave)

### 2) BEREAVEMENT

Cache grants full time employees up to three days paid leave due to the death of a close relative. "Relative" is defined as immediate family including the employee's parent, spouse, child, sibling, spouse's parents, or employee's grandparents. You will be paid based on your scheduled workday.

### 3) JURY DUTY

Cache fully supports the obligation of employees to serve jury duty. Cache will grant paid leave of absence of up to two weeks (or such longer period as required by local law) for full and part time employees. You will receive your regular rate of pay in accordance with your schedule less any payment you receive for jury duty. Employees must submit written documentation of the summons prior to jury duty. Employees who volunteer for jury duty will not receive any compensation from the company for the days they serve on jury duty.

# WORK SCHEDULES AND PAYROLL

## A. WORK SCHEDULES AND PAYROLL

Your supervisor will inform you of your scheduled work hours. Work schedules are established on the basis of Company and individual store requirements and may be subject to change at short notice. If your established work schedule is changed, your supervisor will give you as much notice as possible. In addition, employees may not swap schedules with one another without authorization of the store manager.

## B. SIGNING IN & OUT

All employees must key in and out in accordance with their work schedule, as established by their supervisor. All time not worked that is to be paid for should be keyed into the Time and Attendance system by a member of management. (i.e., sick leave, or vacation). You must key out and in for lunch/dinner periods.

Under no circumstance may an employee key in or out for another employee. Employees violating this policy will be subject to immediate dismissal.

## C. LUNCH AND REST PERIODS

Employees working up to 5 hours in one day will have a 15 minute break and may only leave the store at the discretion of the manager. Employees working more than 5 hours will have a minimum of 30 minutes for lunch. Meal periods are not paid.

Lunch and rest periods may not be taken consecutively.

Where state law requires more or longer breaks or lunch periods other than the policy stated above, the Supervisor will adhere to the law.

## D. PAY SCHEDULES

1.    Hourly paid employees will receive their regular hourly rate for all hours worked up to 40 hours in a workweek. They will receive time and a half their regular hourly rate for all hours worked in excess of 40 hours within a workweek. Days paid but not worked shall not count as hours worked for overtime purposes.

Cache, Inc.                                                                                                          9
February 2002

**180**

2. Non-exempt salaried employees are paid for their regular scheduled workweek. But may have deductions made where they miss a full day of work, except where sick leave applies. Additional overtime compensation will be paid at time and half their regular rate of pay, for hours worked in excess of 40 per week.

3. Exempt employees do not receive overtime pay.

4. Paychecks are currently distributed every other Thursday. Included on the employee's pay stub will be a "earnings statement". This statement is also called a "check stub". The statement indicates to you the mandatory deductions (federal, state and local taxes) as well as any voluntary deductions and benefit contributions

5. The workweek starts on Sunday and ends on Saturday.

# PERSONNEL POLICIES

## RULES AND REGULATIONS

Rules and regulations are a necessary part of the operation of any business. We have endeavored to keep ours reasonable. Therefore, it is required that all employees will learn and adhere to the rules and regulations of Cache, as set forth on the following pages, as well as any other which may be communicated in the future. Employees found to be in violation of any of these rules and regulations are subject to disciplinary action up to and including immediate dismissal.

## ABSENTEEISM

By accepting your position at Cache you have made a commitment. As a member of a team you have an obligation to be there when the team needs you. There will be times when you are ill and unable to report to work. At these times, make sure you notify your supervisor no later than the beginning of each workday. If you are absent for two consecutive scheduled work days and have not called your supervisor to provide a sufficient explanation, it will be considered "Job Abandonment". You will have been considered to have voluntary terminated your job, effective the end of the second day of absence.

## PREFERRED CUSTOMER LISTING (PCM)

PCM lists are the sole property of Cache, Inc. and not any employee. PCM records are not to be removed from the store at any time. PCM lists are not to be photocopied or duplicated.

## CONFIDENTIAL INFORMATION

Our business is challenging, exciting and highly competitive. Although employee awareness is encouraged, confidential information should not be discussed outside the Company. Requests for information concerning the Company, its plans, sales, procedures, or other confidential inquiries, must be referred to your supervisor.

Giving confidential information to sources outside the Company can be grounds for dismissal.

## CONFLICT OF INTEREST

As a Company, Cache tries to conduct business according to the highest standards of business ethics. We expect our employees to do the same.

This means that even the appearance of a conflict of interest between your relationship with our store and your relationship with another company or an individual must be avoided. A conflict of interest exists in any situation where the employee (or a member of employee's household or immediate family) stands to benefit financially or otherwise, by virtue of being a Cache employee, or is involved in any transaction in which Cache has a competing interest.

If management feels a situation is one where a conflict of interest exists, you will be given two weeks in which to either end

Cache, Inc.                                                                                                     10
February 2002

Cache000011

**181**

the conflicting relationship or resign from Cache. Serious violations may even be grounds for immediate discharge.

## DRESS CODE

Personal appearance should be as important to you as it is to us. Cache is a fashion business, which means our customers expect us to be well groomed and well-dressed in clothing that is suitable for our store setting in style, color, and cut.

- ❖ Clothing should be neat, clean, and pressed.
- ❖ Shoes and hosiery must be worn and kept in good condition.
- ❖ A high standard of personal hygiene and grooming must be maintained.
- ❖ Hair must be clean, neat and tastefully styled.
- ❖ Subtle make-up should be worn.
- ❖ Don't wear jeans, sneakers, "jogging" style outfits, T-shirts or any other style of clothing that is not suitable for a professional business environment.

## EMPLOYMENT OF RELATIVES AND FRIENDS

Company policy requires that Cache select the best-qualified applicant for any opening on a competitive basis. This applies to relatives and friends of any associate. However, relatives and members of the same household will not be placed in the same location, nor in a position where one supervises the work of the other.

## GRATUITIES

Cache believes that gifts, favors and gratuities may bias business judgement. For this reason no employee may accept a gift or gratuity in excess of $25.00 per year or accept a loan, entertainment, or similar activities that may influence sound business judgement.

Acceptance of gifts is strongly discouraged. Employees who abuse this policy are subject to disciplinary action.

## PERSONAL PROPERTY

Your supervisor will inform you of facilities provided for you to keep your personal property. You should not bring valuable personal property to work, as the Company cannot be responsible for such losses, should they occur. Purses must not be kept on the sales floor. The Company retains the right to inspect packages and purses of employees when exiting the store.

## SAFETY AND ACCIDENT PREVENTION

Safety is a vital part of security and an important concern for Cache employees. Accidents are very costly to the company in actual dollars, productivity and time. We must promote safety awareness, safe work habits, and compliance with safety regulations.

Fire prevention is an important responsibility. Report all hazards and practice the following preventive measures:

- Keep aisles clear and work areas free of trash.
- Know where exits are located and make sure signs are visible.
- Know and practice the fire evacuation plan for your mall.

Employees must immediately report any unsafe conditions to the Store Manager. In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the Store Manager. Such reports are necessary to comply with applicable law and to initiate insurance and worker's compensation benefits procedures.

Cache is firmly committed to providing an environment that is free form acts of threats of violence. In keeping with this commitment, we have established a strict policy that prohibits any employee from threatening or committing any act of violence on the Company's premises, while on duty, while on company related business, or while operating any vehicle or equipment owned or leased by the Company. Cache will not tolerate employees who make threats, engage in threatening

Cache, Inc.                                                                                             11
February 2002

Cache000012

**182**

behavior, or commit act of violence against employees, customers, visitors, or other individuals.

## SOLICITATION

In the interest of safe and efficient operation of our business, and to protect our employees against interference or annoyance while performing their work, Cache has adopted and shall enforce the following policy:

1.    You may not distribute non-business literature or any other printed or written matter in any work area. Nor may you distribute such matter in non-business areas during your actual working time. Working time does not include lunch hours, coffee breaks, or other rest or break periods (when full attention to work is not required).

