IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| | § | |
| PLAINTIFF, | § | 3:11-CV-0138 |
| V. | § | |
| | § | ***JURY DEMANDED*** |
| CACHE, INC. | § | |
| | § | |
| DEFENDANT. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.  Nature and Stage of the Proceedings

II.  Summary of the Argument

III.  Statement of Facts

    A.   Cache business, personnel and management

    B.  Cache hires Chica and attains Star Status

        1. Cache hires Chica in June 2008; Mareatha becomes District Manager in July
        2. Due to Chica's strong sales and loss prevention skills, the store at the Parks is turned around and awarded 'Star Status'

    C.  Opportunities at Cache contract because of the economy

        1. The store cannot support a manager and co-manager
        2. Carol is told to fire April for weak perfomance
        4. The matrix which allocates people-hours is contracted

    D.  Chica complains that Carol is favoring April by manipulating sales and assignment of cleaning tasks.

    E.  Chica suffers high right ankle sprain and is removed from the schedule

    F.  Chica seeks help from Cache's human resources so she can return to work, complains of unfair treatment and favoritism to April

    G.   Carol does not return Chica to the schedule until September and her hours are reduced

    H.  Chica's protected activity

        1. October 26, 2009, EEOC discrimination complaint
        2. November complaint about unfair treatment to Mareatha
        3. January 13, 2010, memorialization of discrimination complaint
        4. January 15, 2010, EEOC retaliation complain
        5. April 2010, EEOC retaliation complaint based on termination

.

I.   Cache's Allegations of Wrongdoing by Chica

      1. Insubordination or failing to lend April her keys
      2. Violation of policy by recording conversations

      3.  Minor performance issues blown up as policy violations or insubordination

K.     The Pretext: Cache's bait and switch tactics, inconsistent and shifting explanation and mendacity

IV. Summary Judgment Standard.

V. Argument and Authorities.

    A. Prima Facie Case

    B. Evidence of Pretext

    C. FMLA Claim

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| | § | |
| PLAINTIFF, | § | 3:11-CV-0138 |
| V. | § | |
| | § | JURY DEMANDED |
| CACHE, INC. | § | |
| | § | |
| DEFENDANT. | § | |

### Plaintiff's Response to Defendant's Motion for Summary Judgment

Summary judgment should be denied because genuine issues of fact exist regarding Hornsby's real motivation for terminating Chica's employment and because Cache's motion is based on her self-serving, conclusory statements or opinions and not facts.

## I. Nature and Stage of the Proceedings

The plaintiff, LaChica King (Chica) is an African American female.  This case stems from Cache's failure to schedule Chica who was its top salesperson for work for over six weeks in August and September 2009, and her dismissal March 26, 2010, for recording conversations despite its prior permission, knowledge and recording was not against policy.  The facts show that this dismissal would not have occurred if LaChica had not filed a discrimination complaints with the Equal Employment Opportunity Commission and Cache.

## II. Summary of the Argument

At a trial on the merits, Cache will have an opportunity to present its case – to explain why it removed its best salesperson from the schedule for over six weeks August 3, to September

14, 2009, after she returned to work July 30, worked a full nine-hour shift and the store manager agreed she would limit her work day to eight hours.   A jury should evaluate Cache's claim that Marguerita Croasdaile (Margarita) the human resources manager in New York asked Chica to resign January 20, 2010, six days after Mareatha Hornsby (Mareatha) investigated Chica's internal and EEOC discrimination complaints because Chica was "not happy."   A jury might suspect mendacity in Margarita's claim that she did not consult with, get approval of or direction from Mareatha in asking Chica to resign.   At trial, Cache will have to explain why to the jury why it claims Chica was insubordinate when Cache did not give her any order, instruction or command that Chica failed to obey.   Finally, at trial, Cache will have to explain to the jury why it fired Chica for recording conversations using her Blackberry cell phone to protect herself and preserve evidence of discrimination when Cache gave her permission to record, had knowledge she had recorded the conversations long before she was fired and no policy was in place which prohibited her from doing so.   At this stage of the proceedings, there is no basis for summary judgment as a matter of law.

