IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| | § | |
| PLAINTIFF, | § | 3:11-CV-0138 |
| V. | § | |
| | § | JURY TRIAL DEMANDED |
| CACHE, INC. | § | |
| | § | |
| DEFENDANT. | § | |

# PLAINTIFF'S
# APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| | § | |
| PLAINTIFF, | § | 3:11-CV-0138 |
| V. | § | |
| | § | JURY TRIAL DEMANDED |
| CACHE, INC. | § | |
| | § | |
| DEFENDANT. | § | |

## DECLARATION OF LACHICA KING

1. My name is LaChica King and I am the plaintiff in the above-entitled law suit.

2. When I began working at Cache in the Parks Mall, I was given an Employee Handbook and told that it contained Cache's employment policies. I signed a document to indicate that I had been given the Employee Handbook.

3. The Employee Handbook dated February 2002 contains a policy which provides: Telephone Use. The number of telephone lines in our store is limited, only one. We try to keep this line open for daily business needs and for our customers to reach us. Thus, our employees are not to make or receive personal calls except in the case of an emergency." From the time I began employment with Cache in June 2008, until I was terminated March 26, 2010, I was NOT given a revised Employee Handbook and to the best of my knowledge none was issued.

4. From June 2008, until May 27, 2009, and thereafter, managers and sales associates always had personal cell phones on the sales floor and it was my understanding that it was acceptable to use a personal cell phone. Because of this, I had my cell phone on me at all times, but I did not use it if it interfered with my service to customers. I particularly had it if my son needed to reach me, and I have given my cell number to his school in case of emergency.

5. On May 26, 2009, while working with Carol, she verbally told me that she had been told by Mareatha Hornsby, the district manager, to start enforcing a policy of not using cell phones on the sales floor and that I needed to begin recording my coupon usage and discounts on a separate sheet from the other employees. She went on to discuss other rules that were to be enforced. I then suggested that if this were the case, shouldn't we have a store meeting so that we are all on the same page.

6. On May, 27, 2009, Carol had a written note for April and me to sign going over the information she had verbally told me the day before and she noted in this written statement, "Chica already knows".

7. On June 2, 2009, I received a 'write-up' for taking a personal call on my cell phone, in which it states that I did this on May 21, 2009, prior to the time Carol explained that we would no longer be allowed to use our personal cell phones on the floor. I noted this very strange because the cell phone was never an issue and this new change was not explained until May 26, 2009. I told Carol that I didn't remember using my phone on that day and she never addressed it either. Being that I didn't agree with it, I was hesitant to sign the write-up. Carol told me that signing it did not mean that I agreed with it, it simply meant I was acknowledging that she and I had gone over the write-up, so I signed it. At this time I wasn't aware that I could've written a rebuttal statement to disagree with the write-up.

8. After May 27, 2009, I saw Carol Keeler, April Baker, and other employees on the sales floor with their personal cell phones on them. They received calls on their cell phones from time to time and they would discretely look at their phones to check email or text messages and sometimes step off to a corner on the sales floor or go to the fitting room area to respond to phone calls.

9. I was the top performer in Cache at the Park's Mall. In January, 2009, six months after I joined the staff, the store attained Star Status. This is the highest award the company gives to stores for their overall performance. Carol told me that Cache had considered closing their store at the Park's Mall because of major lost prevention issues and low sales. Carol thanked me for helping with the success of the store and said it was because of my great sales abilities and my loss prevention knowledge and experience that helped turn the store around.

10. In January 2009, after a visit from the Regional Manager, Patrick Doyle, Carol Keeler told me that because of the economy the store's available working hours (matrix) had been reduced and that the Co-Manager position had been removed from our store. April Baker held this position. She told me that she had been instructed to terminate April Baker because of her poor overall store performance. Carol told me that she did not want to do this because April needed her job because she had many personal problems, including an alcoholic husband who could not drive unless April blew into his car monitor he had due to his drunk driving. She told me that April had psychological problems and was on prescription medications. Carol said that she suspected her of abusing drugs and alcohol. Carol said she thought April sometimes came to work drunk. She asked me to watch April to let her know if I suspected April of drinking or using drugs on the job.

11. At this time, Carol started showing April preferential treatment by giving her sales and covering for April when April was tardy and opened the store late. Specifically, April opened the store one hour late and Carol asked me not to tell Mareatha because April's job was already threatened. In April and May, 2009, I began to notice receiving large returns from my sales and began questioning Carol and April about why and how these mysterious returns were occurring. Specifically, I recall one of my customers came into the store before a vacation and I assisted her in finding some nice things for the trip. It was a large sale. My customer called me later and said she had used the wrong credit card and how could she fix that. I told her to come in the next day with her receipt and I would do a return and re-sell to charge the clothes to the correct card. She couldn't come the next day for me to fix the issue, so I assured her that I would explain this to Carol who is the store manager and she would not have any problems. I did just

that. My next day to work, I noticed a large return and I followed up with the customer to find out why. The customer told me that she had done as I had suggested and had Carol put the purchase on the right card. Carol had taken my sale. When I asked Carol about this specific incident, she lashed out at me and a few days after this conversation, she wrote a letter to Mareatha trying to justify her actions. She made it clear that she and Mareatha were friends and that Mareatha would believe her

12.  On July 20, 2009, my day off, I suffered a non-work related high right ankle sprain. I was able to still walk and did not believe it was severe enough to go to the doctor, so I asked my uncle how to care for my ankle and examine it. He is a strength and conditioning coach and worked with the Dallas Cowboy's organization. I trusted his expertise in treating sprains because of his profession, although he is not a licensed doctor, nurse or physician's assistant.