2.    You may not solicit in work areas for any purpose during your actual working time.

3.    Persons who are not employees of Cache are not permitted to distribute or post literature of any kind, or any other printed or written matter, on Cache premises. Moreover, they are not permitted to solicit employees, for any purpose, on Cache premises.

## SMOKING/EATING

Smoking is not allowed on the selling floor, in fitting rooms or the backroom. If you must smoke, you must do so in the designated areas for your location, many malls have specific smoking areas, in those cases you must follow the mall rules. Employees are not permitted to consume food or beverage of any type while on the selling floor.

## TARDINESS

Tardiness is...

❖ Reporting to work after your scheduled starting time.
❖ Leaving work before completing your work schedule
❖ Leaving early for, or returning late from, scheduled break or meal periods.

A record of excessive tardiness can be grounds for dismissal, and is factor in appraising your job performance.

## TELEPHONE USE

The number of telephone lines in our store is limited. We want to keep these lines open for daily business needs, and for our customers to reach us. Thus, our employees are not to make or receive personal calls, except in the case of an emergency.

## SHORTAGE CONTROL

The Company has an active shortage control program that consists of many aspects, including: audit procedures, inventory controls, security, safety, and housekeeping checks and monitoring. Package and purse checks and inspection of personal property located on the premises will take place.

# PERSONAL CONDUCT EXPECTATIONS

Although Cache has the right to terminate an employee at will at any time, in certain circumstances Cache may apply progressive discipline, at its own discretion, for the following types of behavior: tardiness, absenteeism, rudeness, lack of cooperation, inefficient job performance, etc.

Cache designed a conduct policy that sets reasonable standards for handling similar situations, in a similar fashion for all its employees. The following are examples of activities that may require a verbal or written warning, and may result in disciplinary action, up to, and including, dismissal.

**183**

## ACTION THAT MAY RESULT IN IMMEDIATE DISMISSAL:

### ACTS OF A CRIMINAL NATURE

An act or acts of a criminal nature including but not limited to: theft, fraud, embezzlement, or larceny.

### INSUBORDINATION

Failure or refusal to follow instructions, to perform work in the manner assigned, or to comply with Company rules and including conduct which undermines management authority by word or action.

### POSSESSION OF WEAPONS

Unauthorized use or possession of explosives, firearms, or other weapons on Company premises or while performing Company business.

### IRESPONSIBLE ACTIONS

Behavior which creates a substantial and unjustifiable risk or harm to another person or to the business or reputation of the Company: serious damage to Company's property: damage to the property or person of others while on Company time or premises; includes, but is not limited to: rudeness, harassment, or defamatory communications to any customer, vendor, visitor, or fellow employee; reckless use of Company equipment, actual, attempted, or threatened physical assault on any fellow employee, customer, vendor, or visitor.

### TRAFFICKING OR USE OF DRUGS/ALCOHOL

Sale, possession, use, or failure to report the sale, possession or use of alcohol or any controlled substance on Company premises; use of Company premises for sale or distribution of drugs or any controlled substance; reporting for work under the influence of alcohol or any controlled substance.

### FRAUDULENT/DECEPTIVE PRACTICES

Use of the Company's property, credit, services or employment relationship in a manner other than prescribed by Company policy, federal, state or local laws. This includes, but is not limited to: willful manipulation or falsification of any Company document (s): misappropriation of Company, vendor or customer property: fraud or engaging in bait and switch practices.

### COUNTER PRODUCTIVE BEHAVIOR

Any personal conduct which substantially limits your effectiveness as a Cache employee by reason of its detrimental effect on the business or reputation of the Company. This includes, but is not limited to: violation of Company conflict of interest policies; unauthorized possession or disclosure of confidential information.

## OTHER ACTS THAT WILL RESULT IN DISCIPLINARY ACTION:

- ❖ Violation of applicable safety rules, which are in fact unsafe work practices.
- ❖ Excessive absences from work, late reporting, long breaks, leaving early, or other violations of company work schedules.
- ❖ Failure to follow a standard of dress appropriate for the business situation involved as established by management.
- ❖ Failure to meet the company's standard for work performance.
- ❖ Failure to follow Company rules, procedures and policies.
- ❖ Abuse of discount privilege.
- ❖ Dishonesty
- ❖ Disorderly conduct or use of foul or abusive language.
- ❖ Falsification of Company documents, including time sheets.

Cache, Inc.                                                                 13
February 2002

Cache000014

**184**

- ❖ Violation of Company's drug and alcohol policy.
- ❖ Harassment of fellow employees, including sexual harassment.
- ❖ Violation of the Company's equal employment policy.
- ❖ Physical fighting.
- ❖ Misuse or removal of equipment or property of the Company, it's employees or it's customers.
- ❖ Violation of applicable policies and procedures, not otherwise specifically mentioned here, but referred to in the disciplinary guidelines.

The above guidelines cannot be and are not meant to be all inclusive of violations for which you can be disciplined. There may be other types of conduct that warrant corrective action. If you have any questions about disciplinary action guidelines, consult your supervisor. Nothing in this is intended to or should be construed to alter the at will relationship by the Company and its employees.

# CORRECTIVE ACTION GUIDELINES

Corrective Action is a guideline to help managers and employees identify and remedy performance or disciplinary problems. Cache anticipates that a manager will ordinarily work within this procedure, though it is recognized that every situation must be viewed individually and there is no guarantee that each step will be utilized in every case. Managers will use their own discretion as how to best handle a situation. Generally, Corrective Action works as follows:

(1)   **Counseling**- the Manager attempts to identify the employee's problem and to explain what is expected and the consequences of not correcting the problem. The Manager will document the discussion with a copy being placed in the employee's personnel file.

(2)   **Written Warning**- the Manager advises the employee in writing of the employee's problem, what is expected, the remedial action expected of the employee, and a time frame for compliance. The employee must sign a copy whether the employee agrees or disagrees. The employee may add written comments on the form. The employee will receive a copy and a copy will be placed in the employee's personnel file.

(3)   **Final Warning or Suspension**- A final warning or suspension means that if an employee has failed to correct a problem or continue improvement, the employee faces termination. This will be in writing and the employee must sign a copy whether the employee agrees or disagrees. The employee may add written comments on the form. The employee will receive a copy and a copy will be placed in the employee's personnel file.

If an employee's disciplinary situation warrants immediate action, an employee can be terminated or can be suspended with or without pay, while the problem is investigated. **The foregoing is not intended to change the "at will" employment relationship and the Company's rights to terminate for business reasons, adverse business conditions, reorganizations, mergers, job elimination, or without cause.**

# POLICY PROHIBITING HARASSMENT

It is the intention of Cache to provide an environment in which all individuals are treated with respect and dignity. Each individual has the right to work in an atmosphere that promotes equal opportunities and prohibits discrimination practices, including sexual harassment.

In compliance with federal, state and local laws and consistent with our policy of equal employment opportunity, Cache strictly prohibits harassment of any employee, resident or visitor in any form, whether based on a person's race, sex, religion, national origin, age, disability, or any other characteristic protected by law. This policy includes prohibition of any form of sexual harassment.

Cache, Inc.
February 2002

14

Cache000015

**185**

The Company will not tolerate unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

♦ The submission of such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

♦ The submission to or rejection of the conduct is used as the basis for decisions affecting hiring, evaluation, promotion or other aspects of employment; and/or

♦ This conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile or offensive work environment.

Examples of sexual harassment include unwelcome sexual conduct such as: verbal harassment, sexual demands, requests, flirtations, or innuendoes, suggestive jokes and slurs, and comments of a sexual nature to describe an individual or an individual's body; physical harassment such as unwelcome physical contact such as touching, pinching, brushing of the body, as well as coerced sexual activity; and visual harassment such as sexually suggestive posters, pictures, drawings, cartoons, or obscene gestures. This list is not all-inclusive. Other unwelcome act or comments of a sexual nature may also constitute sexual harassment.