## STATEMENT OF FACTS

1.  In June 2008, Cache hired LaChica King as a full-time assistant manager at which time it gave her a copy of its Employee Handbook dated February 2002, and had her sign an acknowledgement.  The handbook was not revised during her tenure.

2.  The employee manual contained the following policy on telephone use:  "The number of telephone lines in our store is limited.  We want to keep these lines open for daily business nee

  ds, and for our customers to reach us.  Thus, our employees are not to make or receive personal calls, except in the case of an emergency."   The employee handbook did not contain

any policy regarding cell phones.  The page in the so-called Operational Binder purportedly kept in the store and on the Company's intranet which provided "Personal pages and cell phones should be turned off while you are working and are not permitted on the sales floor" was not reviewed with employees and never enforced.   Complaints by customers that cell phones were interfering with service prompted a change in May 2009, which was communicated to employees.  Carol reviewed the policy with Chica on May 26, telling her she had been told by Mareatha to start enforcing a cell phone policy that prohibited using cell phones on the sales floor.  On May 27, Carol had April and Chica sign acknowledgements that this policy would be enforced as well as others.  She wrote "Chica already knows this" because she had discussed the policy changes with her the previous day.  As explained by Carol, employees could not take calls on their cell phones while on the sales floor.  Carol did not explain to Chica that cell phones had to be turned off or could not be in possession of employees while on the floor.  And, in fact, after the policy was put in effect, employees continued to possess their cell phones and to use them discretely check email or text messages or to take calls in the corner of the sales floor if it did not interfere with customer service.  Cache adopted the policy in response to customer complaints that cell phone use interfered with service.

4.  On June 2, 2009, Mareatha instructed Carol to issue a write up to Chica for receiving a call on her cell phone while on the sales floor on May 21Chica signed to indicate receipt and not agreement because the alleged use of her cell phone occurred before the policy was enforced and she did not believe she took a personal call on the floor on that day or any other.

5. Chica did not make or receive a personal call on her cell phone on the sales floor after Cache put the policy in effect at the store.

6. Chica was the top performer in Cache at the Park's Mall.  In January, 2009, six months after she joined the staff, the store attained Star Status.  This is the highest award the company gives to stores for their overall performance.  Carol told Chica that Cache had considered closing their store at the Park's Mall because of major lost prevention issues and low sales. Carol thanked her for helping with the success of the store and said it was because of her great sales abilities and loss prevention knowledge and experience that helped turn the store around.

7.   After the store was award Star Status, Cache's Regional Manager Patrick Doyle visited the store.  After he left, Carol told Chica that because of the economy the store's available working hours (matrix) had been reduced and that the co-Manager position occupied by April had been removed from our store.  Carol said that she had been instructed to terminate April Baker because of her poor overall store performance and that she did not want to do this because April needed her job.  She confided in Chica that April was dealing with many personal problems, including an alcoholic husband who could not drive unless April blew into his car monitor he had as a result of drunk driving.  She told Chica that April had psychological problems, was on prescription medications and that she suspected her of abusing drugs and alcohol.  Carol said she thought April sometimes came to work drunk and asked Chica to watch April and let her know if she suspected April of drinking or using drugs on the job.

8.  At this time, Carol started showing April preferential treatment by giving her sales and covering for April when April was tardy and opened the store late.  On one occasion April opened the store a whole hour late.  Carol asked Chica not to tell Mareatha because April's job was already threatened.

9.   In April and May, 2009, Chica noticed large returns from her sales which she questioned.   One occurred when one of Chica's customers made a large purchase using the wrong card.   Chica said she could fix it if the customer could come by with her receipt so she could do a return and resale and told Carol the customer might come when she was working.   Carol returned the items against Chica and took credit for the sale.   Carol was covering for April, but taking Chica's sales.

10.   April received preferential treatment regarding store cleaning duties.   Carol and April frequently left notes for Janice Precious Flowers (Janice), African American female with cleaning assignments.   Chica and Janice were assigned to do a disproportionate share of cleaning responsibilities as compared to April and the employees.