13.  My uncle advised me to allow the sprain to heal by staying off of it as much as possible and have it elevated. He told me to apply cold and heat compresses and to wear comfortable shoes.

14.  The next morning, July 21, I woke up and my ankle was in severe pain and swollen. I went in to only open the store and called Carol and asked if she would relieve me. She said no. However, not long after, Mareatha Hornsby came by the store, saw my ankle and sent me home "because I could not perform the duties of my position." I told Mareatha I had already asked Carol to come in and she refused. Mareatha had me call her back.

15.  When Carol finally made it to the store, she then gave me permission to take off four sick days which preceded my previously scheduled five days of vacation in which I was to attend a family reunion with my mother. I told Carol that I would return to work after my vacation for a trial run to see how long I could stand on my ankle. I told her my uncle suggested that I not stand on my ankle for more than 6-8 hours and asked her if we could adjust my schedule so that I would still work and get my hours because I could not afford to be off. She said yes.

16.  On July 30, 2009, I returned to work and worked noon to close. Carol did not ask for a doctor's note. However, by the end of this long day, my ankle was swelling again. Since this day was a trial run, I spoke with Carol that evening and she agreed to adjust the schedule for me to work no more than 8 hours. I was scheduled to work the next day July 31 long hours again and I called Carol and asked if I could allow Janice to work a few of my hours because she was available. Carol told me to just take the weekend off and call her on Sunday for the new schedule.

17.  On Sunday, August 2, I called Carol at the store and she told me to call her on Monday because Mareatha was going to call HR to find out if I qualified for short-term disability. I told Carol that I didn't need short-term disability and that she had agreed to allow me to work no more than 8 hours. She said just call her tomorrow.

18.  I called the store on Monday, August 3, only to find that Carol was not working. I tried calling Carol on her cell and home phones and she would not return my calls. I called the store again and talked to April who told me that I had been completely taken off the schedule and

that my hours had been covered. I asked April for the number to HR in New York and she gave it to me.

19. After being told by April that I was not scheduled for the next two weeks, I contacted Margarita Croaisdale in Cache's human resources. I explained to her about my ankle sprain, the days I was off, July 21 through July 30, and I that I had my uncle examine my ankle. I told her that Carol and I had made a verbal agreement that I could work eight hour days while my ankle fully healed, but that I had been taken off the schedule completely. Ms. Croaisdale appeared upset that Ms. Hornsby did not inform her about my leave and said that she would call Ms. Hornsby and that all I needed was a doctor's note to return . Because the doctor's note was never an issue before with Carol or Mareatha, I went on to explain to Marguerita what I believed was the "real" issue and that I felt like I was being treated differently.

20. I called Carol on August 4. With an attitude, Carol said, "Mareatha said that since you went over our heads and called HR, we don't need to talk to you. Deal with HR!" and the phone hung up.

21. I contacted the Department of Labor and the person that I talked to said that I qualified for Family Medical Leave. I contacted Ms. Croaisdale about my discussion with the Labor Department and she said that she had me on approved FMLA.

22. I got the doctor's note Friday, August 28, 2009, and took it to the store but Carol was off. I returned on Monday, August 31, 2009, and gave it to Carol. I also faxed it to Margarita. Carol left a message saying my note was insufficient, but Margarita said it was fine and that it was no problem for Carol to put me back on the schedule. This is the date that I started to record my interactions with Carol.

23. Carol told me that she did not have to put me back on the schedule for two weeks. Carol did not allow me to return to work until September 14, 2009.

24. On November 24, 2009, I was scheduled to work with April. I tried to be nice to April and dismiss the tension once again because it was her birthday and she had just come back from a week's vacation. I opened and April came in at noon. When she walked in the store, I spoke to April and asked how her vacation was. She took her sunglasses off, looked at me with a grin on her face and rolled her eyes. She did not speak back, but merely walked to the back. The phone rang while April was in the backroom and it was Carol calling to speak with April. When April came to the front I handed her the phone and she walked back to the backroom to talk to Carol. After being in the back on the phone with Carol for about 20 minutes, April came out still on the phone with Carol, told me she forgot her keys and asked me to lend her my keys to close the store. I said "No." She told Carol, "Chica, said no she won't lend me her keys". April then, with a sarcastic tone, extended the phone to me saying, "Carol wants to talk to you." I took the phone and went to the back so that I could record the conversation to protect myself. Carol asked me why I was refusing to lend April my keys and I told her "I don't trust the situation". We discussed the problem with me getting keys when I returned from my leave of absence and that I had not even been told that the locks had been changed while I was out and that the only way I found out is that Bobbye said she would have liked to call in sick, but Carol said that I did not

have keys. At no time did Carol direct, or instruct or give an order for me to give April my keys, but repeatedly told me that I was being ridiculous. Carol even went on to say that "if I were going to be fired" she would have my keys not April. (On that day I was leaving at 6pm and wouldn't return until the next day at 4pm and April would have had my keys in her possession during that time.) I finally suggested that I would give April my keys if Mareatha or somebody knew about April needing my keys so that I was covered. Margarita from HR called and asked me to give April the keys as a favor to her. I gave my keys to April as a favor to Margarita because I never received a direct order or order of any other kind to give April my keys.