Sexual harassment involves behavior that is unwelcome. As with all other forms of harassment, whether or not an employee who engages in sexual harassment meant to give offense, or believed his or her comments or conduct were welcomed, is not significant. Rather, the Company's policy is violated when other employees, whether recipients or mere observers, are in fact offended by comments or conduct that are sexual in nature.

While the legal standards and consequences of sexual harassment are still evolving, the Company's policy has been and remains clear and broader than the law's requirement. This is based upon the Company's requirement that employees treat all others with respect and professionalism.

This policy applies wherever a Company-related function is taking place.

A.   Procedures for Reporting Harassment

Cache encourages employees to report all incidents of harassment, regardless of who the offender may be. The Company will investigate any report of harassment and will take whatever corrective action is deemed necessary, including disciplining, suspending, or discharging any individual who is believed to have violated these prohibitions.

Any employee of Cache who believes that he or she has been sexually or otherwise harassed, or has witnessed an incident of sexual or other harassment should immediately report the incident to his or her Store Manager. If the Store Manager is involved in the reported conduct, or if for some reason the employee feels uncomfortable about making a report to that person. The employee should report directly to his or her District Manager or, if preferred, to the Executive Vice President of Store Operations or the Personnel Manager at the Home Office. If comfortable doing so, an employee who believes that he or she has been harassed by any Cache employee is encouraged to speak directly to the offender as well. Employees are expected to take advantage of preventative and corrective opportunities provided by the Company whenever it is reasonable to do so, in order to avoid harassment or any related harm.

Any supervisor who sees or hears about conduct that may constitute harassment under this policy should immeadiately contact the Human Resource Department.

B.   Investigation of and Response to Harassment Complaints

The Company is committed to taking all reasonable measures to prevent and correct promptly any harassing behavior. Upon receipt of any complaint of harassment, the Company will promptly investigate the complaint. The investigation may include requesting that the complainant explain the incident in writing; interviewing the complainant and the alleged offender; interviewing others who may have knowledge of the incident; recommending an outside investigator, etc. The Company may request that the alleged offender respond in writing to the complaint.

Cache, Inc.                                                                                                    15
February 2002

Cache000016

**186**

If the Company determines that the Company's policy prohibiting sexual or other harassment has been violated, disciplinary action will be taken against the offender, up to and including dismissal. Such action may include, but is not limited to, verbal warnings, suspension or termination of employment.

Cache will not retaliate against employees who complain in good faith about harassment in the workplace. The Company strictly prohibits any form of retaliation by any person against an employee who complains of sexual or other harassment.

C.   Investigation and Response

All employees have a duty to cooperate with any investigation of alleged sexual harassment conducted by or on behalf of the Company. Failure to cooperate or deliberately providing false information during an investigation shall be grounds for disciplinary action, including suspension or discharge.

# PROBLEM SOLVING PROCEDURE

Any employee who feels an on-the-job condition is unjust, feels unfairly treated, or feels discriminated against should discuss the problem with the store manager or immediate superior.

If any employee feels that either the manager or immediate supervisor has not or will not fairly address the problem, then the employee should present the problem to the District Manager.

If the problem cannot be resolved in the above manner, the employee should present the problem to the Executive Vice President of Store Operation at the Company headquarters.

# TERMINATIONS AND RESIGNATIONS

Cache hopes that every employee's stay with the Company is productive, but in the event that an employee's employment is terminated, he or she should know what to expect as well as what the Company expects.

A.   **Notice Requirement**
Although employment is "at-will," proper procedure requires that employees give the Company two weeks notice of intent to resign.

B.   **Return of Company Property**
Upon termination or resignation, employees must return all keys, records, files, supplies, equipment, or any other Company property.

C.   **Outside Inquiries / Employee References**
All outside inquires regarding employment references for current or former Cache employees must be directed to the Human Resource Department. "Off the record" comments are strictly prohibited.

The Company will release only employees' job title and dates of employment to third parties.
Salary information will only be disclosed if an employee signs a written authorization to disclose the information.

All media inquires regarding Cache should be referred to either the Executive Vice President of Store Operations or the Vice President of Marketing.

Cache, Inc.
February 2002

16

Cache000017

*187*

# HANDBOOK ACKNOWLEDGMENT FORM

I acknowledge that I have received a copy of the Cache Employee Handbook. I understand that this edition of the Handbook supersedes all previous descriptions of the Company's policies, procedures, and employee benefits.

I understand that the Handbook describes important information about the Company, and I agree to read the entire Handbook. I agree to abide by all policies and procedures contained in the Handbook. If I have any questions about the Handbook, or about other issues regarding my employment, I will consult with my Store Manager or District Manager.

Cache's personnel policies and benefits are regularly reviewed and maybe modified or supplemented without notice; we will do our best to keep you posted of any changes. However, the Company does not intend by this Handbook to create any contractual obligations, express or implied, on the part of the Company. The Company retains the sole right to interpret the Handbook provisions.

**I understand and agree that, unless I am subject to an employment contract, my employment with the Company is "at will," that is, that both the Company and I are free to terminate my employment at any time, with or without cause or advance notice. I understand that while other personnel policies, procedures, and benefits of the Company may change from time to time in Company's discretion, this at-will employment relationship can only be changed by an express written employment contract signed by an Executive Vice President of the Company.**

\* Please sign and date the attached copy of this Handbook Acknowledgement Form so that it may be placed in your Personnel File.

Cache, Inc.
February 2002

17

Cache000018

**188**

# CACHE DISPUTE RESOLUTION PROCEDURES

Cache recognizes that differences may arise between Cache and its employees and that it is in the interest of both Cache and its employees that there be a fair, economical, prompt, final, binding and less adversarial means of resolving such disputes than litigation in courts.

As a condition of the employment relationship and the continuation of that relationship, Cache requires that its employees agree to resolve any and all disputes and claims arising out of or relating to any application for employment or change of status, cessation of employment, conditions of employment, compensation, or working conditions with Cache, exclusively by final and binding arbitration before a neutral arbitrator. Such claims may include, but are not limited to, the following examples: Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the 1991 amendment, the Americans with Disabilities Act, the Family and Medical Leave Act, state and local discrimination laws, and contract and tort law.

This policy does not apply to workers' compensation claims. Further, this policy does not prelude the filing of administrative charges with the Equal Employment Opportunity Commission or similar federal, state or local agencies, but upon receipt of a right to sue letter or similar administrative determination, the employee and Cache shall be bound to arbitrate any claims arising under such charges. Cache may use this policy in support of a request to the court to dismiss a lawsuit filed by an employee and to require that the dispute be resolved through arbitration.

Under this policy, an employee must file a request for arbitration within one (1) year of the act, action, occurrence or event, which provides the basis for the employee's claim. The one (1) year shall run from the date on which the employee knew, or should have reasonably known, of the facts providing the basis for the claim.

A request for arbitration must be made in writing to the Home Office, at 1460 Broadway, New York, NY 10036, to the attention of the Chief Financial Officer, and must contain a brief statement of the facts and nature of the claim as well as the relief requested. The arbitration will be pursuant to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA"). The arbitrator will be mutually selected from the panel of arbitrators provided by the AAA. The arbitration will be held in the city in which the employee's store is located.

The cost of initiating the arbitration process, the Arbitrator's fees and the costs for a court reporter will be paid by Cache, except that the Arbitrator will retain the authority to allocate all or a portion of the costs to the employee if the Arbitrator determines that the employee requested arbitration in bad faith or on a frivolous claim.

Please sign and date the attached copy of this Handbook Acknowledgement Form so that it may be placed in your Personnel File.