11.   Carol hired Bobbye Villeanova (Bobbye), white female, as a part time sales associate even though Janice continually asked for more hours.   Within six months of hire, Bobbye was promoted from a part-time sales associate to a part time assistant manager.   Carol would invite April and Bobbye to events at the Galleria, but did not invite Chica.

12.   Chica challenged statements made by Carol that she thought had racial overtones. For example, in response to Chica's suggestion Uptown Mall in Cedar Hill might be a potential location for a Cache, Carol replied:  "Isn't Uptown in South Dallas?"  Cache would never put a store in South Dallas."   Chica rejected Carol offer to help her find a job in South Dallas by saying that she loved her job at Cache at the Parks.

13.   On July 20, 2009, Chica suffered a non-work-related injury.   She was examined by her uncle, a strength and conditioning coach with the Dallas Cowboy who diagnosed the injury

as a high right ankle sprain and who told her to allow it to heal by staying off of it as much as possible, elevating and applying hot and cold and compresses and to wear comfortable shoes (no high heels).  Chica did not see a doctor, nurse or physician's assistant.

14.  The morning of July 21, went in to open the store and called Carol to ask her to relieve her, but she said no.  Not long after, Mareatha came by the store and sent her home "because she could not perform the duties of her position."

15.  Carol gave Chica permission to take four sick days off which preceded her previously scheduled five day vacation.  Chica said she would come back to work after her vacation and asked her if she would adjust the schedule so that she could work no more than an 8 hour day as suggested by her uncle and Carol agreed.

16.  On July 30, 2009, Chic worked noon to close.  Carol did not ask for a doctor's note. By the end of the day, Chica's ankle was swelling.  She was scheduled for long hours July 31 long hours and asked Carol if Janice who was available could work a few of her hours.  Carol told her to take the weekend off and she would adjust the schedule so her days were not over 8 hours long and to call on Sunday for the new schedule.

17.  On Sunday, August 2, Chica called Carol who told her that Mareatha was going to call HR to find out if Chica qualified for short-term disability.  Chica told Carol that she did not need short-term disability, she could work and she needed her schedule changed so she would not work longer than an 8 hour day. Carol said to call Monday.

18. When Chica called Monday, August 3, April said Carol was not in.  Chica tried unsuccessfully to reach Carol on her cell and home phones.  Chica called the store again and April told her that she had been completely taken off the schedule and her hours were covered.

19.  Chica called Margarita in Cache's HR.  She explained that taken some sick days because she had sprained her ankle and had off work, July 21 through July 30, that she had returned to work a full day July 30 and Carol had agreed to limit her to an 8 hour work day, but had instead removed her from the schedule completely.  Margarita's response was that Mareatha should have informed her about her leave and that all she needed to return to work was a doctor's note.  Because the doctor's note had not been the issue with Carol or Mareatha before, Chica explained to Margarita that the "real" issue was she was being treated differently.

20.  On August 4, Chica called Carol to discuss returning to work, but Carol said: "Mareatha said that since you went over our heads and called HR, we don't need to talk to you. Deal with HR!" and the phone hung up.

21.  Chica contacted the Department of Labor (DOL) which told her that she qualified for Family Medical Leave (FML).  Chica then called Margarita and told her what she learned from DOL to which Margarita responded that she had put Chica "on approved FMLA."

22. On August 20, Carol left two messages that her "check' was at the store and if she came in to bring the keys so someone else could use them.  Chica did not go in to pick up the pay advice, but on Friday, August 28, obtained a doctor's note which she immediate took to store to give it to Carol, but she was not in.  Chica delivered the note to Carol on Friday, August 31,who told her it was not acceptable to get her back on the schedule.  After Margarita said it was fine,

Carol said she would put Chica back on the schedule, but that she did not have to do so for two weeks.

23.   Carol did not put Chica back on the schedule until September 14, 2009.  Further, after Chica returned from her leave, Carol scheduled her for only 30 hours a week; before her leave she was scheduled for 35 to 40 hours a week.  Carol's explanation for reducing Chica's hours was that by law all she had to do was schedule her for 30 hours.