24. During the time I worked for Cache, our normal store hours were 10am-9pm. From my return to work in September until my termination in March, I made 54 records. Of these, ten of them were on the floor during business hours when I was working. Other conversations I had with Carol were during business hours but we stepped away in the fitting room area or in the back. Most of the records were done in the back where I put the store phone on speaker and used my cell to record. A few of the records are on the floor when I was not working. Cache could know this by noting the time of the records with my work schedule.

25. Specifically, from Aug 31, 2009 – Jan 13, 2010 there are twenty-one recorded conversations and from January 14, 2010, through February 4, 2010, there are 16 recorded conversations. Cache did not have a policy that prohibited recording conversations and I used my smart phone as a recorder. In fact, on Jan. 13, 2010, I asked to record the conversation and was given permission to do so by Mareatha the district manager. Further, during our meeting, I stopped recording and played back earlier recorded conversations that I had that I believed made my point. At no time did Mareatha indicate that I had done anything wrong by recording the conversations or using my cell phone to do so. She knew that I had used my Blackberry smart phone to record the conversations because this is how I played them back for her and recorded the conversation of January 13 2010.

26. As of January 13, 2010, Mareatha knew that I had been recording. Mareatha knew because I told her and let her listen to some of the recorded conversations. Nevertheless, Mareatha, the district manager, did not write up nor verbally counsel me for recording conversations or using my cell phone to do the recordings.

27. The next day on January 14, 2010, Carol gave me a write up at 9pm when the store was closed about losing my keys. I had lost my keys on December 31, 2009, and the locks had been changed January 7, 2010. Further, the write up was not dated nor was it signed by Mareatha or Carol or any other manager. I used my smart phone to take a picture of the write up in Carol's presence, but she did not address me having my phone at that time.

28. The day after that on January 15, 2010, I was told by Carol that I could not have my cell phone on the floor. I believed this was in response to me taking the pictures with the cell phone the night before. At the time, we both had our purses and bags on the cash wrap and Carol had her cell phone out.

29. Five days after that, Wednesday, January 20, 2010, at 3:08 pm, Margarita called me at the store and asked me to resign, to accept one month's pay of $2500 and to sign a waiver of

against my EEOC allegations. Margarita told me that the EEOC had found in Cache's favor, that I was "the cause for ALL the tension in the store" and that "nobody wanted to work with me". I asked Margarita if I did not accept the "deal" where would we go from there. She said that she did not know. I decided to take my chances and declined the offer to resign.

30. On January 30, 2010, I had a conversation with Carol. Carol told me that she did not know what was going on with me and that everything she was doing to me was being directed by HR. Carol acknowledged that both she and Mareatha were aware of April's negative attitude and further that she knew that it was not true that not everyone had an issue with me. Carol said she, Janice and Keely did not have any issues with me.

31. On February 3, 2010, Carol left a note for me that reads, "Chica, call me to let me know if you can come in @ 9am on Friday for meeting with Mareatha. Carol". I called Carol and told her I would. I was quite apprehensive about this meeting with Mareatha and Carol and gave Carol a note the next morning on February 4, for Mareatha, asking if I could have a witness or tape the meeting and she said she would get back with me by that evening. I did not hear back from either Carol or Mareatha.

32. On February 5, 2010, a friend came with me to the meeting, but Mareatha said she could not stay. I reminded her that I had asked to record the meeting if I could not have a witness. Mareatha did not give me permission to tape the meeting and she told me that I could not record the meeting. The phone was visible in my hand and I did not turn off the tape recorder on the smart phone and the conversation was recorded.

33. On February 23, 2010, I addressed the Special Order policy with Carol because my name was showing up on a weekly report that I was doing it wrong, along with others. I signed documenting that we went over it on that day. Carol admitted to me that the entire company had been incorrectly handling Special Orders, but that she had gone over the issue with April. I suggested a store meeting to explain it to everyone would be a good idea. Carol said that she had done it wrong for a long time herself and that she still didn't really understand it, but that she had explained it to me the way she knew how. She said she would contact Mareatha and tell her that she went over it with me on February 23. I did not make any mistakes with the Special Orders after February 23.

35. On March 18, 2010, after Carol met with Derhan Watson who gave her the recordings, Carol came to the store in sweat pants and tennis shoes to give me a bogus write up about violating the Special Orders policy. In the write up, Carol writes that on February 6, I "signed a sheet acknowledging that I had read the policy." I did read the policy on that date. However, Carol also writes that I "gave free shipping on Feb 8, 17, and the 22". The issue started being addressed on February 2, 2010, when corporate sent an email to the district managers which advised all of the store managers to go over the policy with their staff. Carol just had me reread the policy and I continued doing it the same way I had been because I still thought I was doing it correctly until my name began appearing on the bad report on February 8, 2010. Although both Carol and Mareatha had knowledge and proof of the records the morning of March 18, 2010, again I was not given a write up or counseled for no cell phone use, but

instead they gave me a write up for violating the special order policy, something that was corrected on February 23. The work schedule was also changed and Carol either had me working by myself or with Janice. I was not scheduled to work with anyone else in the store.

36. On March 26, 2010, Mareatha terminated me for secretly recording them for a period of six months, which she said was gross insubordination and gross misconduct. It was no secret after January 13, 2010 when Mareatha gave me permission to record our conversation and I allowed her to listen to other records that I had on my Blackberry smart phone.