Cache, Inc.

February 2002                                                                                                      18

Cache000019

**189**

## HANDBOOK ACKNOWLEDGMENT FORM
## PERSONNEL FILE COPY

I acknowledge that I have received a copy of the Cache Employee Handbook. I understand that this edition of the Handbook supersedes all previous descriptions of the Company's policies, procedures, and employee benefits.

I understand that the Handbook describes important information about the Company, and I agree to read the entire Handbook. I agree to abide by all policies and procedures contained in the Handbook. If I have any questions about the Handbook, or about other issues regarding my employment, I will consult with my Store Manager or District Manager.

Cache's personnel policies and benefits are regularly reviewed and maybe modified or supplemented without notice; we will do our best to keep you posted of any changes. However, the Company does not intend by this Handbook to create any contractual obligations, express or implied, on the part of the Company. The Company retains the sole right to interpret the Handbook provisions.

**I understand and agree that, unless I am subject to an employment contract, my employment with the Company is "at will," that is, that both the Company and I are free to terminate my employment at any time, with or without cause or advance notice. I understand that while other personnel policies, procedures, and benefits of the Company may change from time to time in Company's discretion, this at-will employment relationship can only be changed by an express written employment contract signed by an Executive Vice President of the Company.**

_____

Employee's Signature                                    Date

_____

Employee's Name (typed or printed)                      Store #

Cache, Inc.                                                          19
February 2002

Cache000020

**190**

## CACHE DISPUTE RESOLUTION PROCEDURES
## PERSONNEL FILE COPY

Cache recognizes that differences may arise between Cache and its employees and that it is in the interest of both Cache and its employees that there be a fair, economical, prompt, final, binding and less adversarial means of resolving such disputes than litigation in courts.

As a condition of employment relationship and the continuation of that relationship, Cache requires that its employees agree to resolve any and all disputes and claims arising out of or relating to any application for employment or change of status, cessation of employment, conditions of employment, compensation, or working conditions with Cache, exclusively by final and binding arbitration before a neutral arbitrator. Such claims may include, but are not limited to the following examples: Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, including the 1991 amendment, the Americans with Disabilities Act, the Family and Medical Leave Act, state and local discrimination laws, and contract and tort law.

This policy does not apply to workers compensation claims. Further, this policy does not preclude the filing of administrative charges with the Equal Employment Opportunity Commission or similar federal, state or local agencies, but upon receipt of a right to sue letter or similar administrative determination, the employee and Cache shall be bound to arbitrate any claims arising under such charges. Cache may use this policy in support of a request to the court to dismiss a lawsuit filed by an employee and to require that the dispute be resolved through arbitration.

Under this policy, an employee must file a request for arbitration within one (1) year of the act, action, occurrence or event which provides the basis for the employee's claim. The one (1) year shall run from the date on which the employee knew, or should have reasonably known of the facts providing the basis for the claim.

A request for arbitration must be made in writing to the Home Office, at 1460 Broadway, New York, NY 10036, to the attention of the Chief Financial Officer, and must contain a brief statement of the facts and nature of the claim as well as the relief requested. The arbitration will be pursuant to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA"). The arbitrator will be mutually selected from the panel of arbitrators provided by the AAA. The arbitration will be held in the city in which the employee's store is located.

The cost of initiating the arbitration process, the Arbitrator's fees and the costs for a court reporter will be paid by Cache, except that the Arbitrator will retain the authority to allocate all or a portion of the costs to the employee if the Arbitrator determines that the employee requested arbitration in bad faith or on a frivolous claim.


_____          _____
Employee's Signature                      Date


_____          _____
Employee's Name (typed or printed)        Store #

Cache, Inc.                                                    20
February 2002

Cache000021

**191**

**Exhibit 4**
Declaration of Mareatha Hornsby

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LACHICA KING        §
           Plaintiff      §
                  §       Civil Action No. 3:CV-11-0138-P
v.                      §
                  §
CACHE, INC.          §

## DECLARATION OF MAREATHA HORNSBY

I, Mareatha Hornsby, hereby give this statement under oath voluntarily. I am over the age of 21 years and am competent to testify to the matters stated herein. I have personal knowledge of the facts, events, and circumstances stated in this declaration, and they are true and correct.

1.     I am the District Manager for District 19 for Cache, Inc. ("Cache"), a retail clothing chain selling women's clothing headquartered in New York. I have been employed by Cache as a District Manager for about 7 years and have been the District Manager for District 19, which includes Store #246, since July 2008.

2.     At the time I became District Manager over the Dallas area, LaChica King ("King") had recently been hired as a full time Assistant Manager in Store #246 in Arlington, Texas, where Carol Keeler ("Keeler") was the Store Manager and April Baker ("Baker") was the Co-Manager. Keeler and Baker each had supervisory authority over King.

3.     Store #246 was a low volume store, so one of the managers generally opened and worked alone until around 1:00 pm, and, from then until closing, the store was generally staffed by only two employees, at least one being a manager. Store #246 was generally open seven days a week, but King requested to be off on Sundays and on Tuesday evenings, for church attendance, and her request was granted.

4.     During the entire period of my employment with Cache, the criteria to maintain the classification of full time employee has been working an average of at least 30 hours a week.

5.     As Assistant Manager, King was expected to comply with and enforce Cache's policies and procedures and foster a cohesive team-oriented environment. A true and correct copy of the job description of Assistant Manager in effect during King's employment is attached hereto as Exhibit A.

1

**192**

6.      In addition, as a manager, King was responsible for opening and closing the store on certain shifts and was provided a set of Cache's store keys for which she was responsible to use for Cache's benefit.

7.      During the entire period of King's employment, Cache's security policy prohibited employees from having their personal cell phones on the sales floor and also required that the cell phones be turned off during working hours even though stored off the sales floor.

8.      The "no cell phone rule" was contained in the operational in-store binder and on Cache's intranet website, and all management employees, including King, were required to read, comply with and enforce the operational policies and procedures, including the "no cell phone rule." A true and correct copy of the security policy prohibiting cell phones during King's employment is attached hereto as Exhibit B.

9.      Sometime in May or June 2009, Cache's corporate office reduced the number of payroll hours available to Store #246, which meant the store did not have enough hours to support the three full time manager positions that were in the store after the reduction in hours was made.

10.     On or about July 21, 2009, I made a visit to Store #246 and observed that King appeared to have an ankle injury that interfered with her ability to do her job, so I told King she should go home. I spoke to the Store Manager, Carol Keeler ("Keeler"), about King's apparent injury, and Keeler came in to cover King's shift, and King left.

11.     Around early August 2009, I contacted Margarita Croasdaile ("Croasdaile"), Cache's Human Resources Manager, to determine whether King was eligible for short term disability, and Croasdaile said she was not.

12.     After learning that King was not eligible for short term disability, I received no information about King's expected return to work date until around the end of August when I was on vacation. When King went out in August 2009, the other two managers in Store #246, Keeler and Baker, were the only key holders, and one of them had to work each opening and closing shift. So in mid August 2009, I approved promoting a part time sales associate, Bobbye Villanueva, who had previously worked for Cache, to part time Assistant Manager to give the store another key holder.

13.     It is not Cache's practice to contact employees who are on leave, but since King had not contacted Croasdaile, Keeler or me about a return to work date since early August, I did not know whether King planned to return to work at all. This presented a security risk since King had not accounted for her set of store keys, so I told Keeler to call King and ask her to bring in Cache's keys.

14.     King did not answer Keeler's calls about the store keys nor did she respond to the messages Keeler left, so Cache incurred the expense of changing the locks.

2

**193**

15.   King submitted a doctor's note to return to work on or about August 31, 2009, while I was on vacation. The two week schedule for that period had already been approved and made available to employees before King gave notice that she would be returning, so King was not on that schedule.