24.   On November 24, 2009, Chica was scheduled to work with April.  Chica greeted her, April did not return the greeting, but walked to the back.  The phone rang; it was Carol for April and they talked for twenty minutes.  April came out from the back and asked if she could borrow Chica's set of store keys because she had forgotten hers.  Chica said no.  Carol then spoke to Chica and asked why she was refusing to lend April her keys to which Chica responded:  I don't trust the situation".  They discussion between them centered around the difficulty that Chica had getting keys when she returned to work after her leave because the locks had been changed.  During the conversation did Carol did not simply instruct, direct or order Chica to give her keys to April, although she repeatedly told Chica that she was being ridiculous.  Chica suggested she would give April her keys if Mareatha or somebody had knowledge so that she would be covered at which point Carol hung up and shortly thereafter, Margarita spoke to Chica by phone, asked her to lend April her keys as a favor and Chica gave April her set of keys.

25.   Chica did disobey instruction or an order on January 30 to attach coupons to receipts.  What happened is that Carol told Chica it going forward it was mandatory to staple coupons to receipts.  Because there were no store meetings, Carol related these kinds of issues to employees

in one on ones.  Chica told Carol that there would not always be a receipt and gave the example of an internet promotion.  She also pointed out that stapling coupons was something they had come up with to save time in the evenings and not required by (not mandatory) under Cache's policies.  Chica reminded Carol that she had asked that any unofficial changes in Cache policy be put in writing because of the sensitivity of her situation (She felt she was being targeted and set up.)  Carol said never mind.

26.  In the January 30, conversation, Carol told Chica that HR was directing her to take the act and that she Janice and Keely did not have any issues with her.

27.  On January 13, 2010, Mareatha visited the store for an investigation into Chica's internal discrimination complaint.  Mareatha gave Chica permission to record the conversation which she did by using her Blackberry smart phone which she had in her hand.  During the meeting with Mareatha, Chica stopped recording so that Mareatha could listened to earlier records.  Chica gave Mareatha a list of her complaints which centered on lost compensation when she was taken off the schedule August 3, to September 14, and the reduction in her hours thereafter and Mareatha faxed the list to Margarita.

28.  The next day, January 14, Carol delivered a write-up which was not signed or dated to Chica for losing her keys December 31, 2009.  Chica used her smart phone to take a picture of it in Carol's presence who did not indicate that this was a problem at the time.

29.  The next day, January 15, however, Carol told Chica she could not have her cell phone on the floor.  Carol had her cell phone out at the time.  Chica filed a retaliation complaint

because she interpreted that Carol told her she could not have her cell phone was in retaliation which is what reported to the EEOC in her retaliation complaint.

30.  Five days later, on Wednesday, January 20, 2010, at 3:08 pm, Margarita called Chica and asked her to resign, to accept one month's pay of $2500 and to waive her EEOC allegations. Margarita told Chica that the EEOC had found in Cache's favor when all the EEOC did was issue a dismissal on that day.  Chica declined to tender her resignation.

31.  On February 3, 2010, Mareatha asked to meet with Chica to review the results of her investigation.  Mareatha testified in her deposition that she had no notes of her conversations or any other record of her investigation.  Chica asked if she could have a witness or record, but neither Carol nor Mareatha responded.

32. On February 5, a friend of Chica's came with her to the meeting, but Mareatha said she could not stay.  Chica reminded her that she had asked to record the meeting if she could not have a witness.  Mareatha did not give Chica permission to tape the meeting, but the phone was in her hand.  Chica did not turn off the recorder on the smart phone and the conversation was recorded.

33.  Between September and March 26, when she was dismissed Chica made ten recordings on the floor during business hours while she was working.  The other conversations took place in the fitting room area or the back or when she was off work.  On January 13, Mareatha gave Chica permission to record and listened to earlier conversations she recorded without comment.  Mareatha knew Chica recorded the conversations using her Blackberry smart phone, but did not give her a write up, warning or verbally counseling for taping conversations

with her Blackberry Smart phone or even suggest that Chica's doing so was misconduct of any kind.