37. Cache's claim that I directly disobeyed Carol telling me to attach coupons to receipts is wrong. What really happened is that on January 30, Carol told me we "had" to staple coupons to the receipts. Again, Carol did not have store meetings for us all to be on the same page and I was being asked to do things that April was not required to do. I was being harassed and written up for matters that made no sense. So, when Carol told me to start stapling coupons, I told her that at times we wouldn't be able to do so because the customers don't always have them present when they are making a purchase because of internet promotions. I also reminded her that stapling coupons was something that we as managers at store 246 did to do to make it easier for us to count the number of coupons used at the end of the day and that it was not company policy or mandatory to do this. Carol responded that she always stapled the coupons which I knew to be untrue. I had asked Carol to put in writing any changes in policy like this one because of the sensitivity of my situation (I was being harassed). She said never mind.

*I declare under penalty of perjury under the laws of the United States of America that the facts set out above are true and correct and within my personal knowledge.*

LaChica King                    01/23/2012

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS -- DALLAS DIVISION

| | | |
|---|---|---|
| LACHICA KING | § | |
| | § | |
| PLAINTIFF, | § | 3:11-CV-0138 |
| | § | |
| V. | § | *JURY TRIAL DEMANDED* |
| | § | |
| CACHE, INC. | § | |
| | § | |
| DEFENDANT. | § | |

### DECLARATION OF MARCIA HILL

1. My name is Marcia Hill, SFC, United States Army. I am an African American female and I live in Grand Prairie, Texas.

2. Being in the military for over 20 years, I traveled all over the U.S. and abroad, and I have experienced Cache retailers all over.

3. In March 2009, I relocated to the Dallas Fort Worth area. Because I lived in Grand Prairie, the Parks Mall was the closest to me.

4. I met LaChica (Chica) King at the Parks Mall Cache the same month I moved to Grand Prairie. I was blown away by the great customer service and impressed with her sales abilities. Because of these traits, I made Cache in the Parks Mall one of my preferred shopping destinations.

5. Although I learned that Chica no longer worked for Cache, I continued to shop there because my positive experiences with her while shopping at Cache. Sometime in April or May, 2010, I went to Cache in the Parks Mall to shop. There was a white jacket I had my eye on and was hoping the Parks had one.

6. The lady with the British accent (whose name I did not know) was on her cell phone at the register, so I helped myself over to the sales area at the back of the store. I had to interrupt her call for assistance.

*I declare under penalty of perjury under the laws of the United States of America that the facts set out above are true and correct and within my personal knowledge.*

_____     12 January 2012
Marcia Hill

ORIGINAL

1

2  UNITED STATES DISTRICT COURT

3  NORTHERN DISTRICT OF TEXAS

4  DALLAS DIVISION

5  - - - - - - - - - - - - - - - - -x

6  LACHICA KING,

7                    Plaintiff,

8      v

9  CACHE, INC.

10                   Defendant.

11  - - - - - - - - - - - - - - - - -x

12                    December 2, 2011

                      1:11 p.m

13

                      1440 Broadway

14                    New York, New York

15

16

17      DEPOSITION (telephonic) of MARGARITA

18  CROASDAILE, taken on behalf of the

19  Plaintiff, held at the above-mentioned

20  time and place, before Dale W. Tice, RPR,

21  a Notary Public of the State of New York,

22  pursuant to Notice of Deposition.

23

24

25

```
 1                CROASDAILE
 2   responsibility to draft employee
 3   handbooks, correct?
 4        A     Yes.
 5        Q     And you put in it the
 6   information that you believe the employees
 7   should know taken from the policy and
 8   procedure manual, correct?
 9        A     If I'm taking it from there,
10   yes.
11        Q     Where else do you get
12   information to put in the employee
13   handbook?
14        A     As far as benefits go, which is
15   part of that handbook, we bring to their
16   attention that we have, for example, we
17   offer medical insurance to all full-time
18   employees.
19        Q     Why do you give at hire all of
20   the employees a copy of the employee
21   handbook?
22        A     So that they are aware and --
23        Q     Aware of what?
24        A     Of how we handle things.  And
25   what we have to offer.
```

1                CROASDAILE

2        Q      And what your policies and your

3    procedures are; is that correct?

4        A      That is correct.

5        Q      Would you agree with me that

6    it's unfair to terminate an employee who

7    violates a company policy that they had

8    not been told about?

9        A      Perhaps.

10       Q      What do you mean "perhaps"?

11       A      Well, your question is, and

12   correct me if I'm wrong, is it unfair for

13   a company to fire someone for a policy

14   that they were not aware of.

15       Q      For violating a policy they were

16   not aware of.  And you said perhaps.

17       A      I said perhaps, yes.  That is

18   what I said.

19       Q      Can you think of a situation in

20   which it would be fair to terminate an

21   employee for violating a policy they had

22   not been told about?

23              MS. KIRBY:  Objection.  Calls

24       for speculation.  But you can answer.

25       A      We get into a he said-she said.

1              CROASDAILE

2    If I give you the handbook to read, okay,

3    and you sign off that you read it, then I

4    don't think that you can come back and

5    tell me that you are not made aware of

6    something, provided.

7        Q      So what you're saying, it's the

8    employee's responsibility to read that

9    employee handbook that you give them when

10   they are hired, correct?

11       A      Yes.

12       Q      And you hold them accountable

13   for everything in that employee handbook,

14   whether they read it or not, don't you?

15       A      Yes.

16       Q      So if they violate a policy they

17   didn't know about because they didn't read

18   it, that's on them, correct?

19       A      That is correct.

20       Q      But any other circumstance where

21   such a policy is not in the handbook,

22   would you agree that it would not be fair

23   to hold the employee accountable?