16.   Since King did not work Sundays, King was put on the schedule as the full time Assistant Manager on Monday, September 14, 2009.

17.   The position of Assistant Manager can be full time or part time according to the needs of the business, but the other manager positions in Store #246, the Store Manager and the Co-Manager, are full time positions only. Rather than change King to a part time Assistant Manager, King was scheduled for the full time amount of 30 hours to maintain her full time status. In mid to late November 2009, King was scheduled for additional hours due to the approaching holiday season.

18.   Sometime in November, 2009, Croasdaile told me that King had filed an EEOC complaint. I did not disclose to anyone in my district that King had filed an EEOC complaint. To my knowledge no one in my district, other than King, knew that King had filed an EEOC complaint.

19.   After I learned that King had filed an EEOC complaint, I received a call from Keeler advising me that King was refusing to loan her store keys to closing manager, Baker, who had forgotten her keys.

20.   I was in conference with a Store Manager when I learned that King would not give Cache's keys to Baker. It was only three days until "Black Friday," typically the busiest day of the year. So I called Croasdaile and asked her to tell King to hand over Cache's keys to Baker. King finally agreed to give Cache's keys to Baker after Croasdaile called and asked her to do so.

21.   The next day, on or about November 25, 2009, I wrote King up for her refusal to give Cache's keys to Baker when asked by Baker and Keeler, both of whom had authority over King. Keeler presented the write-up to King, and King refused to sign it.

22.   Just over a month later King lost her set of Cache store keys, and, to my knowledge, never found them. Lost keys present a security risk, so Cache had to have the locks re-keyed. I prepared a disciplinary write-up for King's failure to protect Cache's assets based on losing the store keys. King refused to sign that write-up.

23.   Around mid January 2010, I investigated complaints King had made in December 2009, about conflicts between and among employees, by interviewing the employees in Store #246. None of the employees told me of any circumstances between and/or among employees that were related to race, but most of the employees said that they believed King was a cause of tension in the store. The recordings King made over a six month period that were subsequently provided to me indicated to me that King was a source of tension in the store.

3

**194**

24.     I interviewed King last, in the back room off the sales floor, as part of the investigation. King asked if she could record the interview with her cell phone, and since we were not on the sales floor and she was not performing job duties, I did not think King recording me with my consent violated the no cell phone rule, so I allowed her to record the interview.

25.     I do not remember King complaining about race discrimination in December 2009, and did not investigate race discrimination in the interviews I conducted before King. During King's interview, she gave me a written list of complaints that included the following statement: "I conclude with valid proven evidence that I have been discriminated against due to race, religion and my abilities to perform at high levels irregardless of having to work in a hostile environment." I asked King to explain how she had been discriminated against due to her race, and, instead of identifying something she considered to be race discrimination, she said, "Why don't I just read this whole thing, OK, cause it's all in writing." She read it and it contained no facts that indicated to me that she had been discriminated against due to race, and she told me nothing during the interview of approximately 45 minutes that I thought was connected to race.

26.     Afterward I faxed King's complaint list to Croasdaile and followed up with a phone call and told King to record my interview of her. Croasdaile told me that audio and video recordings are not allowed without corporate authorization.

27.     A few days after interviewing the employees of Store #246, on or about January 17, 2010, I received an email from Bobbye Villanueva letting me know that she left the store because of King's conduct. A true and correct copy of the email I received from Bobbye Villanueva is attached hereto as Exhibit C.

28.     I met with King on or about February 5, 2010, to advise her of the results of my investigation of her complaints. At that time I did not know that King had filed another EEOC Charge and did not learn about it until after King's employment with Cache ended.

29.     In the February 5, 2010, meeting King asked me if she could record the meeting, and I told her no and explained that I had allowed it in a previous meeting because I did not know that recordings are prohibited without corporate authorization.  King said, "OK," and I understood that to mean she was agreeing to follow my instruction not to record. I did not know that she had already begun recording and continued to record the entire meeting until over a month later when I obtained copies of the recordings.

30.     Around March 18 or 19, 2010, Keeler provided me copies of approximately 51 audio and video recordings and 20 photographs that King had secretly made of Cache employees, dated from August 31, 2009, through March 3, 2010.

4

**195**

31.    I discovered from the recordings that King had directly defied my instruction not to record the meeting of February 5, 2010. The recordings also showed me that King had engaged in insubordinate conduct in what appeared to be an effort to undermine Keeler's authority and had repeatedly violated the rule prohibiting cell phones on the sales floor before and after our meeting of February 5, 2010.

32.    I considered King's defiance of my directive not to record the February 5, 2010, meeting to be not only insubordinate, but also deceptive and dishonest, since King had indicated that she was complying with my directive not to record the meeting. I also realized that King had been surreptitiously recording employees for over six months.

33.    The content of the recordings indicated to me that King had made statements about Keeler that I considered untrue. For example, King indicated that Keeler provoked her and/or other employees and/or created a hostile environment, but I did not find evidence of that in the recordings.

34.    I considered King's conduct, exhibited by and in the recordings to be insubordinate, dishonest and deceptive, and it confirmed to me what employees had told me about the difficulty they had working with King. With King having a prior write-up for insubordinate conduct, I made the decision to terminate King based on what I learned from the recordings. I got approval from Croasdaile and the Regional Manager, Patrick Doyle, and on March 26, 2010, I terminated King.

35.    No one was promoted or hired to replace King since Store 246 did not have enough payroll hours to justify more than two full time managers.

36.    I am not aware of any employee, other than King, who engaged in the type of insubordinate and/or deceptive conduct that King did. For example, I am not aware of any employee, other than King, who refused to follow directions from his/her supervisor unless the directions were in writing or who refused to give Cache's keys to another manager upon the request of the Store Manager. I know of no employee, other than King, who secretly recorded his/her manager after being told recording was not allowed, and I know of no employee who surreptitiously recorded other employees on the sales floor as King did.

37.    I would have terminated any employee, regardless of race, who engaged in such insubordinate and deceptive behavior as King did.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts stated above are true and correct.

Executed on this 21 day of December, 2011.

Mareatha Hornsby

5

**196**

**Assistant Manager**
**General Summary:**
The assistant-manager is responsible for aiding the store manager with the overall supervision and management of the entire store, which includes the following:

- Leading a dynamic, customer service oriented team, creating a "best in mall" shopping experience for all Cache customers.
- Achieving store sales goals.
- Compliance on all store operations procedures, including payroll and shrink reduction.
- Achieving personal sales goals.

**Responsibilities:**
- Aid with recruiting and hiring a diverse, customer service oriented sales team.
- Train, coach and develop sales associates in providing a "Best-In-Mall" shopping experience and driving overall sales results.
- Foster a cohesive, team-oriented environment.
- Help train entire staff on operational excellence in order to maintain an organized and orderly work environment.
- Manage payroll through effective scheduling both to the needs of the business, and to deter shrink.
- Cultivate open and constant communication with entire staff through use of company tools.
- Consistently execute company merchandise directives including floor-sets, window directives and POS updates.
- Maintain a clean, neat and orderly store, both in front and back of house.

**Qualifications:**
- At least one year of previous retail experience in customer service oriented environment preferred.
- Ability to expand customer base through high-level customer service.
- Demonstrated ability to facilitate learning at all levels.
- College degree preferred.

3/26/2007

EXHIBIT
**A**

Cache000043

*197*

## LOSS PREVENTION

**SECURITY POLICIES**                                                                L-1

8.  THE BACK DOOR IS TO BE KEPT LOCKED AT ALL TIMES AND ONLY OPENED BY A
    MEMBER OF MANAGEMENT FOR ACCEPTING DELIVERIES, REMOVING TRASH, OR
    EMERGENCY EVACUATION. ALL EMPLOYEES SHOULD ENTER AND EXIT THROUGH THE
    FRONT DOOR (UNLESS OTHERWISE DIRECTED BY MALL MANAGEMENT).