34.   On March 18, 2010, the same day that Carol met with Chica's ex-boyfriend Duhran Watson, Carol came to the store in sweat pants and tennis shoes and delivered a write up to Chica for violating the Special Orders policy.   Carol writes that on February 6, King" signed a sheet acknowledging that I had read the policy."  King did read the policy on that date.  Carol then writes that King "gave free shipping on Feb 8, 17, and the 22" as if it were deliberate. Cache began addressing the Special Orders issue February 2, when corporate sent an email to the district managers which advised them to direct store managers to go over the policy with staff. Carol did not review the policy with Chica, but told her to reread the policy which she did. After Chica continued to see her name on the 'bad' report February 8, she went to Carol and asked her to go over the policy with her.  On February 23, Carol did so and the last error that Chica made was the day before. Although both Carol and Mareatha had received the recordings the morning of March 18, 2010, the write up was for violating the special orders policy which she knew had been corrected February 23.

35.   On March 26, 2010, Mareatha terminated Chica for gross insubordination and gross misconduct.

### IV.  Summary Judgment Standard

Summary judgment standards require that all the evidence be viewed in the light most favorable to the non-movant, Chica.   Moreover, the Supreme Court has counseled that, in reviewing a summary judgment motion, "[T]he court . . . must disregard all evidence favorable

to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000). Instead of honoring this rule, the defendants simply ignore most of the relevant facts and spin the rest in the light most favorable to them.

Neither do summary judgment standards allow the defendants to obtain judgment as a matter of law based on inadmissible conclusions or statements based of which the witness lacks personal knowledge.  See Fed.R.Civ.P. 56 (c)(4).  The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. Celotex Corp., 477 U.S. at 322. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. Id. at 324.

Finally, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. Id. at 255.

These standards require a jury trial in this case.


## V. Argument and Authorities

**A.  Chica's prima facie case.**

The Supreme Court defined the order and allocation of proof for a discrimination case in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 67 L.Ed 2nd 668.  Although the precise elements of discrimination will vary depending on the allegations, Id at 802, the complainant's burden at this stage is not onerous.   Where only circumstantial evidence of discrimination is available, a plaintiff must show that he (1) was a member of the protected class (over 40 years old); (2) was qualified for the position; (3) was fired; and (4) was either replaced by someone younger, was treated less favorably than employees who were similarly situated, or was otherwise discharged because of his age.  Collins v. Saia Motor Freight Lines, Inc., 144 Fed. Appx. 368, 372 (5th Cir. 2005).

To establish a prima facie case, a plaintiff need only show "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 41 (5th Cir. 1996) (quoting Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 812 (5th Cir. 1991)).  Therefore, Palasota was not required to demonstrate that the Sales Associates and RMAs were given preferential treatment or that he was immediately replaced by an RMA.'  Palasota, 342 F.3d at 576.

**B.  Evidence of Pretext**

**Absence of a Clear Cut Policy**

Here, Cache did not have a clear cut policy on cell phone use and no policy at all that dealt with recording conversations.

There was no policy in the employee handbook regarding recording conversations. Moreover, Mareatha had expressly given Chica permission to record a conversation on January

13, and when she listened to earlier recording made by Chica in that meeting did not indicate she had done anything wrong.  Although Mareatha later claimed that the policy prohibited recording without the permission of "corporate" Cache never produced the policy and Mareatha did not explain why she, who had been a district manager with Cache for seven years did not know about the policy on January 13, when she gave Chica permission to record a conversation without "corporates" approval.

The cell phone policy is far from clear cut. There is not policy in the Employee Handbook about use of cell phones.  The policy that Cache claims Chica violated when she used her Blackberry smart phone as a recorder is that contained in the store operations manual entitled "lost prevention." This policy states that personal pages and cell phones should be turned off while the employee is working and that they are not allowed on the sales floor.  This policy was never enforced because prior to May 26, 2009, employees received and made calls from the sales floor using their cell phones.   Thus, Cache instituted a cell phone policy that prohibited employees from receiving calls on personal cell phones on the floor.  Carol said the change was because of customer complaints about service.  The policy as explained by Carol to Chica on May 26, 2009, was that employees could not use their cell phones on the sales floor to make or receive calls.  Carol did not say that cell phones should be turned off and no such policy was ever enforced.  As Chic and a customer attest, employees used their cell phones to text, check email or to step away from the sales floor to take a call.