24       A      I would.

25       Q      Let me back up a minute and sort

```
 1                    CROASDAILE
 2        A       No, ma'am.
 3        Q       Ms. Croasdaile, were you
 4   involved in the termination of April
 5   Baker?
 6        A       No.
 7        Q       Were you involved in the
 8   termination of LaChica King?
 9        A       No.
10        Q       Were you involved in the
11   termination of any loss-prevention issues
12   in Mareatha Hornsby's district that you
13   can recall?
14        A       Not off the top of my head.
15        Q       Okay.  So you can't recall
16   anything about the termination in the
17   Mareatha Hornsby's district in the last
18   three years in which you were involved; is
19   that your testimony?
20        A       Yes, ma'am.
21        Q       Now, how is it determined by
22   Cache when you will get involved in an
23   employee termination?
24            MS. KIRBY:  Objection to vague.
25        As to involvement.
```

1           CROASDAILE

2      Q      Do you understand the question?

3      A      Yes, I understand the question.

4      Q      Can you answer it.

5      A      It would depend on the severity,

6  I guess, of the situation, the

7  circumstances.

8      Q      So as the HR manager, if it's a

9  very serious circumstance, then do you get

10  involved in the employee termination; is

11  that your testimony?

12      A      Yes.

13      Q      Is an EEOC complaint severe?

14           MS. KIRBY:   Objection to

15      mischaracterization.

16      A      Are you expecting me to answer?

17      Q      Only if you can.

18           MS. KIRBY:   Do you understand

19      what that means?  If you understand

20      what she is asking.  I don't.  But if

21      you do, you can answer.

22      A      Well, can you repeat the

23  question or rephrase.

24      Q      Yes, I can.

25           Do you give any kind of

1              CROASDAILE

2      direction to regional managers about when

3      to contact you before doing a termination,

4      or is that left up to the regional

5      manager?

6          A      Again, it depends on the reason

7      for the termination.

8          Q      Well, let me ask it this way

9      then:  If the reason for the termination

10     is a gross violation of policy, would the

11     district manager know to involve you?

12         A      They do.

13         Q      How do they know this?

14         A      It's the way that they have been

15     told.

16         Q      Do they get some training when

17     they become the district manager?

18         A      Not from me, no.

19         Q      Okay.  But they do get some

20     training, you think?

21         A      Oh, I know they get training.

22         Q      Do you know whether or not part

23     of that training is how to deal with

24     personnel issues?

25         A      That I don't know.

```
1                  CROASDAILE
2      Q      Okay.  But they don't get
3  training from you, is your testimony?
4      A      That is right.
5            MS. ALLEN:  Mr. Court Reporter,
6      I'm going to call you back in 10
7      minutes.  We can go off the record
8      then.
9            (Recess taken.)
10           THE WITNESS:  Ms. Allen, I would
11     like to clarify something that I said
12     before.
13           MS. ALLEN:  Okay.
14           THE WITNESS:  I called it the
15     policy and procedure manual and the
16     actual name of it is the store
17     operations and POS manual.
18           MS. ALLEN:  Okay.  Store
19     operation and POS manual?
20           THE WITNESS:  Yes, ma'am.  It's
21     sometimes referred to as the policy
22     and procedures manual.
23           MS. ALLEN:  Okay.
24           THE WITNESS:  Also, at the time
25     that Ms. King was employed, there was
```

1              CROASDAILE

2    recollection, there was no discussion of

3    why you were being called instead of the

4    store manager; is that correct?

5         A      That is correct.

6         Q      To the best of your

7    recollection, there was no complaint

8    lodged by Ms. King about her treatment; is

9    that correct?

10        A      That is correct.

11        Q      When is the next time you talked

12   to Ms. King?

13        A      I am not sure.  I'm not sure.

14        Q      What is the next conversation

15   you remember having with her?

16        A      She called to question the hours

17   that she was given.

18        Q      Tell us what you remember about

19   that conversation?

20        A      At the time I said that we were

21   working with matrix hours and that each

22   store had X amount of hours per week.  I

23   mean, I don't recall the whole

24   conversation.  I really don't.

25        Q      Okay.  But you remember that she

1                    CROASDAILE

2    was questioning not getting enough hours;

3    is that your recollection?

4         A      Yes.

5         Q      And you remember discussing with

6    her that you were working with matrix and

7    each store had a certain number of hours;

8    is that correct?

9         A      Yes.

10        Q      Do you remember anything else

11   about the conversation?

12        A      No.

13        Q      Did Ms. King lodge a complaint

14   at that time about the way she was

15   treated?

16        A      I don't recall.

17        Q      Do you know why she was calling

18   you about her hours at the store as

19   opposed to talking to her store manager?

20        A      No, I don't.

21        Q      Do you remember anything else at

22   all about that conversation?

23        A      No, ma'am.

24        Q      Let me ask you with respect to

25   the two conversations we just talked

1                      CROASDAILE

2    about?

3         A      Would you re -- what is your

4    question again?

5         Q      I'm trying to find out if you

6    have a way to refresh your recollection.

7    And you said there's nothing to write.

8    And I was wondering if you could talk to

9    anyone at your place of employment or

10   elsewhere and sort of jog your memory

11   about what you discussed with LaChica

12   King?

13        A      No.

14        Q      Now, did you talk to LaChica

15   King after these couple of times we just

16   talked about?

17        A      Yes, I did.

18        Q      What did you talk about?

19        A      What comes to mind is having to

20   call Ms. King and ask her to release her

21   keys, to lend her keys to another

22   employee.