9.  THE STOCK ROOM DOOR MUST BE KEPT CLOSED AT ALL TIMES WHILE THE STORE IS
    OPEN.

10. ALL TRASH MUST BE INSPECTED BY A MEMBER OF MANAGEMENT FOR COMPANY
    PROPERTY PRIOR TO BEING REMOVED FROM THE STORE. ALL TRASH SHOULD BE IN
    CLEAR TRASH BAGS AND ALL BOXES SHOULD BE FLATTENED PRIOR TO DISPOSAL. BY
    FEDERAL LAW, NO ONE UNDER THE AGE OF 18 MAY REMOVE TRASH FROM THE STORE
    OR OPERATE A TRASH COMPACTOR.

11. ONLY MANAGERS (OR EMPLOYEES AUTHORIZED BY THE DISTRICT MANAGER) MAY
    PROCESS REFUNDS, RETURNS, OR EXCHANGES. A MANAGER MUST APPROVE ALL
    MERCHANDISE CREDIT TRANSACTIONS AS WELL AS ANY VOID-TOTALS. ONLY A
    MANAGER MAY PROCESS A POST-VOID. AN ADDITIONAL SIGNATURE MUST BE
    RECEIVED FOR ALL RETURNS AND EXCHANGES. NO EMPLOYEE SHOULD SIGN ANY
    RECEIPTS WITHOUT ACTUALLY WITNESSING THE TRANSACTION.

12. THE CASH DRAWER MUST BE KEPT LOCKED AT ALL TIMES. ONLY A MANAGER CAN
    TENDER A CASH TRANSACTION. ALL STORE KEYS, REGISTER KEYS, AND
    MANAGEMENT REGISTER AUTHORIZATION CODES MUST BE IN A MANAGER'S
    POSSESSION AT ALL TIMES.

13. BANK DEPOSITS ARE TO BE PROCESSED BY A MEMBER OF MANAGEMENT ONLY. TWO
    SIGNATURES ARE REQUIRED ON A DEPOSIT SLIP. BANK DROPS MUST BE DONE WITH
    TWO PEOPLE -- ONE BEING A MEMBER OF MANAGEMENT.

14. VALIDATED DEPOSIT SLIPS MUST BE PICKED UP FROM THE BANK ON A DAILY BASIS
    AND VERIFIED BY A MEMBER OF MANAGEMENT (BANK VALIDATION MUST MATCH THE
    WRITTEN AMOUNT OF THE DEPOSIT). IF YOUR STORE'S BANK DEPOSITS ARE PICKED
    UP BY AN ARMORED GUARD AND THE VALIDATED DEPOSIT SLIPS MAILED DIRECTLY TO
    YOUR STORE, IT IS THE RESPONSIBILITY OF ALL MEMBERS OF MANAGEMENT TO
    INSURE THAT THE VALIDATED DEPOSIT SLIPS ARE BEING RETURNED TO THE STORE
    ON A TIMELY BASIS.

15. PERSONAL PAGERS AND CELL PHONES SHOULD BE TURNED OFF WHILE YOU ARE
    WORKING, AND ARE NOT PERMITTED ON THE SALES FLOOR.

16. EMPLOYEES MAY NOT POSSESS A WEAPON OR USE/BE UNDER THE INFLUENCE OF
    ALCOHOL OR ANY ILLEGAL SUBSTANCE ON COMPANY PREMISES. SMOKING IS NOT
    PERMITTED IN THE STORE OR BY THE BACK DOOR.

Revised 7/31/06



2

Cache000023

*198*

-----Original Message-----
From: Bobbye Villanueva [mailto:bobbye_leigh@yahoo.com]
Sent: Sun 1/17/2010 2:57 PM
To: Mareatha Hornsby
Cc: cprudit123@msn.com
Subject: events at store 246 on Saturday, January 16, 2010

Hello Maretha:

A few things happened in the store while I was working with Chica yesterday which I have already discussed with Carol. Carol has asked that I email you a summary of these events so that nothing is lost in translation. Essentially, three things occurred:

1. Sabotaging of customers / stealing of sales.
Although I have already discussed this with both you and Carol and I know others have as well these are the two instances which occured yesterday. The first - I was helping a customer gather items thoughout the store, Chica meanwhile was busy with several customers. The customer was ready for a fitting room (she had previously wanted to carry the items around the store with her to match items) when Chica (who was behind the cash wrap) yelled across the store to me (thereby interrupting the conversation she was having in closing a sale and my customer service of the lady I was helping) "She's my real good customer Bobbye I have things in the back on hold for her I will help her." The customer was noticably uncomfortable. I tried to smoothe things over by continuing to be calm and helpful. I set up her fitting room and said that Chica would be with her in a few minutes with the items she had on hold. This sale of course went to Chica. The second - later in the evening a customer came in with her husband. I believe she was a new customer becuase I have not seen her before. I talked to her and her husband and introduced myself to their child. They wanted to look around the store so I checked in on them periodically while helping other customers. As soon as the lady picked up one item (namely the tirquoise jumpsuit we are currently selling) Chica rushed her off to a fitting room, stood outside it the entire time she was trying on, and at one point even asked her if she was wearing panties (which made the customer noticably uncomfortable as she apparently was not and answered honestly). The customer puchased the jumpsuit and a shirt. The last issue related to sabotaging customers is this: the fitting rooms were full at one point during the day. I had three seperate customers waiting on fitting rooms and none in fitting rooms as those were all occupied by Chica's customers. I communicated to Chica that these customers were waiting and showed her where I had their clothing items set aside for fitting rooms. I did not do this in any sort

1



Cache000302

the order of" or the dollar amount of the check (long or short hand). I examined the back of the check and was able to determine the dollar amount ($133.92) from our register's imprinting. I closed down the front register and included the check in the deposit amount. Before shutting down the back register I called Carol to ask what I should do about the check - if she wanted me to leave it aside and enter the reason for the deposit discrepancy in the back computer's notes field. Carol instructed me to go ahead and deposit the check. It is of course possible that the bank will cash it in it's current condition I suppose time will tell. I did not feel comfortable breaking the law and filling in someone else's check though. I am sure this error was not intentional at all. However, it's part of the reason why if the store is not busy I appreciate one of my coworkers helping me close a sale - they help me build the sale, and catch anything I might have missed or overlooked.

Please tell me if I did the wrong thing in leaving the store. In all my years of working retail - including the five years I've worked part time for Cache - I have never had this sort of an environment with a coworker. I want to be as professional as possible and keep a positive team environment in place. For as long as I work with Chica I am open to any suggestions - including constructive critisism on how to get along with her and keep a good environment in the store - one that is good for business and the morale of our team. I am even open to transferring to another store if you think that would be the best solution. It is my hope that things will work out at our Parks at Arlington store. I love working with Carol and April and I really enjoy the position of Part Time Assistant Manager. Whatever you decide is best for our store I will support completely - please help me be a a part of the solution because I do not want to be a part of the problem.

Thank you Maretha,
Bobbye

3

Cache000304

**200**

of confrontational manner, just in the spirit of team work and communication. The issue I am about to describe has been an issue in the past so I wanted to make sure I had communicated in the most polite nice way possible the situation. Even though I had clearly communicated my customers were not in fitting rooms for a substantial amount of time because each time a fitting room opened up one of Chica's customers filled it. I didn't speak with Chica about either of these transactions or the fitting room issue since it's not really my place to reprimand her and I've already shared my concerns with both you and Carol.