**Failure to Give Employee Benefit of the Doubt**

After Carol explained the policy on May 26, and Chica signed off on it on March 27, Mareatha directed that Carol write up Chica for taking a call on May 21.  Chica did not agre to teh write up because she did not take a personal call on May 21, and that date was before the

policy was put in place.  Chica was not given the benefit of the doubt which is evidence of pretext.  See Trujillo v. PacifiCorp, 524 F.3d 1149, 1159-1160 (10th Cir. 2008) (summary judgment reversed because, rather than giving the plaintiffs the benefit of the doubt, the company relied on only negative evidence and failed to interview key witnesses).  Regardless, Chica did not violate the policy against taking personal calls on her cell phone after May 26, 2009.

There was no policy in Cache's Employee Handbook at all which Margarita testified there would have been if an employee would be held accountable for violating the policy.  There was just no clear policy on cell phone use at Cache. It is well established that absence of a clear cut policy, especially one for which an employee is purportedly terminated, may be evidence of pretext.  In Tomczyk v Jocks & Jills Rests., LLC., 198 Fed. Appx. 804, 812 (11th Cir. Aug. 9, 2006) (summary judgment reversed because there were contradictory pronouncements regarding the employer's policy against pay raises which called into question the employer's stated reason – that the plaintiff was fired for violating that policy).

**Inconsistencies**

Mareatha learned on January 13, 2010, in the meeting that she expressly granted permission to Chica record that she had made records of her interactions with Carol without letting her know.  Mareatha learned this because Chica told her and allowed her to listen to records that she though made her point.  In the termination paperwork, Mareatha characterizes Chica's "recordings of unsuspecting co-workers for a period of six months' as gross misconduct. Yet, Mareatha did not say a word about it on January 13.

Mareatha knowledge that Chica had recorded her coworkers and Mareatha's reaction to it undermines Mareatha's claim that she fired Chica for engaging in gross misconduct by recording unsuspecting coworkers for a period of six months. It is well-established that "inconsistent, shifting reasons offered by the employer constitute sufficient evidence of pretext to support a finding of liability. *See, e.g., Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002)*; Loveless v John's Ford, Inc.*, 232 Fed. Appx. 229 at *235 (4th Cir. 2007) (affirming jury verdict where the proffered explanation at trial – poor performance, contradicts reason given to the plaintiff at the termination meeting – desire for younger, more aggressive managers); *Pantoja v American NTN Bearing Manufacturing Corp.*, 495 F.3d 840, 851 (7th Cir. 2007) ("Perhaps [the defendant] has a theory under which these various accounts are consistent...But all this shows only that there is a disputed issue of fact about the true reason."

### Mendacity

Mareatha accuses Chica of insubordination when is false. Mareatha claims that Chica was insubordinate by refusing instruction from Carol to do so. However, Carol never instructed Chica give her keys to April and neither did April. Cache's Employee Handbook provides that insubordination is "failure to follow instructions, to perform work in the manner assigned, or to comply with Company rules… . "   April asked Chica to lend her Chica's store keys to which Chica said no. During the telephone conversation between Carol and Chica, there is never the simple instruction to give her the keys. There are recriminations and explanations which Carol plainly though ridiculous, but never a simple instruction. Thus, claim that Chica refused to follow instruction so insubordinate is false. Moreover, Chica gave her keys to April when Margarita asked that she do so as a favor to her.

Chica was not insubordinate when she did not sign the blank, undated write up for losing her keys issued two weeks after she loss them and a week after the locks had been changed.  The timing of the write up, January 14, for an event that happened New Year's Eve when Chica lost her keys makes Mareatha actions suspect.  Further Cache's feigned concern about changing the locks when Chica lost her keys is at best, a gross exaggeration and, at worse, a lie.  Mendacity may establish pretext.  As the Supreme Court said:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 147 (2000) (citing Wright v. West, 505 U.S. 277, 296 (1992)).  See also Ameristar Airways, Inc. v. Admin. Review Board., ___ F.3d ___, 2011 WL 3505466 (5th Cir. 2011) arose when the employee was fired in retaliation for reporting air safety problems:

If the trier of fact does not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit—that it acted for retaliatory or discriminatory reasons.