23        Q      Tell us about that conversation.

24        A      I received a call stating that

25   Ms. King refused to lend her keys to

```
1                    CROASDAILE
2    that your testimony?
3         A     Yes, that is my testimony.
4         Q     So you didn't call the regional
5    manager to discuss this with her at all?
6         A     No.
7         Q     And you didn't call the store
8    manager either, right?
9         A     No.
10        Q     In your career with Cache, have
11   you ever done that before?
12        A     Yes.
13        Q     Tell us about those other
14   occasions when you did that.
15        A     A case where we have had unhappy
16   employees and it's -- I offer them the
17   opportunity to leave.
18        Q     Okay.  Specifically, can you
19   give us an example of when you did that
20   for another employee other than LaChica
21   King?
22        A     I have done it for employees who
23   are not meeting the requirements of their
24   job and are just unhappy.
25        Q     Can you give us some examples of
```

1                    CROASDAILE

2    when you did that.

3              Let me ask it this way, Ms.

4    Croasdaile:  In the last three years,

5    2008, when LaChica King was asked to or

6    told by you that she could resign and get

7    severance, how many other employees have

8    you made that offer to?

9         A    Since then?

10        Q    Yes.

11        A    Perhaps five.

12        Q    Now, with respect to those five

13   employees who you have called and asked to

14   resign and you would give them a

15   severance, did you get input from any of

16   their store managers or regional managers

17   or district managers?

18        A    Not always, no.

19        Q    So your testimony is that about

20   the approximately five times that you have

21   done this since you did this with LaChica

22   King, you have sometimes gotten some input

23   from the store manager, district manager,

24   or regional manager, correct?

25        A    That is right.

1              CROASDAILE

2        Q      Now, let's talk about 2011.

3              Have you called up an employee

4     and offered them money to resign?

5        A      Not this year, no.

6        Q      What about last year 2010:  You

7     made this offer to LaChica King; isn't

8     that right?

9        A      Yes.

10       Q      Other than making this offer to

11    LaChica King in 2010, did you make it to

12    any other employee last year?

13       A      Yes.

14       Q      Who?

15       A      It's not somebody in Texas.

16       Q      Who was it?

17       A      It was an employee who was not

18    happy with us and the person subsequently

19    left.

20       Q      Who was it?

21       A      You want the name?

22       Q      Yes.

23             MS. KIRBY:  Let me interrupt

24       here.  Was there a confidentiality

25       agreement signed when the person

1                    CROASDAILE

2        accepted the severance?  Was that part

3        of the agreement?

4              THE WITNESS:  Yes.

5              MS. KIRBY:  Then she can't tell

6        you the name due to the

7        confidentiality.

8              MS. ALLEN:  Please lodge an

9        objection, counselor.  And if you

10        instruct her she may not answer, we

11        will certify that and get it to the

12        Court.

13   BY MS. ALLEN:

14        Q     My question is, who did you

15   offer in 2010 severance if they resigned?

16              MS. KIRBY:  I'm going to object.

17        It calls for confidential information.

18        And I instruct you not to give the

19        name.

20        Q     Are you going to give me the

21   name, Ms. Croasdaile?

22        A     No, ma'am.

23        Q     And that is on advice of your

24   counsel?

25        A     Yes.

1              CROASDAILE

2      Q      Where was the person located who

3  you made this offer to?

4      A      There was one in California.

5      Q      Was there another one somewhere

6  else?

7      A      That's the only one that comes

8  to mind right now.

9      Q      When you made this offer to the

10  employee in California to resign and you

11  would pay them severance, had they filed

12  an EEOC complaint against Cache?

13      A      No, ma'am.

14      Q      Did you ask them to sign

15  something waiving their right to sue Cache

16  for discrimination?

17      A      I don't recall at this point.

18      Q      Did you ask Ms. King to waive

19  her rights to file her EEOC complaint in

20  court if she resigned and took the

21  four-week severance?

22      A      Yes, I did.

23      Q      But you don't remember whether

24  you asked the person in California that?

25      A      The difference between the

1              CROASDAILE
2     California case was that the person left
3     before, then came back and complained that
4     certain things had happened.  And we paid
5     her.  It wasn't the case that I said if
6     you quit I will pay you.  The person had
7     already quit.
8          Q     Oh, so this person wasn't even
9     an employee at the time, correct?
10         A     At the time -- yes, she was not.
11         Q     So then other than LaChica King,
12    you can't recall in the last two years,
13    2011 and 2010, calling up an employee and
14    making them an offer to resign and you
15    would pay them four weeks of severance; is
16    that correct?
17         A     I don't remember, yes.
18         Q     What is it that the person in
19    California said had happened and came back
20    to complain about?
21         A     That she was not given time for
22    break.
23         Q     She was not compensated -- it
24    was a wage and hour issue; is that fair to
25    say?

1             CROASDAILE

2        A     No.

3        Q     Okay.  What kind of issue was it

4    then, not given time for a break; what do

5    you mean?

6        A     That she had worked on the

7    clock.

8        Q     Well, don't most employees work

9    on the clock?

10       A     Sorry.  She had -- she was off

11   the clock and worked and so we compensated

12   her for those times.

13       Q     She had a right to be

14   compensated for working whether she was on

15   or off the clock, didn't she?

16       A     Yes, she did.

17       Q     And that is why you decided to

18   pay her for the time that she had worked;

19   is that correct?