2. Hostile work environment:
One of the customers that Chica works with regularly is named Yvonne. Yvonne and Chica used to be coworkers at Gordon's Jewelry Store. Each time Yvonne comes in Chica introduces her to me as one of her very good customers who used to be her mortal enemy while they were working together. Yvonne came in the store several times Saturday. She tried on clothes each time. I tried to help Chica build the sale by complimenting Yvonne on her choices and showing her items that would go nicely with each of her selections. Yvonne came in the store in the evening to try on her items one last time and select those which she wanted to purchase. At this time the store was dead. I only had one customer in the fitting room. A teenage girl wanting to in her own words "play and try on prom dresses". Even though she was playing I treated her as though she might purchase a dress. I pulled several dresses for her, suggested accessories, and talked about different shoe and hairstyle ideas. When I felt as though I was crowding the customer I went and stood at the end of the cash wrap. Chica was ringing up Yvonne's purchases. Chica does not like to have help ringing things or bagging things so I was at the very end of the cash wrap - at least 6 feet away from her but close enough to make conversation with her and the customer. She and Yvonne had been discussing which items Yvonne would get and totalling up prices on the calculator when Chica turned to me and snapped "Is there a reason you are standing up here?" I replied that I was just there if she needed help and had enjoyed talking with Yvonne. She shot me a very mean look and I was taken off gaurd and calmly said that I wasn't doing anything wrong. Chica then almost yelled "You have a customer in the fitting room." I answered that yes I did, and I'd been helping her quite a bit and didn't want to crowd her and in any event she was changing into another dress. Chica then said "Well you are crowding me and you need to move." I was so shocked and hurt. I had been trying my hardest to get along with her all day - even to the point of letting the sales issues and fitting room issues roll off my back - not to mention all of the shoppers she had announced as "hers" the moment they entered the store all day. I coldn't believe that she would behave that way in front of a customer - or at all. I didn't want any further conflict to occur, or anything else like that to happen in front of customers, and since no higher level of management was there I chose to distance myself from the situation entirely. I finished with my customer, who true to her word bought nothing, put away the dresses she tried on, and since the store was still dead gathered my things from the back and told Chica "I'll be back at 8:00 so that you can leave" and left the store. I said this to her very politely and calmly so as not to cause any further outbursts from her. I immediately called Carol who said I had done the right thing. I returned to the store at five minutes to 8:00 so that Chica could leave and not go into overtime hours. When I closed down the store for the night I asked Carol to walk me through how to correct my time for the 2 hours (6pm to 8pm) that I left the store due to Chica's behavior. So essentially, I felt as though I had no other option but to take an unpaid 2 hour break due to Chica's behavior. Not only was Chica unprofessional and rude - but I cannot imagine any reason why she'd be upset by my presence. It caused me to wonder if she was doing something dishonest for her friend. Since I was not allowed to stand even near the front of the cash wrap I do not know what was purchased or what coupons or special promotions were used for Yvonne - aside from two $25.00 off coupons that Yvonne brought in.

3. Potential loss of money to the store.
When I closed the drawer for the night we had one check - which Chica took from one of her sales. I was not at the counter when the transaction occurred. I noticed immediately that the only information on the check was the customer's signature and driver's license information (which the customer had written). The customer did not write Cache as "pay to

2

Cache000303

*201*

**Exhibit 5**
Declaration of Carol Keeler

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| LACHICA KING | § | |
| Plaintiff | § | |
| | § | Civil Action No. 3:CV-11-0138-P |
| v. | § | |
| | § | |
| CACHE, INC. | § | |
| Defendant | § | |

## DECLARATION OF CAROL KEELER

I, Carol Keeler, hereby give this statement under oath voluntarily.  I am over the age of 21 years and am competent to testify to the matters stated herein.  I have personal knowledge of the facts, events, and circumstances stated in this declaration, and they are true and correct.

1.     I worked as the Store Manager of Cache's Store #246 in Arlington, Texas from January 2008, until sometime in December 2010, when vision impairment rendered me unable to work.

2.     As Store Manager, I recruited LaChica King ("King") to work for Cache and trained her as the full time Assistant Manager when she was hired in June 2008. I did not have the authority to make disciplinary decisions to write up an employee or to terminate an employee.

3.     In addition to her managerial responsibilities, King had sales goals which she routinely met or exceeded. April Baker ("Baker") was the Co-Manager of Store #246 with supervisory authority over King.

4.     Toward the end of May 2009, I wrote out a list of rules that I considered important for both managers, King and Baker, to follow and enforce. Both King and Baker signed their acknowledgment of reviewing this list, which included the rule that no cell phones were allowed on the sales floor. A true and correct copy of this list signed by King and Baker is attached hereto as Exhibit A.

5.     On or about June 2, 2009, I presented a write-up to King for violating the rule prohibiting cell phones, which King signed. A true and correct copy of this write-up is attached hereto as Exhibit B.

6.     On or about July 21, 2009, King called me after she opened the store and said she injured her ankle. I came into the store around 12:30 pm and worked so she could leave

1

202

because of her ankle. King took pre-scheduled vacation for part of the time she was out following her ankle injury.

7.      King returned to work on or about July 30, 2009, and worked with me that day and indicated to me that her ankle was not fully recovered. King took the weekend off and called me on or about August 2, 2009, Sunday, and I let her know that Mareatha Hornsby, the District Manager, would check to see if she was eligible for short term disability.

8.      King was out the month of August 2009, and she did not contact me after the early part of August until she submitted a doctor's note to return to work around the end of August 2009. Unknown to me at the time, King began recording conversations with me when she gave me her doctor's note.

9.      One of the conversations King recorded was over the telephone when she called me on New Year's Day to tell me that she could not find her keys. Without complaint I took my key to her to open the store even though as a salaried employee, I spent approximately an hour to an hour and a half, without pay, taking my keys to King to use to open the store.

10.     I gave King several days to find the keys before reporting the loss to Hornsby, who wrote King up for losing the store keys. I presented the write-up to King, and she refused to sign it even though she lost Cache's keys.

11.     Shortly thereafter, in January 2010, the part time Assistant Manager, Bobbye Villanueva, called me to let me know that King had engaged in conduct in front of customers that caused her [Villanueva] to decide to leave the store to avoid conflict with King. A few days later Villanueva emailed me about another incident with King. A true and correct copy of that email from Villanueva is attached as Exhibit C.

12.     Another conversation King recorded of me was in October 2009, when she called me from the EEOC office and misrepresented her circumstances as being at the doctor's office. I gave her the day off, and she was paid sick pay for her absence the day she called from the EEOC office stating she was at the doctor's office.

13.     I did not know until after King was terminated that she filed any EEOC charge or that she complained about race discrimination. I did not find out that King had been recording me until on or about March 17, 2010, when an acquaintance of King's, Dehran Watson, told me she had been recording me. Mr. Watson said he had copies of the recordings and offered to give me copies, which I got from him shortly thereafter.

14.     As the Store Manager, I believed it was my responsibility to provide copies of the recording King made to Hornsby, and I did so. But I did not participate, influence, recommend or make the decision to terminate King.

**203**

Keeler / Pruitt

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts stated above are true and correct.

Executed on this 20 day of December, 2011.

Carol Keeler

3

**204**

Sign = ~~~~~~~~~~~~~ 5/27/09
          Kchica + 5/27/09
5/26/09        @ Chica + April
          Review Points

1. Make sure enter entire # off all
   coupons - now works to
                identify whom coupon id.

2. Make sure everything represented on
   floor from backstock.

3. April - keep your own sheet for
   damages + coupons given you cannot
   enter entire code for.
        — Chica already knows.

4. No cell phones on floor or
   private calls on store phone

5. Greet every person.

6. Checked by on envelope - I
        will sign
   All receipts should be in envelope
   if coupon used staple to it or
   write explanation on it.