**Suspicious Timing.**

Pretext is also shown by the suspicious timing of the termination. See, e.g., Wallace v DTG Corp, Inc., 442 F.3d 1112 (8th Cir. 2006) (pretext shown in this retaliation case by showing there were only 15 days between the plaintiff's complaint of sexual harassment and the regional manager's decision to terminate her).  Here, Cache sought King's resignation only five days after

she participated in the investigation of her internal discrimination complaint and within two months of Cache's receiving notice in November 2009, that Chica had filed an EEOC complaint. Likewise, most of the write ups and her termination follow protected activity. While suspicious timing alone may not carry the pretext burden, but in combination with other evidence of pretext it can, and often does. See <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 409 (5th Cir. 1999); <u>Evans v. City of Houston</u>, 246 F.3d 344, 356 (5th Cir. 2001).  It should here.

## C.  FMLA Retaliation Claim

The plaintiff could find no reported case in the Fifth Circuit regarding a claim can be made for FMLA interference or retaliation when the plaintiff is not entitled to leave either because not eligible employee because of length of service or hours or the employer is not eligible because it does not employee the minimum employees in the geographical area or because the plaintiff does not actually have a "serious medical condition."  That is this case because it is undisputed that Chica did not see a health care professional within the meaning of the FMLA.  However, she was told by Margarita that she was on "approved FMLA."

In <u>Potts v. Franklin Elec. Co</u>., 2006 U.S. Dist. LEXIS 60781, 7-8 (D. Okla. 2006), the court held that an employee who had requested leave for medical testing after his dentist told him that he might have oral cancer was not precluded from pursuing an FMLA retaliation claim over his termination when the testing revealed that he did not have oral cancer. The court reasoned, in part, "Importantly, 29 U.S.C. § 2615(a), does not say that employees must be "eligible," or "qualify" for leave, before they may file either an interference, or retaliation claim for requesting leave. This proscriptive section is in sharp contrast to the prescriptive provision in 29 U.S.C. §

2612, which states that only "eligible" employees are entitled to FMLA leave. 'It is also important to note that FMLA protects the "attempt" to exercise a right; thus § 2615 can protect someone who mistakenly asks for FMLA leave although they may be ineligible.' (citing Walker v. Elmore County Bd. of Educ., 223 F. Supp. 1255, 1259 (N.D.Ala. 2002). Thus, under Potts, Chica's FMLA retaliation claim survives even though she did not have a serious health condition. See also *Pereda v. Brookdale,* Case No. 10-14723 (11th Circuit January 10, 2012) in which 11th Circuit held that the FMLA protects a preeligibility request for post-eligibility leave.

It seems consistent with other Fifth Circuit law in Title VII cases that a person who does not have discrimination case is protected from retaliation for protected activity. Here, Cache has utterly failed to profer a reason it removed Chica from the schedule and reduced her hours from 35 to 40 to 30. The reasons seem to be "because we said so" get a doctor's note even though you already started work and "because we can" an employee is full time if she workds a minimum of 30 hours a week.

## <u>Conclusion</u>

The court should deny defendant's motion for summary judgment and allow the jury to determine the factual issues in this case.

Respectfully submitted,

s/  N. Sue Allen_____
N. Sue Allen, SBOT 00791992
Allen Law Firm
2200 Forest Park Blvd, Suite 107
Fort Worth, Texas 76110
(817) 926-5005
(817) 926-5165 (facsimile)
Email:  sue@sueallenlaw.com

Attorney for LaChica King

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of this document was served on the following counsel of record via the Court's ECF filing system.

Mr. Reece L. Harrison
Ms. Cheryl Kirby
Oppenheimer, Blend, Harrison & Tate
711 Navarro, Sixth Floor
San Antonio, Texas 78205


<u>s/  N. Sue Allen</u>
N. Sue Allen


The