20       A     That is correct.

21       Q     Now, how about before LaChica

22   King, going back, what is the next person

23   you offered money to to resign, or have

24   you had anybody other than LaChica King so

25   far?  Before LaChica King, who did you

1                    CROASDAILE

2    make an offer to resign employment and

3    offer severance?

4        A      I can't remember at this point.

5        Q      Can you remember where they were

6    located?

7        A      I cannot remember at this point.

8        Q      Can you even remember whether or

9    not you even made this offer to anyone

10   else other than LaChica King?

11       A      I'm not sure.

12       Q      So then it's possible that the

13   only person you ever made the offer to is

14   LaChica King, right?

15       A      Perhaps.

16       Q      Do you have a way to refresh

17   your recollection on this, some document

18   in which you list employees asked to

19   resign and you would pay severance?

20       A      No, I don't.

21       Q      Did you talk to someone at the

22   company and find out who you may have made

23   this offer to -- could you?

24       A      Yes.

25       Q      Who would you go ask?

1                CROASDAILE

2       A       Truthfully, I don't know at this

3   point.

4       Q       You don't know who you would go

5   ask:  Is that you are saying, you are not

6   sure?

7       A       I'm saying that I don't

8   remember.  So I don't want to give

9   information that is not accurate.

10      Q       It's not about recollection.

11  I'm just trying to find out if you have

12  the ability or capability of refreshing

13  your recollection of this occurring

14  before.  And so my question was, is there

15  anybody that you can talk to at the

16  company and ask that might refresh your

17  recollection?

18      A       I would have to ask the

19  regionals.

20      Q       And how would the regionals know

21  whether or not you had done this?

22      A       Because more than likely I may

23  have asked.  I don't know.  I don't know

24  where I would go.  I would have to go back

25  into my office and try to think who could

```
 1                    CROASDAILE
 2    I possibly have done this and come up with
 3    names.
 4        Q    But it's fair to say that as we
 5    sit here today the only employee that you
 6    can think of that you asked to resign and
 7    pay severance is LaChica King; isn't that
 8    right?
 9        A    Well, that's the only one that I
10    remember at this point, yes.
11        Q    And it's your testimony, just so
12    that I am clear, that this was not
13    something that you talked to anybody at
14    Cache about in advance; is that your
15    testimony?
16        A    Yes.
17        Q    As the HR manager, do you have
18    the ability to spend the company's money
19    in that fashion?
20        A    Up to a certain amount of money,
21    yes.
22        Q    What amount of money is that?
23        A    $3,000.
24        Q    So it's your testimony that as
25    the HR manager you have the authority to
```

1              CROASDAILE

2      A      All I know is that I saw a list

3    of her demands.

4      Q      And you also know that you saw a

5    complaint from her about race

6    discrimination, didn't you?

7              MS. KIRBY:   Objection.

8      Mischaracterizes testimony.

9      A      I do not recall seeing anything

10   about race.

11     Q      To your knowledge, Ms.

12   Croasdaile, did LaChica King ever let you

13   know that she felt that she was being

14   discriminated against based on her race?

15     A      Not to my knowledge, no.

16     Q      What about the EEOC complaint,

17   was that a clue?

18     A      That was stated in there, yes.

19     Q      Okay.   Let me see if I can

20   refresh your recollection.   I have a copy

21   of what Ms. Hornsby said she sent to you

22   from LaChica King.   And this paragraph

23   that reads, "I conclude with months of

24   proven evidence that I have been

25   discriminated against due to race,

1              CROASDAILE

2    religion, and my ability to perform in

3    high levels irregardless of having to work

4    in a hostile environment."

5              Does that refresh your

6    recollection about Ms. King's complaint to

7    you of discrimination?

8         A     It's been two years.

9              MS. ALLEN:  Move to strike as

10        nonresponsive.

11   BY MS. ALLEN:

12        Q     Can you answer the question?

13        A     I said it has been two years.

14   So, no, I do not recall.

15        Q     But the documents that you were

16   sent, you think you would have read it?

17        A     I'm sure I did.

18        Q     So, then, it's fair to hold you

19   accountable for the information contained

20   in that letter, isn't it?

21        A     Yes.

22        Q     Ms. Hornsby, does Cache have a

23   policy that prohibits recording

24   conversations?

25        A     Are you talking to Ms. Hornsby?

1           CROASDAILE

2     Q     Stop.  I apologize.

3           Ms. Croasdaile, does Cache have

4  a policy that prohibits recording

5  conversations by the employee who

6  participates in the conversation?

7     A     Yes, we do.

8     Q     Where is that policy located?

9     A     It is in the policy, in the

10  manual.

11    Q     Let me stop you for just a

12  moment and ask you, when was this policy

13  adopted?

14    A     We have had a policy about

15  taping conversations as far back as 2006

16  maybe.  I'm not sure about the year.  But

17  it's not recently.

18    Q     So this is a written policy that

19  deals with taping conversations; is that

20  your testimony?

21    A     Yes, ma'am.

22    Q     When is the last time you have

23  seen this written policy?

24    A     I saw it as recently as a week

25  or so ago.  Maybe this week.

1                    CROASDAILE

2    store.

3        Q       Anywhere in the store?

4        A       On our premises.

5        Q       So it's your testimony that

6    there is a policy, a Cache policy, that's

7    written that prohibits tape recording

8    conversations anywhere on Cache premises;

9    is that right?

10       A       It may not say "premises."  I

11   know it says "sales floor."

12       Q       But there is a policy that

13   prohibits tape recording conversations on

14   the sales floor; is that right?