7. Always log time clock adjustments



EXHIBIT
A

**205**

Keeler / Pruitt                                    817-306-7640                    p.5

# PROGRESS REPORT

NAME OF EMPLOYEE:  LaChica King

STORE #  246

DATE OF LAST
CONFERENCE  04/13/09

AREAS OF PERFORMANCE:  Please check areas involved.

| | | | | | | |
|---|---|---|---|---|---|---|
| Quantity of work | ☐ | Cooperation | ☐ | Other | ☒ |
| Quality of work | ☐ | Attendance | ☐ | | |
| Reliability | ☐ | Lateness | ☐ | | |

REVIEW:
The intent of this Progress Report is to identify LaChica's Leadership opportunities and to improve her overall performance as an Asst Manager at store #246.

On Thursday, May 21, 2009, LaChica was observed having a private conversation on her ~~██████████████████████████████████████████~~ ~~██████████████████████████████████████████~~ ~~██████████████████████████████████████████~~ ~~██████████████████████████████████████████~~

LaChica's leadership behaviors must improve immediately in order for her to remain successful as an Asst Manger for Cache. LaChica, I am here to support you and help you succeed, however, the final accountability for your performance and success rest with you. You must follow all Cache policy and procedures as laid out in the employee handbook and POS manual going forward. It is important that you are clear in your understanding of what is expected of you going forward and that you know the consequences should this behavior continue will result in further action leading up to or resulting in your separation from Cache.

DATE OF NEXT CONFERENCE: _____

_____          6/2/09
SIGNATURE OF EMPLOYEE                      DATE SIGNED

_____          6/2/09
SIGNATURE OF MANAGER                       DATE SIGNED

**EXHIBIT**
**B**



*206*

Keeler / Pruitt                                   817-306-7640                 p.6

Date: Sun, 24 Jan 2010 20:11:17 -0800
From: bobbye_leigh@yahoo.com
Subject: events in the store last Thursday
To: cpruitt123@msn.com

Hello Carol:

Per your request I am again writing to convey events which occurred during the time I worked with Chica. This time on Thursday, January 21, 2010.

Chica was scheduled to leave when April and I arrived at 12pm. I arrived before April, shortly before 12pm. I said hello to Chica when I walked in the store and asked how she was doing. She did not respond at all even though we made eye contact. I went to the back and clocked in and came back out on the sales floor. She was standing behind the cash wrap and had unpacked some shirts (although not switched hangers, censored,

1



EXHIBIT
C

**207**

steamed, or unpacked the remaining shipment in the box) prior to my arrival. I noticed the shirt was of similar fabric and design to one we had carried last spring and I commented I was lucky to have purchased the one last year as I could easily still wear it this year and it look like current season merchandise. She did not respond so I asked if she remembered the shirt. She then threw down the inventory control documents she was holding and said "I cannot even believe you're even trying to talk to me." She continued on and said that she had been told I was "scared to work with her." I told her that I was certainly not scared of her but that I had left the store last week so that her temper might have time to cool and we could avoid a confrontation - that it was a new day and a new week and I was more than capable of putting the events of last week behind me. She continued to verbally attack me about the incident - how she believed she had done nothing wrong but I on the other hand had violated multiple store policies by not being near the fitting room which my customer occupied. I remained calm and told her I had already relayed the entire indident as well as my private HR concerns to our store manager and was certain that Carol would let me know which if any policies I had violated. She persisted with the alleged Loss Prevention policy she claimed I had violated and referenced a memo that Carol had written about our new inventory policies as well as mandatory bag checks. I told her I would read the memo and if I had any questions I would ask Carol. I remained very calm and her voice continued to rise. She kept on and on about everything she felt I had done wrong I remained non confrontational and told her that since she and I were the same level (Assistant Manager) I didn't feel that she should be reprimanding me or dictating policies she felt I had violated - that I felt that was the responsibility of our store manager and that if I had violated any policy in any way I was more than willing to learn from my mistake and improve - but that I hadn't even been able to read the memo she kept referencing because she continued to confront me etc. She interrupted me and asked "So you mean we make the same amount of pay?" to which I replied I was not aware of her rate of pay and it was not any of my business. She then told me she could not put the event behind her even if it was a new day unless I was willing to talk to

2

her about it. (I had previously told her I thought the conversation would be best suited in the presence of a third party mediator or witness - such as our store manager and that I really had no obligation to discuss HR conversations I'd had with the store manager with her). She said "What are we supposed to do going forward in the future?" I told her that in the future I would always be uncomfortable any time she spoke down to me, belittled me, ordered me around, or acted as if she was in an authoritative position over me - anytime but especially in front of customers and that I felt as though her words and actions both the previous day and the current day were unprofessional, discourteous, and rude. That I could promise her I would never speak to her in that fashion and I'd like equal treatment in return. She changed the subject back to her belief that I had violated a Loss Prevention policy - and reiterated her belief that I had no business being up at the counter. I disagreed and said that I had never received any training or read any manuals or memos that said anything of the sort and that as long as I was an employee of the store and on the clock I should be able to be anywhere in the store unless a private meeting was occurring in the back for example. At this point April arrived at work and saw Chica confronting me and being verbally combative. Chica was almost yelling at this point while I remained calm and said she thought this would be good issue to discuss in future store meetings.

As you know we do not have store meetings. As you also know - your new inventory period memo said absolutely nothing about fitting rooms apart from keeping track of merchandise as it enters and exits the fitting room and providing good customer service - which I promise I was doing.

I am at a complete loss Carol. I desperately want to get along with Chica and foster a positive team environment. I feel as though she is creating a hostile workplace that I am not contributing to at all. On a private note, I am a little scared of working with her as she is volatile and unpredictable. My family and boyfriend have both suggested that should I ever need to leave the store again due to her behavior I ask mall security to escort me back to further document her behavior. At first this suggestion sounded

3

extreme to me but after Thursdays events I am starting to believe it might have some merit. I have never been in this sort of work environment or situation before. I am open to any suggestions as to how to better get along with Chica and not provoke her. I had hoped being cheerful and conversational would foster that - but it unfortunately had the opposite effect.

Unfortunately this is the third time I've had to give written documentation of events pertaining to Chica. I am happy to document as often as I need to, but do hope that soon things will be resolved. I'm looking forward to a positive resolution to this issue in our store. Thank you for listening to my concerns.

Bobbye Villanueva

**210**

**Exhibit 6**
Declaration of Cheryl Kirby

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| LACHICA KING | § | |
|       Plaintiff | § | |
| | § | Civil Action No. 3:CV-11-0138-P |
| v. | § | |
| | § | |
| CACHE, INC. | § | |

## <u>DECLARATION OF M. CHERYL KIRBY</u>

I, M. Cheryl Kirby, hereby give this statement under oath voluntarily. I am over the age of 21 years and am competent to testify to the matters stated herein. I have personal knowledge of the facts, events, and circumstances stated in this declaration, and they are true and correct.

1.    I am an attorney who represents Cache, Inc. ("Cache") in the above styled matter.

2.    In my capacity as Cache's legal representative, I received electronic documents from Plaintiff's counsel in the above styled matter in response to Defendant's Requests for production.

3.    The electronic documents I received include audio recordings made by Plaintiff without Defendant's knowledge while Plaintiff was employed by Defendant. Defendant had previously obtained copies of the audio recordings produced by Plaintiff shortly before Plaintiff was terminated.

4.    True and correct copies of audio recordings produced by Plaintiff that are referenced in Defendant's Brief in Support of Motion for Summary Judgment are contained in a compact disc (CD) that is enclosed in a 9 x 12 envelope attached hereto as Exhibit A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts stated above are true and correct.

Executed on this 21 day of December, 2011.

_____
M. Cheryl Kirby

**211**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

Civil Action No. 3:CV-11-0138-P

LaChica King, Plaintiff

vs.

Cache, Inc., Defendant

**SUMMARY JUDGMENT EVIDENCE**
**"Recordings"**



EXHIBIT

**A**

*212*