15       A       Yes, I believe so.

16       Q       Now, were Ms. Hornsby and Ms.

17   King on the sales floor when Ms. Hornsby

18   gave Ms. King permission to tape the

19   conversation?

20       A       I don't know.

21       Q       Then why did you tell Ms.

22   Hornsby that there would be no

23   conversations taped?  That had nothing to

24   do with being on the sales floor.

25       A       It's not something that we do.

1           CROASDAILE

2      Q      Why not?

3      A      We don't.  I don't know where

4  the origin of it is, but it is something

5  that we do not do.

6      Q      We do not tape record

7  conversations?

8      A      No.

9      Q      I beg your pardon?

10     A      I said no.

11     Q      Now, is it your testimony that

12  Mareatha Hornsby violated the procedure

13  for district manager when she permitted

14  Ms. King to tape record the conversation

15  that day?

16     A      Ms. Allen, I don't know why Ms.

17  Hornsby allowed Ms. King to record the

18  conversation.  I don't.

19          MS. ALLEN:  I move to strike as

20      nonresponsive.  Can the reporter read

21      back the question.

22          (The question was read by the

23      court reporter as recorded above.)

24     A      I don't know.  So did she

25  violate it?  Yes.  Was there a reason why

Page 31

1                        DWIN
2    they can put them in the employee's file.
3    But a lot of the conversations really are
4    verbal discussions.
5         Q      Okay.  I think that is my
6    question there.  Let's back up for a
7    minute to number two.  And it is about a
8    policy that prohibits an employee from
9    tape recording the conversation with a
10   co-worker or superior.
11             Are you aware of such a policy?
12        A      The policy that is in place does
13   not say those exact words that you just
14   said.  The policy that actually is written
15   now is that there's no unauthorized video
16   recording or audio recording of either
17   customers or employees.  So it doesn't use
18   the word superior.
19        Q      Okay.  So the policy in effect
20   now says, "There's to be no unauthorized
21   video or audio recordings of customers or
22   employees?"
23        A      Correct.
24        Q      When was the policy that you
25   testified there would be no unauthorized

1              DWIN

2    video or audio recording of customers or

3    employees adopted?

4       A     It was adopted in practice many

5    years ago back when technology really

6    advanced to the point where everyone had a

7    smart phone that could do these types of

8    things.  In terms of it being -- when we

9    updated our handbook last time we made

10   sure to include it.

11      Q     Let me find out the answer to my

12   question, which is when was the policy

13   adopted that we were talking about, that

14   is in writing that says no unauthorized

15   videotaping or audio recording of

16   customers or employees?  That is the

17   policy we are talking about right now.

18      A     Yes.  The date on the employee

19   handbook, meaning the date it was sent out

20   was 2010.

21      Q     Was there a month?

22      A     It was before June.  Or it was

23   either March or May, I think.  It was

24   early 2010.

25      Q     So early 2010 Cache adopted

Page 33

```
 1                    DWIN
 2    written policy which reads that there is
 3    to be no unauthorized video or audio
 4    recordings of customers or employees; is
 5    that right?
 6        A    I might be getting a word wrong.
 7    That is not the whole sentence.  That is
 8    part of a whole list of things not to do.
 9    I don't want to say when the policy became
10    enacted.  It is just that is the date that
11    is on the employee handbook that we are
12    discussing.
13        Q    Was this policy that we were
14    discussing in the handbook prior to 2010?
15        A    No.  Because the previous
16    version of the handbook was from 2002.
17        Q    So your testimony is you updated
18    the handbook in 2010 and the prior
19    updating was 2002, correct?
20        A    That is correct.
21        Q    And there was no policies
22    regarding unauthorized video or audio
23    recording in the 2002 employee handbook;
24    is that right?
25        A    That is correct.
```

Page 34

1              DWIN

2      Q      But there is such a policy in

3   the 2010 employee handbook?

4      A      Yes.

5          MS. ALLEN:  May I ask your

6      lawyer if I have been given a --

7          MS. KIRBY:  The new employee

8      handbook.  I objected to that was

9      irrelevant.  But I can get it to you.

10          MS. ALLEN:  Okay.  I request

11      that you get that to me.

12   BY MS. ALLEN:

13      Q      Now, when you say it was a

14   policy in practice when you say not to

15   record video or smart phones, tell me what

16   you mean by that?

17      A      I know it was a policy that was

18   in place.  I'm giving you the date it was

19   put into writing.  But as technology

20   advanced, there's more and more ways to

21   really record and videotape.  Back in

22   2002, I don't even know if Blackberrys

23   were around back then, but I know when

24   they first came out they didn't even have

25   the camera.  It was just E-mail.  I think

1                    DWIN

2   we have gotten to the point where we are

3   just more specific with all of the things

4   that you can do based on what is

5   available.   I couldn't tell you the exact

6   date it was put into practice originally.

7   But we have had policies that were in

8   writing that I didn't know the dates to in

9   terms of no photography allowed in our

10  stores.   That was writing, I believe the

11  date on that was 2006 or earlier.

12          In the employee handbook, the

13  2002 version, which was the one I was just

14  referring to, there is a policy for -- it

15  was either handbook or it was in the store

16  operations manual that all employees cell

17  phones must be turned off and kept in the

18  back room.

19          So we did speak to other types

20  of not using technology on the sales floor

21  and in the store.

22          MS. ALLEN:   Let me move to

23      strike as nonresponsive.

24  BY MS. ALLEN:

25      Q    The testimony which I asked you